NONCONFIDENTIAL

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| DAK AMERICAS LLC,<br>INDORAMA VENTURES USA, INC., and<br>NAN YA PLASTICS CORPORATION, AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NOVATEX LIMITED, G-PAC CORPORATION,<br>NIAGARA BOTTLING, LLC, and iRESIN, LLC,<br><br>Defendant-Intervenors. | ) | Court No. 18-00238 |

**PLAINTIFFS' RULE 56.2 MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

PAUL C. ROSENTHAL
KATHLEEN W. CANNON
DAVID C. SMITH
BROOKE M. RINGEL
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Plaintiffs DAK Americas LLC, Indorama Ventures USA, Inc., and Nan Ya Plastics Corporation, America

May 16, 2019

**NONCONFIDENTIAL**

## Table of Contents

**Page**

ADMINISTRATIVE REVIEW UNDER DETERMINATION ........ 1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ........ 2

STATEMENT OF FACTS ........ 4

STANDARD OF REVIEW ........ 9

ARGUMENT ........ 10

I. THE COMMISSION'S FINDING THAT SUBJECT IMPORTS DID NOT SIGNIFICANTLY UNDERSELL U.S. PRODUCER PRICES IS UNFOUNDED ........ 10

A. The Commission Has Recognized in This Case and Previously That Price Drives Sales in the U.S. PET Resin Market ........ 11

B. The Commission's Finding That Subject Imports Did Not Significantly Undercut U.S. Producer Prices Is Not Supported by Substantial Evidence or In Accordance With Law ........ 15

1. In Finding No Significant Underselling by Imports, the Commission Failed to Explain How Myriad Purchaser Reports and Evidence of Underselling by Subject Imports Were All "Outweighed" by the Results of Its Indirect Pricing Comparisons ........ 15

a. Purchaser Rankings Comparing the U.S. Product with Subject Imports Show Import Prices Were Lower Than U.S. Prices ........ 16

b. The Commission Failed To Address Reports by the Majority of Purchasers That They Shifted to Subject Imports That Were Lower Priced Than the U.S. Product ........ 18

c. The Commission Did Not Reconcile the Import Market Share Surge at the U.S. Industry's Expense With Its Finding of Overselling by Subject Imports ........ 21

NONCONFIDENTIAL

**Table of Contents**
(continued)

**Page**


d. The Commission Wrongly Ignored Importer Pricing Data Showing Underselling on Direct Import Sales as Being "Outweighed" by the Indirect Pricing Analysis ..... 22

e. The Commission's Decision to Disregard Key Record Evidence Showing Import Underselling Was Inconsistent With Its Obligation to Consider the Record as a Whole ..... 23

2. The Commission's Quarterly Indirect Importer Pricing Analysis Is Flawed ..... 25

3. The Commission Failed to Articulate How It Determined That the Level of Underselling It Found Was Not "Significant" in This Industry ..... 30

II. THE COMMISSION ERRED IN FINDING THAT DOMESTIC SUPPLY CONSTRAINTS EXPLAINED THE SUBJECT IMPORT VOLUME SURGE IN 2016 ..... 34

A. There Was No Supply Shortage When Subject Imports Surged into the U.S. Market in 2016 to Replace PET Resin Imports from Canada, China, India, and Oman ..... 34

B. The Commission Ignored Substantial Evidence That Any Domestic Supply Constraints Did Not Occur Until After the 2016 Subject Import Surge ..... 37

1. Importer and Purchasers Reports on Which the Commission Relied Do Not Demonstrate a Supply Shortage in 2016 ..... 38

2. Weather Events Cited by the Commission Did Not Cause Supply Shortages in 2016 ..... 41

3. Domestic Producers' PET Resin Imports Are Not Evidence of Supply Shortages in 2016 ..... 44

**Table of Contents**
(continued)

**Page**

III. THE COMMISSION'S FINDING THAT SUBJECT IMPORTS DID NOT HAVE A SIGNIFICANT ADVERSE IMPACT ON THE DOMESTIC INDUSTRY IS ALSO IN ERROR BECAUSE IT WAS DRIVEN BY ITS UNSUPPORTED FINDING OF NO SIGNIFICANT UNDERSELLING ........ 47

CONCLUSION ........ 51

# TABLE OF AUTHORITIES

Page(s)

## Cases

Alberta Pork Producers Marketing Bd. v. United States
669 F. Supp. 445 (Ct. Int'l Trade 1987) .......... 30

Altx, Inc. v. United States,
167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) .......... 10, 21, 23, 25, 31

Companhia Paulista de Ferro-Ligas v. United States,
20 CIT 473 (1996) .......... 33

Dastech Int'l v. USITC,
963 F. Supp. 1220 (Ct. Int'l Trade 1997) .......... 10, 24

Diamond Sawblades Mfrs. Coalition v. United States,
219 F. Supp. 3d 1368, 1375 (Ct. Int'l Trade 2017) .......... 43

Hynix Semiconductor, Inc. v. United States,
431 F. Supp. 2d 1301 (Ct. Int'l Trade 2006) .......... 31

Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,
463 U.S. 29 (1983) .......... 10, 24-25, 50

Nippon Steel Corp. v. United States,
301 F. Supp. 2d 1355 (Ct. Int'l Trade 2003) .......... 49

Nippon Steel Corp. v. United States,
337 F.3d 1373 (Fed. Cir. 2003) .......... 9

Rhone Poulenc, Inc. v. United States,
899 F.2d 1185 (Fed. Cir. 1990) .......... 30

Suramerica de Aleaciones Laminadas, C.A. v. United States,
44 F.3d 978 (Fed. Cir. 1994) .......... 9

Tropicana Prods., Inc. v. United States,
484 F. Supp. 2d 1330 (Ct. Int'l Trade 2007) .......... 41, 43, 49, 50

Universal Camera Corp. v. NLRB,
340 U.S. 474 (1951) .......... 9, 11

Usinor v. United States,
26 CIT 767 (2002) .......... 10, 11, 25

USX Corp. v. United States,
655 F. Supp. 487 (Ct. Int'l Trade 1987) .......... 31

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) .......... 9

19 U.S.C. § 1677(7)(C)(i)-(iii) .......... 10

19 U.S.C. § 1677(7)(C)(ii) .......... 20, 31

19 U.S.C. § 1677f(i)(3)(B) .......... 10

## Legislative

Statement of Administrative Action ("SAA"),
H.R. Doc. No. 103-316, at 870, reprinted in 1994 U.S.C.C.A.N. at 4199 .......... 30

S. Rep. No. 249, 96th Cong., 1st Sess. 88 (1979),
reprinted in 1979 U.S.C.C.A.N. 381, 474 .......... 31

## Administrative Determinations

Carbon and Certain Alloy Steel Wire Rod from Belarus, et al.,
USITC Pub. 4752 (2018) .......... 28

Certain Corrosion-Resistant Steel Products from China, et al.,
USITC Pub. 4620 (2016) .......... 43, 44, 47

Certain Hot-Rolled Steel Flat Products from Austria, et al.,
USITC Pub. 4638 (2016) .......... 32

Certain Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from China,
USITC Pub. 4190 (2010) .......... 28

Certain Stainless Steel Plate from Belgium et al.,
USITC Pub. 3188 (1999) .......... 32

Certain Steel Nails from China,
USITC Pub. 4022 (2008) .......... 32

Cold-Rolled Steel Flat Products from China and Japan,
USITC Pub. 4619 (2016) .......... 44

Low Melt Polyester Staple Fiber from Korea and Taiwan,
USITC Pub. 4808 (2018) .......... 28

PET Resin from Canada, et al.,
USITC Pub. 4604 (2016) .......... *passim*

Polyethylene Terephthalate Resin from Brazil, et al.,
USITC Pub. 4835 (Nov. 2018) (PR 209) ("Final Determination") and
Confidential Views (CR 342, PR 209) .......... *passim*

**Miscellaneous**

Certain Polyethylene Terephthalate Resin from Canada, the People's Republic of China, India, and the Sultanate of Oman: Amended Final Affirmative Antidumping Determination (Sultanate of Oman) and Antidumping Duty Orders, 81 Fed. Reg. 27,979 (Dep't Commerce May 6, 2016) .......... *passim*

Certain Polyethylene Terephthalate Resin from India and the People's Republic of China: Countervailing Duty Order (India) and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order (People's Republic of China), 81 Fed. Reg. 27,977 (Dep't Commerce May 6, 2016) .......... *passim*

Polyethylene Terephthalate Resin From Brazil, Indonesia, Korea, Pakistan, and Taiwan; Determinations, 83 Fed. Reg. 56,377
(USITC Nov. 13, 2018) (PR 211) .......... 1

DAK Americas LLC, Indorama Ventures USA, Inc., and Nan Ya Plastics Corporation, America (collectively, "Plaintiffs" or "Petitioners") submit this Memorandum of Law in support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record. In this action, Plaintiffs challenge the negative final injury determination by the U.S. International Trade Commission (hereinafter "Commission" or "ITC") in the antidumping duty investigations involving polyethylene terephthalate ("PET") resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan (hereinafter "the subject countries"). Because the Commission's final determination is not supported by substantial evidence and is not otherwise in accordance with law, Plaintiffs respectfully request that this Court remand the underlying administrative determination and instruct the Commission to reconsider its findings on the issues challenged by Plaintiffs.

## ADMINISTRATIVE REVIEW UNDER DETERMINATION

This action involves a challenge to certain aspects of the Commission's final negative determination in the antidumping duty investigations in Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan, which examined whether the domestic PET resin industry was materially injured or threatened with material injury by reason of subject imports. See Confidential Views of the Commission ("Views") (CR 342, PR 209);[1] Polyethylene Terephthalate Resin from Brazil, et al., USITC Pub. 4835 (Final) (Nov. 2018) ("Final Determination") (PR 209); ITC Final Staff Report ("FSR") (CR 342, PR 209). The Commission's determination was published in the Federal Register on November 13, 2018. 83 Fed. Reg. 56,377 (USITC Nov. 13, 2018) (PR 211). Specifically, Plaintiffs challenge the

---

1 Documents in the administrative record are cited using the description provided in the Index to the Administrative Record filed with the Court on March 6, 2019 (ECF No. 36). Documents are cited by their confidential and/or public record number, as appropriate (i.e., "(CR__)" and "(PR __)").

Commission's findings that (1) subject imports did not have significant adverse price effects, and (2) subject imports did not have a significant adverse impact on the domestic PET resin industry.

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

**1. Whether the Commission's determination that subject imports "generally oversold" the domestic product is supported by substantial evidence and in accordance with law?**

No. The Commission erred in its analysis of a major statutory factor – whether subject imports significantly undercut the prices of U.S. producers – that it was required to consider in reaching its injury determination in this case. Record evidence establishes that (1) 16 out of 25 purchasers ranked imports as priced lower than the U.S. product; (2) 11 of 19 purchasers that reported shifting sales from U.S. producers to subject imports stated the subject imports were lower priced; (3) quarterly direct import pricing data showed underselling in the vast majority of comparisons; (4) in a market the Commission found to be driven by price, subject imports gained market share at the U.S. industry's expense; and (5) indirect quarterly price comparisons based on data of eight importers showed underselling by imports in one-third of comparisons. Despite this record evidence, the Commission found that subject imports "generally oversold" the domestic product. In reaching this conclusion, the Commission did not consider the record evidence as a whole, as the law requires, but focused solely on the indirect quarterly pricing data of the eight importers and found the level of underselling to be insignificant. Not only did the Commission fail to address the myriad errors in the pricing data on which it did rely, it improperly ignored the underselling by direct imports, which importers relied on precisely because they were lower priced. Finally, the Commission did not explain how it concluded that in the context of this price-sensitive industry, the underselling that it did find was not "significant." As a result, the Commission's finding that subject imports did not significantly

undersell the domestic product is unsupported by substantial evidence and not in accordance with law.

2. **Whether the Commission's determination that the subject imports' volume and market share gains at the expense of the domestic industry were due to domestic supply constraints rather than due to significant underselling by subject imports is supported by substantial evidence?**

No. Contrary to the Commission's finding, there was no supply shortage in 2016 when subject imports surged in to replace PET resin imports from China, Canada, India, and Oman, which were the subject of a March 2015 petition and placed under antidumping and countervailing duty orders in May 2016. Instead, the record overwhelmingly demonstrates that any identifiable supply constraints did not occur until September 2017, well after the subject import surge. The Commission erred in relying on importer and purchaser reports related to supply issues and weather disruptions, none of which support any domestic supply interruptions in 2016, and ignored an even larger number of importer and purchaser reports of no supply constraints during the period of investigation. The Commission did not explain admissions by respondents, under oath, that no significant supply issues occurred until after the import surge. The Commission's conclusion that domestic producers' imports revealed a supply shortage driving the subject import surge also lacked substantial evidentiary support. Thus, the Commission's determination that a supply shortage in 2016 explained how higher-priced subject imports captured market share from the domestic industry that year is unsupported by substantial evidence.

3. **Whether the Commission's determination that the subject imports did not have a significant adverse impact on the domestic industry – based on its finding of a lack of significant import underselling and of domestic supply constraints – was supported by substantial evidence and in accordance with law?**

No. Despite finding that the domestic industry was suffering declines in statutory trade and financial variables, and that subject imports had increased in volume and gained market share at the U.S. industry's expense, the Commission found no adverse impact by subject imports. The Commission's conclusion was expressly predicated on its finding of a lack of significant underselling by subject imports and on its finding that domestic supply constraints explained the import surge. Thus, the errors in Issues 1 and 2 above led to the Commission's erroneous conclusion that subject imports had no adverse impact on the domestic industry, in contravention of substantial record evidence and of law.

## STATEMENT OF FACTS

PET resin is a polyester polymer – plastic – material that is used to make water and soda bottles, among other common products. Large beverage companies buy millions of pounds of PET resin to produce their plastic bottles. In March 2015, U.S. producers of PET resin sought relief from unfairly-traded imports from Canada, China, India, and Oman. PET Resin from Canada, et al., USITC Pub. 4604 (Final) (2016), at 3. In that case, the Commission determined that PET resin imports from those four countries had materially injured the domestic PET resin industry because imports of PET resin, a fungible and price-sensitive product, gained sales and market share from domestic producers on the basis of price. See id. at 19, 28-29. As a result, the

U.S. Department of Commerce ("Commerce") published antidumping and countervailing duty orders on May 6, 2016.[2]

Even before issuance of the orders on the four countries subject to the prior investigation, PET resin imports subject to the instant case began to rapidly enter the U.S. market. Subject imports surged between 2015, when the first case was filed, and 2016, increasing by almost 450 million pounds. ITC Final Staff Report ("FSR") at IV-5 (CR 342, PR 209). Through the first half of 2017, subject imports increased by another [ ] pounds. Prelim. Staff Rep. at C-3 (CR 150, PR 89). By mid-2017, subject imports exceeded the 2014 peak level of PET resin imports from Canada, China, India, and Oman; subject imports replaced the prior unfairly-traded PET resin imports, and then some. The Commission found the same conditions of competition here as in the prior investigation – namely, that PET resin is highly substitutable, that the U.S. PET resin market is price-sensitive, and that subject imports from Brazil, Indonesia, Korea, Pakistan, and Taiwan (the "subject imports") gained significant market share at the domestic industry's expense. Views at 29-30, 45, 46 (CR 342, PR 209).

Faced with this onslaught, the domestic PET resin industry filed antidumping petitions against imports from the five subject countries on September 26, 2017. Just prior to the petition filing, M&G Polymers, the smallest company in the domestic industry (representing less than 10 percent of domestic production) announced that it would be ceasing production at its sole U.S.

---

[2] See Certain Polyethylene Terephthalate Resin from Canada, the People's Republic of China, India, and the Sultanate of Oman: Amended Final Affirmative Antidumping Determination (Sultanate of Oman) and Antidumping Duty Orders, 81 Fed. Reg. 27,979 (Dep't Commerce May 6, 2016; Certain Polyethylene Terephthalate Resin from India and the People's Republic of China: Countervailing Duty Order (India) and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order (People's Republic of China), 81 Fed. Reg. 27,977 (Dep't Commerce May 6, 2016)

plant in Apple Grove, West Virginia facility. See Transcript of ITC Hearing conducted on Sept. 13, 2018 ("Tr.") (PR 213) at 37, 53; FSR at III-7 (CR 342, PR 209). At the preliminary staff conference, Mr. Fred Fournier, M&G's Executive Director of Global Marketing and Sales, testified that his company's financial difficulties were caused by large cost overruns at the new facility it was building in Corpus Christie, Texas, and that the lower revenues M&G was earning were due to competition with low-priced imports. Transcript of ITC Staff Conference conducted on Oct. 17, 2017 ("Conf. Tr.") (PR 81) at 33-35. After the staff conference, on October 24, 2017, M&G filed for Chapter 11 bankruptcy and closed its Apple Grove facility. FSR at III-7 (CR 342, PR 209). The Commission subsequently determined that the domestic industry as a whole (and, as the record shows, the industry even without M&G) suffered a decline in its financial performance, characterized by low capacity utilization rates, lost market share, and rapidly deteriorating profitability. See Views at 42-45 & n.173 (CR 342, PR 209); Petitioners' Posthearing Brief (Sept. 21, 2018) ("Pet. Posthrg. Brf.") at 11, Exh. 2, slide 12 (CR 308, PR 189).

Despite the Commission's finding that the U.S. PET resin market remained highly price-sensitive, that subject imports' rapid increase and market share gains came at the domestic industry's expense, and that there was a steep decline in the domestic industry's financial condition, the Commission reached a negative determination. Views at 30, 45-47 (CR 342, PR 209). The Commission stated that the presence of subject imports did not "explain{} the decline in the industry's financial performance during the POI." Id. at 45. The Commission reached this conclusion because it found that subject imports oversold the domestic product. Id. at 34. The Commission relied solely on the quarterly indirect pricing data provided by a relatively small number of importers in finding overselling. Id. at 33.

Yet, U.S. purchasers and importers were very clear that they switched to subject imports and that those imports were lower priced than the U.S. product. Quarterly direct pricing data of importers showed overwhelming underselling. FSR at V-11-V-14 (CR 342, PR 209). Purchasers reported in questionnaire responses that subject imports were lower-priced. See generally U.S. Purch. QRs at IV-3; infra section I.B.1.a. & Footnote 7. Importer [

] Mr. Safieddin of Niagara Bottling admitted he turned to subject imports after the first group of PET resin imports receded in response to the prior case and orders: "In the case of the first ruling there were plenty of origins from which we could still import." Tr. at 213-14 (PR 213). Indeed, purchasers acknowledged that [ ] pounds were shifted from the domestic producers to subject imports and that those imports were lower priced. See FSR at V-30-V-33 (CR 342, PR 209); infra section I.B.1.b.

Importers and purchasers also admitted that the prevailing condition of competition in the U.S. PET resin market during the underlying investigation was the same as it was in the prior case: purchases are made on the basis of price. One of the largest purchasers of PET resin, [ ] and that subject imports [

] Other purchasers and importers reported similarly. See infra sections I.A., IB.1. The overwhelming responses of purchasers and importers indicated that subject imports were lower priced than the U.S. product and they used those low prices to extract low prices from the domestic industry. See, e.g., Niagara Posthrg. Brf. at [ ]

(CR 309, PR 191). When domestic producers did not lower their prices enough, importers and purchasers bought from the subject countries. See Pet. Posthrg. Brf. at Exh. 3, paras. 4, 10-12, 18-19; Exh. 5, para. 6; Exh. 8, paras. 4-18, 20-22 (CR 308, PR 189).

Based on its overselling finding notwithstanding the substantial evidence to the contrary, the Commission concluded that "any market share shifts . . . were due to factors other than price." Views at 46 (CR 342, PR 209). The Commission reasoned that higher-priced subject import gains could only be explained by subject imports' surge into the market in response to domestic supply shortages. Id. at 46-47. During the October 2017 staff conference, however, Mr. Rosenthal, counsel to Petitioners, acknowledged that the recent closure of the M&G facility had created "tightness" in the market, but that tightness had only arisen in September 2017. Conf. Tr. at 89 (PR 81). At the final hearing, Ms. Esserman, respondents' counsel, acknowledged this fact, admitting that the supply shortage did not begin until September 2017 and that there was no shortage that caused the surge of imports in 2015 and 2016. Tr. at 171-72, 187 (PR 213). Witnesses for the respondents corroborated this view. Id. at 173. Numerous record statements by importers and purchasers indicated that any tightness in supply occurred after the M&G shutdown, and were not the cause of the 2016 subject import surge. See infra section II.

In its Final Determination, the Commission recognized that the domestic industry was in an injured condition. The domestic industry lost market share to the subject imports, its capacity utilization declined, and its financial condition deteriorated. See Views at 44-45 (CR 342, PR 209). Every measure of profitability – gross, operating, and net – plummeted over the period of investigation. Views at 44 (CR 342, PR 209); FSR at C-4 (CR 342, PR 209). In particular, producers' net income fell from [ ] in 2015 to [

] in 2017. Id. Nonetheless, the Commission made a negative injury determination predicated on a finding of subject import overselling, explained by a supply shortage that did not occur until after the subject import surge. The Commission did not explain how overselling by U.S. producers in a market allegedly facing tight supply could lead to the financial deterioration the Commission found. This appeal followed.

## STANDARD OF REVIEW

The statute requires this Court to "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "'more than a mere scintilla'" and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). In determining whether an agency has identified substantial evidence to support its determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Indeed, in Universal Camera, the U.S. Supreme Court rejected an overly deferential manner of applying the substantial evidence test, instead emphasizing that an agency determination may not be sustained "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." 340 U.S. at 487.

The statute also requires that the Commission provide an "explanation of the basis for its determination that addresses relevant arguments" made by interested parties concerning volume,

price effects, and impact on the domestic industry. 19 U.S.C. § 1677f(i)(3)(B). Flowing from this requirement, the standard of review also mandates that the Commission "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). While an administrative agency is presumed to have considered all evidence on the record, Dastech Int'l v. USITC, 963 F. Supp. 1220, 1226 (Ct. Int'l Trade 1997), "it must address significant arguments and evidence which seriously undermines its reasoning and conclusions," Altx, Inc. v. United States, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001). See also Usinor v. United States, 26 CIT 767, 783 (2002) (discussing agencies' "responsibility to explain or counter salient evidence that militates against {their} conclusions").

## ARGUMENT

### I. THE COMMISSION'S FINDING THAT SUBJECT IMPORTS DID NOT SIGNIFICANTLY UNDERSELL U.S. PRODUCER PRICES IS UNFOUNDED

The statute sets forth three factors that the Commission must consider in reaching its injury determination: (1) the volume of subject imports; (2) the prices of subject imports; and (3) the impact of subject imports on the domestic industry. 19 U.S.C. § 1677(7)(C)(i)-(iii). Here, the Commission found the first statutory factor was met (Views at 31-32 (CR 342, PR 209)), found the second statutory factor was not met due to a lack of import underselling (id. at 37-38), and found that the impact factor was not met due also to the lack of import underselling (id. at 41-42 n.161, 45). Specifically, the Commission recognized that the volume of subject imports was significant and increasing both in absolute terms and relative to consumption. Id. at 31-32. The Commission's further finding that subject imports generally oversold U.S. producer prices,

however, led it to conclude that any import volume increases and resultant market share lost by the U.S. industry was not due to price. Id. at 37-38, 45. With respect to the final statutory factor, the Commission found that the lack of underselling "is particularly probative to an assessment of the impact of subject imports" and that the "higher priced" subject imports did not have a significant adverse impact on the U.S. industry. Id. at 42 n.161, 45-46. Thus, the Commission's finding of a lack of underselling by subject imports was the linchpin to its negative decision.

The Commission's finding of no significant underselling, in turn, was predicated entirely on its quarterly indirect import price comparison analysis without regard for extensive contrary record evidence from purchasers and direct importers, who overwhelmingly reported that subject imports were lower priced. Similarly, the Commission's finding disregarded record evidence that in the price-sensitive PET resin market where price drives sales, it was subject imports – not the U.S. industry – that gained market share at a time when no U.S. supply constraints existed, further evidence of the underselling by subject imports. The Commission's myopic focus on the results of its indirect pricing analysis – despite obvious flaw in the data – and its failure to consider the "whole record" in reaching its finding of no significant underselling cannot be sustained. As detailed above, the Commission was required to consider evidence that fairly detracts from its conclusion (Universal Camera, 340 U.S. at 478, 488), and to "explain or counter salient evidence that militates against its conclusions." Usinor, 26 CIT at 783. Its failure to do so renders its decision unsupported by substantial evidence and not in accordance with law.

## A. The Commission Has Recognized in This Case and Previously That Price Drives Sales in the U.S. PET Resin Market

The Commission determined that price drives purchasing decisions in the U.S. PET resin market. See Views at 29-30 & n.119 (CR 342, PR 209). Price is a critical purchasing factor

because PET resin is highly interchangeable regardless of source. The Commission found a "high degree of substitutability between the domestic like product and subject imports." Id. at 29, 33. Record data show that PET resin is a "large-volume, commodity-grade" product that is manufactured to standard industry specifications and dimensions – qualities that contribute to the product's substitutability. See id. at 8; FSR at I-12-I-13 (CR 342, PR 209). The record further shows that all responding U.S. producers and "the vast majority of importers and purchasers" reported PET resin from different sources to be "always" or "frequently" interchangeable. Views at 18 (CR 342, PR 209). Indeed, 19 of 25 responding U.S. purchasers reported that, since 2015, they had purchased imported PET resin from subject countries instead of domestically-produced PET resin, demonstrating that U.S. producers and importers of subject PET resin are competing for sales to the same U.S. customers. See FSR at V-30 (CR 342, PR 209); Petitioners' Prehearing Brief (Sept. 6, 2018) ("Pet. Prehrg. Brf.") at Exh. 2 (CR 282, PR 166) (showing substantial overlap in U.S. customers to whom domestic producers and importers sell PET resin).

This significant level of interchangeability makes price a key purchasing factor in the U.S. PET resin market. See Views at 33 (CR 342, PR 209). When asked to list the top three factors they consider when buying PET resin, U.S. purchasers identified price more than any other factor. FSR at II-23 (CR 342, PR 209). Twenty-two of 25 purchasers stated that price is a "very important" purchasing factor for PET resin. Id. at II-24. The majority of purchasers reported that they "always" or "usually" purchase the lowest-priced product; none reported that they "never" purchase the lowest-priced product. Id. at II-23. U.S. purchasers demonstrated that price is key in other ways as well. [ ] U.S. purchaser of PET resin, [ ]

**NONCONFIDENTIAL**

confirmed that domestic PET resin and subject imports are highly interchangeable, making price paramount in its purchasing decisions:

> [
>
> ]

[ ] U.S. Purch. QR at [ ] (CR 214). [ ] also reported that it [ ] Id. at III-26, III-28, [ ] Other purchasers such as [ ] See Pet. Posthrg. Brf. at Exh. 8, at 3 and Att. 1 (CR 308; PR 189).[3]

The record here and the Commission's findings as set forth in the Views echo the prior Commission determination regarding the substitutability of PET resin from all sources and the price-sensitivity of the U.S. PET resin market. In its final determination in 2016 in the investigation on PET resin from Canada, China, India, and Oman, the Commission explained:

---

3 At the Commission's hearing, domestic industry witnesses further confirmed that the price-sensitive nature of the U.S. PET resin market caused their companies to lose sales to subject imports on the basis of price. See Tr. at 22, 28, 32 (PR 213).

> There is a moderate to high degree of substitutability between the domestic like product and cumulated subject imports. Most responding domestic producers, importers, and purchasers reported that product from all countries was either "always" or "frequently" interchangeable. We also find that price is an important consideration for purchasers of PET resin. Purchasers most frequently cited price as the top purchasing factor, and all 18 purchasers reported that price was a "very important" purchasing factor. Non-price factors were reported as being less important in purchasing decisions. When asked whether differences other than price are ever significant in their sales in choosing between PET resin from different sources, all domestic producers and a majority of importers and purchasers answered that non-price differences were "sometimes" or "never" important.

Polyethylene Terephthalate (PET) Resin from Canada, et al., USITC Pub. 4604 (Final) (2016), at 19. Thus, the Commission again confirmed in this case what it had previously recognized as to the price-based nature of PET resin sales.

Despite its continued recognition of this important condition of competition, the Commission's Final Determination failed to recognize the price-driven nature of subject imports' market share gains in this price-sensitive market. In the Final Determination, the Commission found that the volume of, and increase in, subject imports, both absolutely and relative to consumption, were significant. Views at 31-32. The Commission also recognized that increasing volumes of subject imports gained market share at the domestic industry's expense. Id. at 32. Nonetheless, the Commission did not find that these market share gains were price driven. Id. at 45-46. As more fully discussed below, the Commission's finding that a significant volume of subject imports captured market share from the domestic producers for reasons other than price in a highly price-sensitive market is not supported by substantial evidence.

### B. The Commission's Finding That Subject Imports Did Not Significantly Undercut U.S. Producer Prices Is Not Supported by Substantial Evidence or In Accordance With Law

The Commission's finding of a lack of significant underselling was predicated entirely on its comparisons of the quarterly indirect import price data with U.S. producer quarterly prices, the results of which were inconsistent with all other record data. The Commission did not explain how, when considering the record as a whole, the degree of overselling shown in the indirect pricing comparisons outweighed ***all*** other record evidence to the contrary. The Commission's indirect import pricing analysis itself contained errors that were unaccounted for by the Commission. Further, the Commission failed to explain why the underselling that it did find was insignificant in the context of this industry. As a result, the Commission's decision is unsupported by substantial evidence and not in accordance with law.

#### 1. In Finding No Significant Underselling by Imports, the Commission Failed to Explain How Myriad Purchaser Reports and Evidence of Underselling by Subject Imports Were *All* "Outweighed" by the Results of Its Indirect Pricing Comparisons

The fundamental flaw in the Commission's pricing analysis was its failure to explain why it did not consider the extensive record evidence of import underselling as a whole, instead of rejecting discrete pieces of evidence that showed underselling as "outweighed" by the results of its indirect pricing comparisons. Despite clear flaws, the Commission regarded its indirect pricing comparison as its "holy grail," and improperly disregarded or dismissed all of the evidence that contradicted the conclusions the agency sought to extract from its underselling analysis. As detailed below, it is impossible to conclude that pricing data from eight importers outweighed all other record evidence including: (1) rankings by 16 purchasers showing subject imports were priced lower than the U.S. product; (2) reports by 11 of 19 purchasers who shifted

from the U.S. product to subject imports that the imports were lower priced; (3) direct pricing comparisons relied on by the Commission showing underselling by imports [ ] percent of the time; (4) data from [ ] that the Commission wrongly excluded showing underselling in over [ ] percent of comparisons; (5) anecdotal statements by purchasers that price drives sales and that subject imports were lower priced; and (6) subject import market share gains in the price-sensitive PET resin market at the U.S. industry's expense. These factors, as detailed further below, when coupled with the showing of underselling in at least one-third of comparisons in the quarterly indirect importer pricing data,[4] provide powerful evidence of significant underselling by subject imports in direct contradiction to the Commission's conclusion.

**a. Purchaser Rankings Comparing the U.S. Product with Subject Imports Show Import Prices Were Lower Than U.S. Prices**

First, purchasers were asked to rank the U.S. product and subject imports with respect to a variety of factors that affect purchasing decisions, including price. See U.S. Purch. QR at IV-3 (PR 94). Purchasers overwhelmingly reported that subject imports were priced lower than the U.S. product. FSR at II-29-II-31 (CR 342, PR 209). In fact, while rating the U.S. product as comparable to subject imports on most factors, and superior to the subject imports on others, the only factor on which purchasers reported that the U.S. product was inferior to subject imports – i.e., priced higher than the subject imports – was price. Id. at II-31.[5] Purchasers consistently

---

4 As discussed below in section I.B.2., the proportion of underselling should be even higher but for the Commission's failure to consider certain importers' data.

5 The Commission stated: "A rating of superior means that price/U.S. transportation cost is generally lower. For example, if a firm reported 'U.S. superior,' it meant that the U.S. product was generally priced lower than the imported product." FSR at II-30 n.1 (CR 342, PR 209). Here, as detailed above, purchasers reported that subject imports were superior to the U.S.

(cont'd on next page)

singled out price as the sole differentiating factor that gave subject imports an edge over the U.S. product for every target country because the import price was lower than the U.S. price.[6] Id.; see also Purch. QRs at IV-3.[7]

The Commission dismissed these rankings as "small" relative to the total number of purchasers, stating that the number of responding purchasers ranged from 4 to 11 out of a total of 25 purchasers. Views at 38 n.150 (CR 342, PR 209). In fact, a total of 16 purchasers reported rankings that compared the U.S. product with subject imports.[8] Indeed, the number of purchasers responding to this question is larger than the number of importers providing indirect quarterly pricing data on which the Commission relied to conclude that overselling by imports was prevalent. Id. at 33. Just eight of 19 importers provided indirect quarterly pricing data used by the Commission in its pricing comparisons. FSR at IV-1 n.2 (CR 342, PR 209); Views at 33 (CR 342, PR 209). Thus, the absolute number of importers on whose data the Commission relied – eight – was well below the number of purchasers providing data – 16 – that the Commission

---

product on the price factor, meaning that imports were priced lower than the U.S. product. Id. at II-30.

6 Notably, purchasers did not perceive the subject imports to be "superior" to the U.S. product on the "availability" of the imports or their reliability of supply, despite the Commission findings of supply issues affecting U.S. producers. FSR at II-30 (CR 342, PR 209).

7 See U.S. Purch. QRs at IV-3 of [

]

8 See id. Further, the purchasers that failed to respond to this question did not express disagreement with these responses; they simply did not complete that question.

rejected for being "relatively small." Views at 33, 38 n.150 (CR 342, PR 209); FSR at V-9 (CR 342, PR 209).[9]

Even on a country-specific basis, there is no justification for the Commission's claim that the purchaser responses were small relative to the importer data on which it relied. [ ] importers provided quarterly pricing data used by the Commission for four of the subject countries, and [ ] importers provided quarterly pricing data for one country. FSR at V-9 (CR 342, PR 209). By contrast, purchasers responding to the price-ranking question totaled eight for Brazil, four for Indonesia, eight for Korea, nine for Pakistan, and eleven for Taiwan. Id. at II-30. Accordingly, there is no basis – and no explanation – for the Commission's decision to ignore the purchaser responses as being "relatively small" when they were, in fact, greater in number than the importer responses on which the Commission relied.[10]

### b. The Commission Failed To Address Reports by the Majority of Purchasers That They Shifted to Subject Imports That Were Lower Priced Than the U.S. Product

Second, elsewhere in the record, purchasers again reported that the subject imports were priced lower than the U.S. product – yet, the Commission entirely failed to consider these record

---

[9] The importer data on which the Commission relied to calculate underselling was also a smaller percentage of the total number of importers responding (8 of 19, less than half) as compared to the number of purchasers responding to the lower price ranking question (16 of 25, more than half). FSR at V-9 (CR 342, PR 209).

[10] The Commission also asserted that the purchaser responses were "outweigh{ed}" by the "actual" pricing data. Views at 38 n.150 (CR 342, PR 209). This statement is simply a tautology. The Commission wrongly found the number of purchasers responding was "small" (failing to recognize that 16 purchasers responded) and relied instead on an even smaller number of importers who provided pricing data. Moreover, as discussed in section I.B.1.e., the question is not whether this discrete piece of evidence from purchasers was outweighed by the indirect pricing data, but whether all of the record information, when considered as a whole, was outweighed by the indirect pricing data of the eight responding importers. Finally, there is no record evidence to indicate "actual" pricing data was more accurate than purchaser reports that imports were lower priced. Indeed, as discussion in section I.B.2., the "actual" pricing data suffered from several problems.

data. FSR at V-30-V-33 (CR 342, PR 209). Purchasers were asked whether they had bought subject imports instead of the U.S. product and, if they did, whether the subject imports were lower priced than the U.S. product. U.S. Purch. QR at III-28(a), III-28(b) (PR 94). Of the 19 purchasers who reported that they had purchased imported PET resin from the subject countries instead of U.S.-produced product, eleven reported that the subject import prices were lower than the U.S. prices. FSR at V-30-V-33 (CR 342, PR 209). Thus, the majority of the purchasers who reported that they had shifted to buying subject imports stated that the imports were sold at lower prices. Id. Further, these purchasers who reported shifting to lower-priced subject imports were not "small" and did not account for a small volume of purchases. Instead, as shown in the table below, purchasers who reported shifting to lower-priced imports accounted for [ ] pounds of PET resin purchases in 2017.

[ ]

See also Pet. Posthrg. Brf. at Exh. 2, slide 15 (CR 308, PR 189).

Total imports of the subject product were 831 million pounds in 2017 (FSR at C-3 (CR 342, PR 209)), so this volume reported by purchasers to be lower-priced can be deemed neither

"small" nor insignificant. It is also notable that the import purchases that were reported to be lower priced [ ] from 2015 to 2017, as the subject imports gained market share in the United States. Id.

The Commission did not even address these reports of lower prices by most purchasers who shifted from buying the U.S. product to subject imports. Instead, the Commission focused solely on whether the purchasers who had shifted to buying the lower-priced imports admitted that they were doing so for reasons of price. Views at 37 (CR 342, PR 209). The question of whether a purchaser admitted the purchase was for reasons of price – a subjective question that many purchasers and importers dispute in trade cases because doing so could lead to increased duties – does not negate the record evidence from these same purchasers that the subject imports were priced lower than the domestic product. FSR at V-30-V-33 (CR 342, PR 209). The statute directs the Commission to consider whether there has been "significant price underselling by the imported merchandise," not whether the purchasers admitted to buying for reasons of price. 19 U.S.C. § 1677(7)(C)(ii). Reports by most responding purchasers that the imports they bought were lower priced are directly inconsistent with the Commission's conclusion that the subject imports largely oversold U.S. producer prices.

The Commission never reconciled these critical reports from purchasers that imports were lower priced than the U.S. product with data from a fewer number of importers that showed the opposite. Instead, the Commission ignored the reports by purchasers that the imports they shifted to buying were "lower priced" than the U.S. product and rejected other rankings by purchasers that also indicated the subject imports were lower priced, opting to rely exclusively on the indirect pricing data from the eight importers. The Commission's failure to address these

critical record data that militated against its finding of prevalent overselling by subject imports cannot be sustained. See Altx, 167 F. Supp. 2d at 1374.

c. **The Commission Did Not Reconcile the Import Market Share Surge at the U.S. Industry's Expense With Its Finding of Overselling by Subject Imports**

Third, as discussed in section I.A., the Commission found that the U.S. PET resin market is a highly price-sensitive market in which price drives buying decisions. In the context of this market, the Commission did not explain how subject imports gained market share at the direct expense of the U.S. industry if they were priced higher than the U.S. product. Nor did the Commission explain why the domestic industry had large amounts of excess capacity at a time of alleged supply constraints. FSR at III-15 (CR 342, PR 209). The supply constraints to which the Commission referred did not occur until late 2017 by respondents' own admission, so cannot explain the import surge that occurred in 2016. See infra section II.

What explains that import surge is underselling by subject imports, as purchasers consistently reported. Major U.S. purchasers, including [

] all emphasized the price-based nature of sales and that subject imports acknowledged that subject imports were gaining sales and market share by selling at lower prices than U.S. producers. See section I.A.; see also [

] The Commission's failure to reconcile the market share gains by subject imports in a price-sensitive market with its finding of overselling – at a time of no supply constraints – leaves its decision unsupported by substantial evidence.

d. **The Commission Wrongly Ignored Importer Pricing Data Showing Underselling on Direct Import Sales as Being "Outweighed" by the Indirect Pricing Analysis**

Fourth, not only did the Commission disregard consistent reports by purchasers that subject imports were lower priced than the U.S. product, the Commission also ignored "actual" pricing data in the form of direct import price comparisons that showed rampant underselling by subject imports. Specifically, the Commission compared pricing data reported by direct importers – i.e., those companies sourcing directly from the foreign producers in lieu of purchasing from U.S. producers – and found that subject imports were predominantly underselling U.S. producer prices. FSR at V-21-V-24 (CR 342, PR 209). Of the [ ] quarterly price comparisons on which the Commission opted to rely (having disregarded [ ] importers' pricing data that showed even more underselling (see infra section I.B.2.)), the Commission found underselling in [ ] comparisons, or [ ] percent of the time. FSR at V-21-24 (CR 342, PR 209). As the record shows and as U.S. producers testified, some of the most extreme degrees of underselling by subject imports occurred on these direct import sales. Id. at V-19-V-22; Tr. at 36-37, 50 (PR 213).

Nonetheless, the Commission disregarded this evidence of underselling – which was consistent with the reports by purchasers that subject imports were lower priced – finding that this evidence, like the purchaser reports, did "not outweigh" the indirect pricing comparison data due to the relatively "small" volumes of direct imports. Views at 36 (CR 342, PR 209). Importantly, the Commission did not explain why it could not consider this evidence of underselling on direct import sales in addition to the indirect price comparisons and the purchaser reports, as Petitioners had urged it to do. Pet. Posthrg. Brf. at 7-8 (CR 308, PR 189); Petitioners' Final Comments (Nov. 15, 2018) ("Pet. Final Comments") at 9-10 (CR 336, PR

203). That the volume of imports at issue in the direct import price comparisons on which the Commission focused was smaller than the volume at issue for indirect import price comparisons[11] provides no basis for the Commission to rely on one, but to entirely ignore the other. As the Court held in Altx, Inc., while the Commission "need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermine its reasoning and conclusions." 167 F. Supp. 2d at 1374.

**e. The Commission's Decision to Disregard Key Record Evidence Showing Import Underselling Was Inconsistent With Its Obligation to Consider the Record as a Whole**

The chart below summarizes the record data on underselling. In the left column is the indirect pricing data on which the Commission relied; in the right column, the other record data that the Commission ignored or discounted, piece by piece, as not overriding the results of its indirect pricing analysis.

[11] Had the Commission not decided to disregard pricing data for [

] See infra section I.B.2.

| **Record Price Information on Underselling/Overselling** | |
|---|---|
| **ITC Relied Upon** | **ITC Discounted/Ignored** |
| Indirect quarterly prices of 8 importers show underselling by imports in one-third of comparisons. Views at 34 (CR 342, PR 209); FSR at V-27-V-28 (CR 342, PR 209). | Rankings by 16 purchasers show that prices offered for subject imports are lower than U.S. producer prices. FSR at II-30 (CR 342, PR 209); see also Footnote 7 supra. |
| | Eleven of 19 purchasers that shifted to buying the U.S. product from subject imports reported that the imports were lower priced. FSR at V-34 (CR 342, PR 209). |
| | Major purchasers reported that price drives sales and that imports have lower prices than U.S. producers. See section I.B.1.a.-c. |
| | Direct quarterly pricing data on which the ITC relied shows underselling by subject imports in [ ] percent of comparisons. FSR at V-21-V-24 (CR 342, PR 209); [ ] |
| | Direct quarterly pricing data of [ ] – which the ITC ignored – shows underselling in [ ] of comparisons. [ ] Imp. QR at II-2a-III-2e [ ]; FSR at V-11-V-14 (CR 342, PR 209). |
| | Significant market share gains by subject imports at the U.S. industry's expense took place in a price-sensitive market, indicating imports are gaining sales based on a lower price. FSR at C-3 (CR 342, PR 209). |

What the Commission failed to do was consider the record as a whole and explain why all of the information in the right-hand column that militated against its finding of prevalent overselling by subject imports did not call into question its conclusion to that effect. While administrative agencies are presumed to have considered all the evidence in the record (see Dastech Int'l, 963 F. Supp. at 1226), an agency has the obligation to "examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n v. State Farm

Mut., 463 U.S. 29, 43 (1983). The explanations the Commission proffered were both wrong and piecemeal in failing to take account of facts that seriously undermined its decision. See Altx, 167 F. Supp. 2d at 1374. Where the majority of responding purchasers reported consistently in response to various Commission questions that imports from the subject countries were priced lower than the U.S. product, and where the direct import price comparisons showed that subject imports were priced lower than the U.S. product, the Commission was under an obligation to explain how it could conclude that subject imports oversold U.S. producers based solely on the indirect quarterly price comparisons. Here, the Commission provided no explanation to "counter salient evidence that militates against its conclusions," as this Court required in Usinor. 26 CIT at 783. Accordingly, this matter must be remanded to the Commission for further explanation.

### 2. The Commission's Quarterly Indirect Importer Pricing Analysis Is Flawed

The Commission's decision to rely solely on the indirect quarterly pricing data to find a lack of significant underselling is also erroneous because of significant flaws in those quarterly pricing data.

First, the Commission did not reconcile the underselling shown by [ ] with reports by [ ] that subject imports were priced lower than the U.S. product. [ ] quarterly import pricing data showed overselling by subject imports in the [ ] of comparisons and, as such, had a major effect on the total database. FSR at V-11-V-14 (CR 342, PR 209); [ ] Yet, when asked whether the subject imports to which it shifted were lower priced than the U.S. producer prices, [ ] said *yes*. [ ] Similarly, [ ] reported that subject imports were priced lower than the U.S. product, but its reported

pricing data also showed overselling. See [ ] The Commission never addressed this contrary record evidence, did not attempt to verify their data, and relied only on the quarterly price comparisons while ignoring the reports by each company that undermined the credibility of the data they presented. Views at 33-35 (CR 342, PR 209).

Second, the Commission excluded the data of [ ] whose data showed [ ] for reasons that were unfounded. The Commission first stated that [ ] does not appear to engage in arm's-length transactions because it imports products and transfers to affiliates . . . ." Views at 34 n.136. This statement is simply wrong. As [ ] questionnaire response states, [ ] Thus, [ ] Id. The Commission's finding of affiliation was in error. At a minimum, if the Commission did not find it appropriate to treat [ ] as an indirect importer, it should have treated it as a direct importer as the Commission staff did in its price analysis. FSR at V-9 n.19 (CR 342, PR 209) [ ] Because this erroneous finding on affiliation was one reason the Commission refused to rely on the [ ] pricing data in any manner, this matter must be remanded for the Commission to reconsider its pricing analysis with the inclusion of these pricing data.

The other factor the Commission cited as the basis of its decision to entirely disregard the data of [

] is that "the company was unable to identify precisely the product type it imports." Views at 36 n.141 (CR 342, PR 209); see also [ ] Notably, however, the Commission did include in its database pricing information provided by another company that was not able to identify precisely the product type that was imported and that admitted to product variances for the pricing data it provided. [

] The Commission's decision to include [ ] data that showed overselling, but to exclude [ ] data that showed underselling – despite the same product variation issue with both companies' data – reflects an arbitrary methodology and cannot be sustained by the Court.

The additional importer whose data the Commission disregarded was [ ] submitted quarterly pricing data at the preliminary stage of the case that showed underselling and that Petitioners urged the Commission to consider in its final analysis. Pet. Prehrg. Brf. at 28-31 (CR 282, PR 166); Pet. Posthrg. Brf. at 7-8 (CR 308, PR 189). In other cases where a company submits data preliminarily, but not at the final stage of the case, the

Commission has relied on the data that was submitted preliminarily to ensure that its record is complete and to prevent parties that fail to submit requested information from benefitting.[12]

The Commission failed to address the exclusion of [ ] data from its database despite the issue being raised by Petitioners. Pet. Prehrg. Brf. at 28-30 (CR 282, PR 166). Only the Commission staff discussed the issue, with staff stating that [ ] pricing data had been excluded because the pricing data were [ ] and there "may" have been errors in such data. FSR at V-9 n.18 (CR 342, PR 209).[13] No record evidence indicated any specific errors in those pricing data. Moreover, other importer pricing data also showed "variation," yet the Commission relied on those data.[14] See id. Once again, the Commission's decision to ignore the [ ] data while relying on that of other companies whose data also showed [ ] reflects an unjustified and arbitrary approach that lacks record support.

Third, it bears recognition that these [ ] whose data the Commission disregarded would have caused a significant change to the quarterly underselling analysis by the Commission had it looked at these data. As shown below, the pricing data of these excluded importers – one of which, [

12 See, e.g., Low Melt Polyester Staple Fiber from Korea and Taiwan, USITC Pub. 4808 (Final) (2018), at 3 n.5, VII-7; Carbon and Certain Alloy Steel Wire Rod from Belarus, et al., USITC Pub. 4752 (Final) (2018), at 4-5 and n.13, VII-36; Certain Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from China, USITC Pub. 4190 (Final) (2010), at 20-21.

13 Notably, the [

]

14 Importer [

]

] showed underselling in virtually all instances:

**Underselling of the Subject Merchandise by Imports from [ ]**

| Importer | Number of Quarters – Underselling | Underselling Volume | Number of Quarters – Overselling | Overselling Volume | Percent Underselling Based on Number | Percent Underselling Based on Volume |
|---|---|---|---|---|---|---|
| [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Source: See FSR at V-11-V-14 (CR 342, PR 209); [ ] | | | | | | |

Were these data included in the Commission's quarterly pricing analysis, it would have found underselling by subject imports for the majority of the volume analyzed ([ ] percent) and on almost [ ] percent) of the quarterly price comparisons analyzed. FSR at V-11-V-14 (CR 342, PR 209); [ ] Only by excluding these data and ignoring the direct import pricing data comparisons could the Commission conclude that the overselling by subject imports was prevalent.

The Commission's underselling finding, in turn, drove the Commission to issue a negative injury decision in this case. Exclusion of these importers' data that directly affected the indirect quarterly pricing analysis on which the Commission relied to reach its finding of no significant underselling was in error and resulted in the significant understatement of the level of underselling by subject imports. Excluding the [ ] importer pricing data also rewarded respondent for its noncooperation by a finding of no injury and no imposition of an

order, in direct contravention of law.[15] [ ] was noncooperative in that it failed to submit a questionnaire response at the final stage of the case and it did not respond to follow up questions by the Commission.[16] Had its data been used, significant additional underselling by imports would have been found, as reflected in the table above.

### 3. The Commission Failed to Articulate How It Determined That the Level of Underselling It Found Was Not "Significant" in This Industry

Finally, even assuming that the Commission committed no error in failing to address contrary record evidence showing imports were lower priced, its finding of a lack of significant underselling must still be remanded due to its failure to articulate why the underselling it did find was not "significant." The Commission found that there was a "prevalence of the overselling by subject imports" based on the indirect price comparisons and concluded that there was not "significant price underselling" by subject imports. Views at 38. The Commission did not explain why the evidence of underselling that was found – in one-third of indirect price comparisons, on the vast majority of direct price comparisons, and as reported by the majority of purchasers – in the context of this industry, was not deemed to be significant within the meaning of the statute.

---

15 Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, at 870, reprinted in 1994 U.S.C.C.A.N. at 4199 ("{w}here a party has not cooperated, Commerce and the Commission may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully").

16 As this Court has recognized, "when a party has relevant evidence within his control which he fails to produce, that failure give rise to an inference that the evidence is unfavorable to {that party}." Alberta Pork Producers Marketing Bd. v. United States 669 F. Supp. 445, 459 (Ct. Int'l Trade 1987); Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190-91 (Fed. Cir. 1990).

The statute requires the Commission to consider whether significant underselling by subject imports has occurred when assessing material injury. 19 U.S.C. § 1677(7)(C)(ii). The legislative history makes clear that the question of "significance" may vary by industry:

> The significance of the various factors affecting an industry will depend upon the facts of each particular case. . . . It is expected that in its investigation the Commission will continue to focus on the conditions of trade, competition and development regarding the industry concerned. For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant. Similarly, for one type of product, price may be the key factor in making a decision as to which product to purchase and a small price differential resulting from the amount of the subsidy or the margin of dumping can be decisive; for others, the size of the differential may be of lesser significance.

S. Rep. No. 249, 96th Cong., 1st Sess. 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474. Citing this legislative history, the Court similarly recognized in Altx that "{t}he significance of underselling in an investigation will necessarily depend on the particulars of the product and industry at issue, not necessarily on the import of certain percentages understood in the abstract." 167 F. Supp. 2d at 1365.

The Court has recognized that a small volume of imports may be significant where a substitutable product and price-sensitive industry is at issue.[17] As discussed in section I.A., the PET resin industry involves a substitutable product and is highly price-sensitive. Where a price-sensitive industry is at issue, a mixed pattern of underselling and overselling is to be expected

---

17 See, e.g., Hynix Semiconductor, Inc. v. United States, 431 F. Supp. 2d 1301, 1309 (Ct. Int'l Trade 2006) ("the market share fluctuations are made more significant due to the fungibility of the goods in question and the price-sensitive nature of the DRAMs market."); USX Corp. v. United States, 655 F. Supp. 487, 490 (Ct. Int'l Trade 1987) (nothing that, in price-sensitive industries that produce fungible products, "the impact of seemingly small import volumes . . . is magnified in the marketplace").

and that underselling can be significant – particularly where, as here, the purchaser reports also indicate underselling. In its investigation of nails from China, the Commission found underselling in less than half of the instances surveyed, but nonetheless concluded the underselling by imports to be significant in the context of the price-sensitive market and in light of the record as a whole, including the purchaser responses:

> The pricing data show mixed underselling by subject imports. Subject imports undersold the domestic like product in 41 of the 84 quarterly comparisons, with margins of underselling ranging from 0.1 to 32.1 percent. While there is a mixed price comparison pattern, the amount of underselling is significant for a highly substitutable product such as this for which price plays a very important role in purchasing decisions. Moreover, notwithstanding the mixed price comparisons, the majority of responding purchasers (approximately 82 percent) indicated that the subject Chinese imports are priced lower than the domestic product. Thus, on balance, we find that this evidence demonstrates that there has been significant price underselling of the domestic like product by subject imports.

Certain Steel Nails from China, USITC Pub. 4022 (Final) (2008), at 18-19 (emphasis added). The Commission similarly found in Stainless Steel Plate that a mixed pattern of underselling and overselling was significant in the context of a commodity market that was price-sensitive and in light of purchaser statements that they perceive subject imports to be lower priced. See Certain Stainless Steel Plate from Belgium et al., USITC Pub. 3188 (Final) (1999), at 19-20. The Commission has expressly recognized that underselling by imports can be found to be significant even when more imports are overselling than underselling the U.S. producers.[18]

---

18 See id., USITC Pub. 3188 at 18 (underselling by subject imports in 41.5 percent of comparisons was found to be significant); Certain Hot-Rolled Steel Flat Products from Austria, et al., USITC Pub. 4638 (Final) (2016), at 35-36 ("Cumulated subject imports undersold the domestic like product in 196 of 396 quarterly comparisons, or 49.5 percent of the comparisons….").

For the PET resin industry at issue here, as discussed in section I.A., the Commission found that there was a "high degree of substitutability" and that "price is an important purchasing factor." Views at 29-30, 33 (CR 342, PR 209). Thus, the Commission expressly found that the industry at issue here is a price-sensitive industry. The record evidence also showed a mixed pattern of underselling and overselling, and purchasers of PET resin overwhelmingly reported that subject imports were sold at lower prices. Indeed, as indicated above, [ ] pounds of the 800 million pounds of imports in 2017 that were bought by purchasers instead of domestic PET resin were lower priced than the U.S. product. Despite this evidence, the Commission failed to explain why it did not find the import underselling to be significant in the context of this highly substitutable product and price-sensitive industry.

There is no legal requirement that a preponderance or prevalence of underselling be demonstrated in order to conclude that the underselling by imports is significant.[19] Indeed, the Commission is not even required to find significant underselling to reach an affirmative injury determination. Companhia Paulista de Ferro-Ligas v. United States, 20 CIT 473, 478 (1996) (citing Cemex S.A. v. United States, 790 F. Supp. 290, 299 (Ct. Int'l Trade 1992), aff'd without op., 989 F.2d 1202 (Fed. Cir. 1993)). Given that the Commission recognized the PET resin industry to be the type of price-sensitive industry for which a mixed pattern of underselling and overselling could still be significant, the Commission's failure to explain how it concluded that this evidence of subject import underselling that existed on this record was not "significant" was in error and requires remand to the Commission for further explanation.

19 As the cases cited above show, the Commission has found underselling to be significant in cases with less than a majority of underselling instances.

## II. THE COMMISSION ERRED IN FINDING THAT DOMESTIC SUPPLY CONSTRAINTS EXPLAINED THE SUBJECT IMPORT VOLUME SURGE IN 2016

While the Commission concluded that the domestic industry lost significant market share to the significant and increasing volumes of subject imports over the POI, the Commission found that subject imports gained share for reasons other than price given its finding that subject imports did not significantly undersell the domestic product. See Views at 43, 45-46; see supra section I.B. The Commission's finding that domestic supply constraints – the sole non-price factor identified – caused subject imports' market share gains is not supported by substantial evidence. See Views at 47.

### A. There Was No Supply Shortage When Subject Imports Surged into the U.S. Market in 2016 to Replace PET Resin Imports from Canada, China, India, and Oman

The timing of the subject import surge is highly relevant to the Commission's analysis. The domestic industry filed the prior trade case on PET resin from Canada, China, India, and Oman on March 10, 2015. PET Resin from Canada, et al., USITC Pub. 4604 at 1. Those PET resin imports declined after the petition was filed, from a peak of 725.2 million pounds in 2014 to 522.5 million pounds in 2015. By 2016, PET resin imports from Canada, China, India, and Oman had declined to less than 200 million pounds, corresponding to the imposition of those antidumping and countervailing duty orders on May 6, 2016.[20] Pet. Prehrg. Brf. at 25 (CR 282, PR 166).

At the same time, PET resin imports from the subject countries were surging. Between 2015 and 2016, subject imports increased by 143.1 percent (compared to an increase of 16.6

[20] See supra Footnote 2.

percent between 2016 and 2017). FSR at IV-5 (CR 342, PR 209). This surge reflects a response to the prior trade case and resulting orders. See id. at I-7-I-8. The domestic industry filed the underlying trade case on September 26, 2017, after which subject imports declined. Id. at I-1, IV-5. M&G had already announced that it would be ceasing production at its Apple Grove, West Virginia plant. Id. at III-7. Subsequently, in late October 2017, domestic producer M&G filed for bankruptcy. Id. As the Commission recognized, subject imports receded from the U.S. market in response to the pendency of this investigation. Views at 28 n.128 and 45 n.174 (CR 342, PR 209).




Source: Official Import Statistics for all imports in 2014 and for imports from prior investigation in 2015 and 2016. FSR at IV-5 for subject imports in 2015 through interim 2018.

Increasing subject imports gained significant market share when they surged into the U.S. market in 2016 as PET resin imports from Canada, China, India, and Oman backed off. Subject imports' share of the U.S. market grew from 4.2 percent in 2015 to 10.0 percent in 2016. FSR at IV-41 (CR 342, PR 209). Subject imports continued to gain another 1.9 percentage points of

market share in 2017 prior to the case filing.[21] Id. The Commission recognized in the Final Determination that these volume and market share increases were significant "both in absolute terms and relative to consumption in the United States." Views at 32 (CR 342, PR 209).

The record is clear that the significant subject import growth in 2016 was in response to the opportunity presented by receding PET resin imports from Canada, China, India, and Oman, and not due to a U.S. supply shortage. Indeed, the Commission's staff report expressly acknowledged that "quarterly U.S. imports from the five subject countries of these instant investigation increased following the filing of the 2015 petitions and imposition of the 2016 orders on PET resin imports from Canada, China, India, and Oman." FSR at IV-9 (CR 342, PR 209) (emphasis added).

Moreover, domestic industry and respondent witnesses at the hearing all testified as to the opportunistic behavior of the subject imports in 2016, tying the prior PET resin trade case and imposition of orders directly to the flood of subject imports. For example, U.S. importer [

] At the Commission's final hearing, Mr. Safieddin of Niagara Bottling admitted he turned to subject imports after the first group of PET resin imports receded in responses to the prior case and orders: "In the case of the first ruling there were plenty of origins from which we could still import." Tr. at 213-14 (PR 213);

21 Subject imports increased by an additional [ ] pounds in the first half of 2017, grabbing a further [ ] percentage points of market share compared into interim 2016 levels, which the Commission also considered significant during the preliminary phase of the case. Consolidated Prelim. Views and Staff Report at 31, C-3 (CR 150, PR 89).

see also id. at 23 (Mr. McNaull of DAK), 27-28 (Mr. Freeman of Nan Ya), 36 (Mr. Cullen of DAK) (each explaining that subject imports replaced the unfairly traded imports from Canada, China, India, and Oman, limiting the relief granted to the domestic industry from the 2016 orders).

In sum, the record, as reflected in the Commission's Final Determination, makes clear that the subject import volume surge and market share gains occurred in 2016. The timing of the surge corresponded to the retreat from the market of PET resin from Canada, China, India, and Oman following the imposition of orders that year, and not in response to domestic supply constraints, as discussed below. Further, as the Commission found, the subject import surge was significant on both an absolute and relative basis. Views at 32 (CR 342, PR 209).

**B. The Commission Ignored Substantial Evidence That Any Domestic Supply Constraints Did Not Occur Until After the 2016 Subject Import Surge**

The Commission recognized that the major subject import surge occurred in 2016 at the expense of the domestic industry. Views at 45-46 (CR 342, PR 209) ("We acknowledge that the domestic industry lost [ ] percentage points of market share and subject imports gained [ ] percentage points as subject imports increased substantially in {2016}."). Yet, the Commission concluded that the 2016 surge occurred in response to a domestic supply shortage. See id. There is simply no basis in the record for that conclusion. As respondents admitted:

> {The supply shortage is} the issue dominating the market, ***now and yes, since September of last year. We are not saying that all imports were drawn in since 2015, because of a shortage in 2017.*** . . . I'm not saying then that it was a shortage.

Tr. at 171-72 (Ms. Esserman) (PR 213) (emphasis added).

> We are not suggesting in 2016 that there was a shortage and that you had imports. Absolutely not.

Id. at 187 (Ms. Esserman).

> The phenomena of being turned down was as recently as 2018. ***I don't recall having been turned down prior to that.***

Id. at 173 (Mr. Safieddin) (emphasis added).

The Commission completely ignored these statements in the Final Determination. Its finding contradicting these admissions cannot be sustained.

### 1. Importer and Purchasers Reports on Which the Commission Relied Do Not Demonstrate a Supply Shortage in 2016

The Commission's reliance on Table II-4 of the staff report as evidence of "numerous reports of domestic supply constraints" to explain the subject import surge in 2016 is wrong. See Views at 47 & n.182 (CR 342, PR 209). Those reported constraints did not occur in 2016 when subject imports had their biggest volume and market share gains.[22] In fact, the record contains no evidence of domestic supply shortages before September 2017.[23]

Table II-4 of the Commission's staff report includes responses by [ ] importers and [ ] purchasers allegedly "reporting supply constraints since January 1, 2015." FSR at II-12 (CR 342, PR 209). The characterization of these responses is incorrect. Of the [ ] cited

---

22 Plaintiffs do not argue that there were no supply constraints at all during the POI. The record shows and Plaintiffs conceded below that there was some supply tightness in the U.S. PET resin market beginning in September 2017 when M&G's Apple Grove facility lost access to raw materials, and then M&G declared bankruptcy and ceased operations at Apple Grove in October 2017. See Pet. Final Comments at 7 (CR 336, PR 203); FSR at III-7 (CR 342, PR 209); [ ] iResin Posthrg. Brf. at 14 (CR 310, PR 192). But those supply constraints occurred well after the import surge.

23 Novatex and Graham Packaging complained of a supply shortage in October 2016 due to Hurricane Matthew. See FSR at II-15-II-16. As discussed below, Hurricane Matthew had virtually no impact on the domestic industry's ability to supply PET resin at any point in 2016.

importers, [ ] did not identify any domestic supply constraints.[24] Further, the remaining [ ] importers listed in the table noted supply interruptions, but their questionnaire responses make clear that they were referring to supply problems in late 2017 <u>after</u> the import surge.[25] [ ] explained in its importer questionnaire response that claimed [ ] also cited [ ] by imports. [ ] These critical clarifications did not appear in the staff report's "supply constraints" table. <u>See</u> FSR at II-12 (CR 342, PR 209). Moreover, the Commission did not mention in its views – let alone consider – the [ ] importers ([ ]) – nearly [ ] the number of importers listed in Table II-4 – that affirmatively reported <u>no</u> supply constraints whatsoever since January 1, 2015.[26]

Similarly, <u>none</u> of the reports by [ ] purchasers cited in Table II-4 of the staff report support the Commission's finding of supply shortages in 2016. [ ] purchasers' responses regarding supply tightness in the market placed such tightness in the latter part of 2017, often

---

24 [ ] identified only [ ] [ ] and [ ] complained about [ ] FSR at II-12 (CR 342, PR 209).

25 [ ] also reported in its importer questionnaire response that any supply interruptions did not occur until the fourth quarter of 2017. <u>See</u> [ ]

26 <u>See</u> Imp. QRs of [ ] at III-16.

tied specifically to M&G's bankruptcy.[27] [ ] other purchasers complained about domestic prices, [ ][28] As to the [ ] purchasers that alleged any domestic inability to supply ([ ]),[29] none tied the claimed shortages to any specific time period.[30] Id. The Commission also ignored [ ] additional purchasers that affirmatively stated they did not experience any supply constraints since January 1, 2015.[31]

Table II-4, therefore, does not demonstrate an inability of any domestic producer to supply customers in 2016, when the Commission recognized subject imports penetrated the U.S.

---

27 See FSR at II-12-II-13 (CR 342, PR 209) (responses by [ ]). [ ] noted that [ ] Purch. QR at II-2 (CR 168). [ ] reported that [ ] Purch. QR at III-12 (CR 214).

28 See FSR at II-12-II-13 (CR 342, PR 209) (responses by [ ]). [ ] also cited [ ] Purch. QR at III-10 (CR 189).

29 Notably, [ ] rated the United States with a "5," indicating the best possible performance, in terms of both availability and reliability of supply. [ ] Purch. QR at IV-3 (CR 171). [ ] rated the United States as a "4" (very good performance), and [ ] gave domestic producers a "3" and "5," respectively, with respect to those factors. [ ] Purch. QRs at IV-3 (CR 322 and CR 166).

30 Purchaser questionnaires in the final phase of the Commission's investigation were due in July 2018, so these responses focused largely on supply constraints purchasers faced in 2018. Plaintiffs do not contest that there was some temporary PET resin supply tightness in the last quarter of 2017 and into the first quarter of 2018 – the most contemporaneous frame of reference for those purchasers completing their questionnaires in the second quarter of 2018. U.S. producers' capacity utilization in the first quarter of 2018, however, jumped to 89.0 percent (up from 69.3 percent in the first quarter of 2017) to meet customer demand when subject import volumes declined as a result of the trade case. FSR at III-15; Views at 45 n.174 (CR 342, PR 209).

31 See U.S. Purch. QRs of [ ] at III-13.

market at the domestic industry's expense. The Commission further ignored substantial record information that fairly detracted from its reliance on a purported supply shortage to explain the subject import surge in 2016, including the majority of importers and numerous purchasers that affirmatively stated they did not experience any supply shortage at all during the POI. In making its determination, the Commission must "'consider the whole record and whatever in the record fairly detracts from its finding.'" Tropicana Prods., Inc. v. United States, 484 F. Supp. 2d 1330, 1347 (Ct. Int'l Trade 2007) (quoting Suramerica de Aleaciones Laminadas, C.A. v. United States, 818 F. Supp. 348, 365 (Ct. Int'l Trade 1993), aff'd, 44 F.3d 978 (Fed. Cir. 1994)). Indeed, the Commission's finding that subject imports surged into the U.S. market in 2016 in response to a supply shortage is an "'explanation . . . that runs counter to the evidence'" before it. Id. at 1347 (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43). For these reasons, the Commission's finding is unsupported by substantial evidence.

### 2. Weather Events Cited by the Commission Did Not Cause Supply Shortages in 2016

The Commission cited "disruptive weather events" as a cause of domestic supply problems, but the overwhelming evidence demonstrates that the only record evidence of a weather event in 2016 did not lead to domestic supply shortages that year. See Views at 47 (CR 342, PR 209).

The only mention on the record of a potentially disruptive weather event in 2016 was Hurricane Matthew in October[32] of that year.[33] See Novatex Posthrg. Brf. at 5, 9 (CR 311, PR

32 Hurricane Matthew occurred more than a year and a half after subject imports began increasing in response to imports from Canada, China, India, and Oman began receding from the market. See FSR at IV-9 (CR 342, PR 209); Pet. Final Comments at 6-7 (CR 336, PR 203).

188); FSR at II-15-II-16 (CR 342, PR 209). The Commission's own staff report, however, clarifies that the hurricane did not, in fact, interrupt domestic supply. The staff report states, "DAK declared force majeure at its Fayetteville facility due to the hurricane's impact on rail transportation of raw material to that facility." FSR at III-6 (CR 342, PR 209). It also clarified that that single facility's production was down "for less than one week. DAK supplies PET resin from inventory and other facilities." Id. (emphasis added). The record shows that no other domestic producer experienced significant supply problems at that time. Pet. Posthrg. Brf. at Exh. 3, para. 22, Exh. 5, para. 8, and Exh. 8, para. 24 (CR 308, PR 189) (domestic producers explaining that the hurricane's impact on their ability to supply customers in October 2016, if any, was minimal). Respondents placed information on the record also proving that Hurricane Matthew did not disrupt supply. Novatex Posthrg. Brf. at Exh. 8 (CR 311, PR 188) (industry report from [ ] explaining that [

]).

The next alleged weather-related supply interruption mentioned on the record did not occur until August 2017 when Hurricane Harvey hit the Gulf Coast – well after subject imports flooded the U.S. market. See FSR at II-16, III-7 (CR 342, PR 209); iResin Posthrg. Brf. at 14-15, Exh. 8 (CR 310, PR 192). Fundamentally, and contrary to the Commission's Final Determination, an alleged supply shortage caused by a hurricane in August 2017 cannot explain the increase in subject imports in 2016. Moreover, overwhelming record evidence shows that Hurricane Harvey did not, in fact, affect domestic producers' ability to supply their customers.

33 While the Commission's staff report states that U.S. purchaser "Graham also reported that there had been other supply difficulties during 2015-17," the earliest "supply difficulty" mentioned was Hurricane Matthew in October 2016. FSR at II-15-II-16 (CR 342, PR 209).

See Pet. Posthrg. Brf. at Exh. 1, Q.20 (CR 308, PR 189); Pet. Final Comments at 7 (CR 336, PR 203); Novatex Posthrg. Brf. at Exh. 8 (CR 311, PR 188) (industry report from [ ] stating that [ ]).

The Commission failed to consider the substantial evidence that fairly detracted from – and, in fact, militated against – its conclusion that weather events contributed to a supply shortage in 2016. See Tropicana Prods., 484 F. Supp. 2d at 1347; Diamond Sawblades Mfrs. Coalition v. United States, 219 F. Supp. 3d 1368, 1375 (Ct. Int'l Trade 2017) (requiring agency to address "material and undisputed evidence" that contradicted its conclusion) (citing Usinor v. United States, 26 CIT 767, 783 (2002)). The Commission rejected respondents' arguments in another recent case that supply constraints – including disruptive weather, maintenance outages, and the closure of outdated production lines – drew subject imports into the U.S. market. See Certain Corrosion-Resistant Steel Products from China, et al., USITC Pub. 4620 (Final) (2016), at 23-24. The claimed supply shortages in Corrosion-Resistant Steel Products did not correspond to the timing of the subject imports' increase in that case, which is also true here. See id. at 24 (concluding that the alleged supply constraints were temporary and "cannot explain the magnitude and duration of the increase in subject imports," which occurred early in the POI and continued until the case was filed). Further, domestic corrosion-resistant steel producers, like domestic PET resin producers here, had plenty of available capacity, such that they were "capable of supplying at least a significant share of the market" that subject imports captured

during and after the alleged supply shortages.[34] Id.; FSR at III-15 (CR 342, PR 209). Thus, the Commission's reliance on weather-based supply disruptions to explain how subject imports penetrated the U.S. market in 2016 is not supported by substantial evidence.

### 3. Domestic Producers' PET Resin Imports Are Not Evidence of Supply Shortages in 2016

The Commission also cited U.S. producers' imports of PET resin as proof of a supply problem, but that factor similarly fails as an evidentiary matter to explain the subject import increase between 2015 and 2016. See Views at 31-32 & n.130 (CR 342, PR 209).

First, domestic producers were not responsible for the growth in subject imports in 2016. [ ] the [ ] domestic producer, did not import any PET resin during the POI. See Views at 46-47 n.180 (CR 342, PR 209); FSR at III-15 (CR 342, PR 209). In fact, [ ] had [ ] pounds and [ ] pounds of available capacity in 2015 and 2016, respectively. FSR at III-15 (CR 342, PR 209). The [ ] producer, [ ] did not import PET resin from any subject country during the POI. Id. at III-15, III-22. [ ] also had significant unused capacity in 2015 and 2016 available to supply U.S. customers: [ ] pounds and [ ] pounds, respectively. Id. at III-15. These facts alone constitute substantial evidence detracting from the Commission's finding of supply disruptions in the U.S. market at the time of subject imports' significant volume and market share increases.

---

34 See also Cold-Rolled Steel Flat Products from China and Japan, USITC Pub. 4619 (Final) (2016), at 27-28 & n.147 (similarly dismissing respondents' reliance on alleged supply shortages to explain subject imports because subject imports continued to increase throughout the POI until provisional duties were imposed and market participant reports did not corroborate claims regarding the timing of the shortages). While the Commission found that subject imports in Certain Corrosion-Resistant Steel Products undersold the domestic like product (USITC Pub. 4620 at 24), the Commission's finding of overselling in the underlying investigation is not supported by record evidence. See supra section I.B.

Second, contrary to the Commission's finding, the domestic producers' stated reasons for importing do not evince a U.S. market supply shortage that attracted subject imports. See Views at 28, 32 n.130 (CR 342, PR 209). [ ] did not import PET resin because they could not supply the domestic market in 2016 when subject imports were flooding the U.S. market.[35] [ ] See id. at 46 n.180; FSR at III-23 (CR 342, PR 209). To the extent [ ] – before the subject import surge. FSR at III-23 (CR 342, PR 209). Further, [ ] compared to its [ ] pounds of available capacity that year. Id. at III-15, III-23. Similarly, [ ] imported PET resin [ ] in 2016. Id. at III-24.

Although [ ] explained that its nonsubject imports from Mexico were [ ] those imports accounted for [ ] domestic production in 2015 and 2016, respectively.[36] Id. at III-22. These imports, relative to [ ] domestic production, do not indicate a major supply interruption in the

---

[35] Only [ ] imported PET resin from subject countries [ ] FSR at III-23-III-24 (CR 342, PR 209). The record also lacks any evidence of supply disruptions that explain why subject imports from [ ] increased in volume between 2015 and 2016 by [ ] respectively. Id. at IV-5.

[36] PET resin from Mexico has long been present in the U.S. market, has held a stable market share over the POI, and has not been unfairly traded. See Tr. at 262 (PR 213); FSR at IV-5, IV-41 (CR 342, PR 209).

U.S. market as a whole, particularly when [ ] and other domestic producers had [ ] available capacity at the time. Id. at III-15. In fact, [ ] nonsubject PET resin imports accounted for [ ] of its own available capacity in both 2015 and 2016. Id. at III-15, III-22. There is no evidence that [ ] intended to substitute or make up for unavailable domestic capacity with [ ] import volumes.[37] That domestic producers imported PET resin for reasons other than an inability to supply the domestic market is substantial evidence that subject imports were not in response to supply constraints in 2016 and fairly detracts from the Commission's conclusion on this point.[38]

Finally, that subject imports here receded from the U.S. market in interim 2018 in response to the filing of the case below (see Views at 22 n.128, 45 n.174) – at a time when the parties generally agree the U.S. market experienced some supply tightness – demonstrates that any apparent shortage was not enough of a draw on subject imports to overcome the provisional dumping duties requiring them to be sold at a fair price.[39]

---

37 Other nonsubject PET resin imports from [ ] and did not increase between those two years. FSR at III-22 (CR 342, PR 209).

38 U.S. producers' subject imports did not drive the subject import surge between 2015 and 2016. Shipments of subject imports by U.S. producers accounted for [ ] percent of apparent U.S. consumption in 2015, and only [ ] percent in 2016 – the year that subject imports overall had their biggest market share gains. FSR at IV-40 (CR 342, PR 209). In contrast, shipments of subject PET resin not imported by domestic producers increased from [ ] pounds ([ ] percent of the U.S. market) in 2015 to [ ] pounds ([ ] percent of the market) in 2016. See [ ]; FSR at IV-38 (CR 342, PR 209). Thus, subject import shipments that had no connection to domestic producers increased by [ ] percent from 2015 to 2016 and expanded their market share at a rate of [ ] that of the domestic producers' subject import shipments. See id. at IV-5, IV-12, IV-41.

39 In fact, it was the domestic industry, not subject imports, that stepped up to service U.S. customers when M&G closed. U.S. producers' capacity utilization increased to 89.0 percent in the first quarter of 2018, up from just 69.3 percent in the first quarter of 2017, demonstrating that

(cont'd on next page)

There is no basis for the Commission's conclusion that domestic supply constraints caused subject imports' significant and increasing volumes in 2016. The record does not support any major or industry-wide supply shortage – caused by hurricanes or otherwise – in 2016 when subject imports' gains were admittedly significant. See Certain Corrosion-Resistant Steel Products from China, et al., USITC Pub. 4620 at 23-24. Although some domestic producers imported PET resin during the POI, they did not do so because they could not supply customers with domestic PET resin, and their imports did not drive the subject import surge. Because the record does not support that a supply shortage occurred in 2016, the Commission's finding that a supply shortage explains the subject import surge is not supported by substantial evidence.

## III. THE COMMISSION'S FINDING THAT SUBJECT IMPORTS DID NOT HAVE A SIGNIFICANT ADVERSE IMPACT ON THE DOMESTIC INDUSTRY IS ALSO IN ERROR BECAUSE IT WAS DRIVEN BY ITS UNSUPPORTED FINDING OF NO SIGNIFICANT UNDERSELLING

The Commission's finding that subject imports "have not had a significant adverse impact on the domestic industry" was predicated on finding that subject imports predominantly oversold the domestic product. Views at 48 (CR 342, PR 209). That finding, and the explanations developed by the Commission to justify how higher-priced imports could have taken market share from the domestic industry, all lack substantial evidentiary support. Notably, in the Final Determination, the Commission recognized the domestic industry's injury reflected in declining trade and financial variables, particularly between 2016 and 2017 when the subject import surge was taking its toll on U.S. producers. See id. at 42-44. The domestic industry's

the domestic industry was able to increase production to supply the market. FSR at III-15 (CR 342, PR 209). In the first quarter of 2018, the three remaining U.S. producers' shipments more than offset M&G's absence from the market. See Pet. Posthrg. Brf. at Exh. 2, slide 35 (CR 308, PR 189).

capacity utilization declined as production dropped in 2017. FSR at C-4 (CR 342, PR 209). Domestic producers lost significant market share to subject imports. Id. at C-3; see also Views at 32 (CR 342, PR 209). The domestic industry's gross, operating, and net profitability all [ ] declined over the POI, with producers' net income deteriorating from [ ] in 2015 to a [ ] in 2017. FSR at C-4; Views at 44 (CR 342, PR 209). The domestic industry's operating income to net sales ratio also declined over the POI, [ ] percent by 2017. Id. If there were shortages and overselling, one would expect to see the domestic industry prospering. The Commission failed to recognize or reconcile the disconnect between its findings and the rest of the record.

Although recognizing these injurious effects, the Commission concluded that subject imports did not "explain{} the decline in the industry's financial performance during the POI" and loss of market share directly to subject imports. Views at 45 (CR 342, PR 209). In reaching that conclusion, the Commission found that subject imports oversold the domestic like product. See id. at 46 & n.177. According to the Commission, higher-priced subject imports' market share gains could only be explained by subject imports surging into the U.S. market in response to domestic supply shortages. See id. at 45-46. None of these findings has substantial record support.

As a threshold matter, the Commission's finding of subject import overselling was not supported by substantial evidence and contrary to law. See supra sections I.B. The Commission found subject import overselling by relying solely on quarterly indirect import pricing data, which was problematic in significant ways. The Commission failed to address extensive contrary record information showing lower prices of subject imports or explain how ***all*** of this contrary record data was outweighed by pricing data of just eight importers. See supra section

I.B.1. The Commission ignored internal inconsistencies in the importer questionnaire data on which it did rely, and arbitrarily and unlawfully excluded [ ] whose data showed predominant subject import underselling. See supra section I.B.2. The Commission also failed to articulate why the amount of import underselling it did find in the underlying investigation was not significant, as it is required to do under the statute, particularly given the price-sensitivity of the U.S. PET resin market. See supra section I.B.3.

The Commission's conclusion that a domestic supply shortage in 2016 explained how higher-priced imports gained market share in 2016 also lacked substantial record support. See Views at 45-47 (CR 342, PR 209). Contrary to the Commission's finding, supply constraints did not occur until late 2017, well after the subject import surge. See supra section II.B. None of the information on which the Commission relied – importer and purchaser reports, weather events, and domestic producers' imports – demonstrated domestic supply interruptions in 2016. See id.

The Commission's impact finding, therefore, is fundamentally flawed and cannot stand. The Court "cannot evaluate the substantiality of evidence supporting an ITC determination 'merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" Nippon Steel Corp. v. United States, 301 F. Supp. 2d 1355, 1364 (Ct. Int'l Trade 2003) (requiring the Commission to account for evidence that fairly detracts from its finding on remand) (citation omitted); see also Tropicana Prods., 484 F. Supp. 2d at 1345-46 (remanding to the Commission to consider "{several} important aspect{s} of the problem") (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43)).

Moreover, in the absence of any supported non-price reason for the domestic industry's declining trade and financial condition over the POI, the Commission failed to explain how

subject imports gained market share at the domestic industry's expense in a price-sensitive market except by reason of price. See supra section I.A. Indeed, the Commission's findings of predominant subject import overselling and the related supply shortage explanation, which should suggest a prosperous domestic industry, are inconsistent with evidence of U.S. producers' excess capacity, lost market share, and declining profitability. See FSR at C-3, C-4 (CR 342, PR 209). Thus, the Commission's negative impact finding fails because the Commission did not "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); see also Tropicana Prods., 484 F. Supp. 2d at 1348-49 (remanding to the Commission to explain its rationale for discounting evidence that detracted from its material injury determination). The Court must remand the injury determination to the Commission for proper consideration of the substantial record evidence demonstrating that subject imports gained sales and market share on the basis of price and caused the domestic industry's material injury.

## CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court:

(1) Determine that the Final Determination is unsupported by substantial evidence and not in accordance with law with respect to finding that subject imports did not have adverse price effects;

(2) Determine that the Final Determination is unsupported by substantial evidence with respect to finding that subject imports did not have a significant adverse impact on the domestic PET resin industry;

(2) Remand the Final Determination to the Commission with instructions to correct the errors identified herein; and

(3) Provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

/s/ Paul C. Rosenthal
PAUL C. ROSENTHAL
KATHLEEN W. CANNON
DAVID C. SMITH
BROOKE M. RINGEL
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to DAK Americas LLC,
Indorama Ventures USA, Inc., and Nan Ya Plastics
Corporation, America

Dated: May 16, 2019

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to the Court of International Trade Standard Chambers procedures, and the May 14, 2019 Order granting Plaintiffs' motion to increase the word limitation to its brief in support of their Rule 56.2 Motion for Judgment Upon the Agency Record to 18,000 words (ECF No. 41), counsel for Plaintiffs DAK Americas LLC, Indorama Ventures USA, Inc., and Nan Ya Plastics Corporation, America, certifies that this Response Brief contains 16,381 words, including footnotes, tables, and charts. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2013.

Respectfully submitted,

/s/ Brooke M. Ringel
PAUL C. ROSENTHAL
KATHLEEN W. CANNON
DAVID C. SMITH
BROOKE M. RINGEL
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20007
(202) 342-8400

Counsel to Plaintiffs DAK Americas LLC,
Indorama Ventures USA, Inc., and Nan Ya
Plastics Corporation, America

Dated: May 16, 2019