

# UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, DC 20436

September 23, 2020

**VIA ELECTRONIC SERVICE**          **BUSINESS PROPRIETARY**
                                    **INFORMATION REMOVED**

Honorable Mario Toscano
Clerk of the Court
James L. Watson U.S. Court of International Trade Bldg.
One Federal Plaza
New York, NY 10278-0001

RE:     *DAK Americas LLC et al. v. United States*, Court No. 18-00238

Dear Mr. Toscano:

      Pursuant to the Court's opinion and order of June 4, 2020 (Slip Op. 20-80) in the above-referenced case, the United States International Trade Commission hereby files the enclosed remand determinations.

      The confidential version of the remand determinations is being submitted and served under separate cover.

                    Respectfully submitted,

                    /s/ Brian R. Allen
                    Brian R. Allen
                    Attorney-Advisor
                    Office of the General Counsel
                    U.S. International Trade Commission
                    500 E Street, SW
                    Washington, DC 20436
                    Telephone: (202) 205-3034

Enclosure

## Views of the Commission

By opinion and order dated June 4, 2020, the U.S. Court of International Trade remanded the Commission's unanimous negative injury determinations in *Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Investigation Nos. 731-TA-1387–1391 (Final), USITC Pub. 4835 (Nov. 2018).[1] Upon consideration of the remand order, and based on the evidence in the record of these investigations, the Commission again determines that an industry in the United States is not materially injured or threatened with material injury by reason of imports of polyethylene terephthalate ("PET") resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value.

## I. Background

In November 2018, the Commission determined that an industry in the United States was not materially injured or threatened with material injury by reason of subject imports of PET resin.[2] Petitioners DAK Americas LLC, Indorama Ventures USA, Inc. and Nan Ya Plastics Corporation, America (collectively, "Petitioners" or "Plaintiffs"), all of which are domestic producers of PET resin, appealed the Commission's final negative injury determinations. On appeal, they challenged the Commission's analyses of underselling and impact that led to the Commission's finding of no present material injury.[3] Several respondent interested parties

---

[1] *DAK Americas LLC v. United States*, No. 18-00238, slip op. 20-80 at 15, 41 (Ct. Int'l Trade June 4, 2020).

[2] *Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv. Nos. 731-TA-1387-1391 (Final), USITC Pub. 4835 (Nov. 2018).

[3] In their substantive submissions to the Court, Plaintiffs did not challenge the Commission's findings of no significant price depression or suppression. Nor have they challenged the Commission's findings underlying its determination of no threat of material injury.

participated as Defendants-Intervenors in the litigation before the Court.  These parties are

iResin LLC ("iResin"), a U.S. importer of subject merchandise; Niagara Bottling LLC ("Niagara

Bottling"), a U.S. importer *** of subject merchandise; and Novatex Limited, a producer of

subject merchandise in Pakistan, and G-Pac Corporation, its affiliated U.S. importer (collectively,

"Novatex").

The Court remanded the Commission's determinations so that it may reconsider the

following issues:

(1) its finding that overselling predominated and underselling was not significant in light of record evidence showing underselling and prior findings that even underselling that occurred in less than 50 percent of price comparisons could be significant,

(2) its finding that supply constraints were the cause of market share shifts rather than underselling in light of conflicting evidence that supply constraints solely occurred beginning in October 2016, and

(3) its impact finding in light of the insufficiencies in its overselling and supply constraint findings.[4]

The Court also instructed the Commission to "address and distinguish on remand any applicable

findings of a general nature from prior determinations that conflict with its ultimate

determination regarding underselling and supply constraints" in the present investigations.[5]

On July 10, 2020, the Commission published notice of its remand proceedings in the

Federal Register.[6]  In the notice, the Commission stated that it was not reopening the factual

record, but invited parties to file comments concerning how the Commission could best comply

with the Court's remand instructions.  On July 20, 2020, Petitioners, iResin, Niagara Bottling,

and Novatex each filed remand comments with the Commission.

---

[4] Slip Op. at 41.
[5] Slip Op. at 15.
[6] *Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan; Notice of Remand Proceedings*, 85 Fed. Reg. 41624 (July 10, 2020).

## II.   No Material Injury by Reason of Subject Imports

In responding to the Court's remand instructions, we have considered the factual record as a whole, as well as arguments made by the parties in their submissions in both the proceedings of the original investigations and the remand proceedings.  We have adopted in their entirety the Commission's original findings, analysis, and conclusions regarding issues not raised on appeal: domestic like product, domestic industry, negligibility, cumulation, legal standards, subject import volume, and threat.[7]  We also incorporate our prior findings, analyses, and conclusions set out in the Original Views on the conditions of competition, price effects, and impact, as supplemented and further considered and explained below in response to the Court's instructions.

We respectfully maintain that our original determinations are consistent with the Federal Circuit's holding that each injury investigation by the Commission is *sui generis* and, "{f}or that reason, prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries."[8]  We continue to view our findings on underselling, substitutability, the importance of price, and supply constraints as unique to each investigatory record, and respectfully disagree that such determinations constitute findings of a general nature.  The Commission's determination as to whether there is significant underselling demonstrated on any particular record, in our view,

---

[7] Vice Chair Stayin and Commissioner Karpel were not members of the Commission at the time of the original investigations, and thus they did not participate in those determinations.  They have reviewed *de novo* the record from the original investigations.  For purposes of these remand proceedings, in addition to joining in full these Remand Views, they have adopted all findings from the Original Views and determinations that have not been modified herein.

[8] *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007); *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1255 (Ct. Int'l Trade 2016).

cannot be reduced to a bright-line mathematical formulation,[9] nor does the Commission have any set practice regarding the timing of supply constraints. However, as instructed by the Court in this case, we have examined and distinguished the prior Commission determinations cited by the Court.

### A.    Conditions of Competition and the Business Cycle

#### 1.    Demand Considerations

Demand for PET resin in the U.S. market increased each year of the period of investigation ("POI"). Apparent U.S. consumption for PET resin increased from 6.3 billion pounds in 2015 to 6.9 billion pounds in 2016 (an increase of 8.7 percent from 2015 to 2016), and then to 7.0 billion pounds in 2017 (an increase of 2.0 percent from 2016 to 2017); apparent U.S. consumption remained relatively level between January–March ("interim") 2017 and interim 2018, at 1.7 billion pounds.[10]

From 2015 to 2017, apparent U.S. consumption increased 685 million pounds, or by 10.8 percent.[11] Parties to these investigations agreed, and questionnaire responses reflected, that demand, as measured by apparent U.S. consumption, grew over the POI.[12]

---

[9] *See Mexichem*, 179 F. Supp. 3d at 1255 (quoting *U.S. Steel Corp. v. United States*, 33 CIT 984, 1003, 637 F. Supp. 2d 1199, 1218 (2009) in turn citing *Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005)); *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1365 (Ct. Int'l Trade 2001), *aff'd following remand*, 370 F.3d 1108 (Fed. Cir. 2004). Price sensitivity, substitutability, and underselling analyses are issues we address in virtually every one of our antidumping and countervailing duty investigations. Treating our underselling analyses as a matter of a general nature rather than a *sui generis* consideration under the facts of each unique investigation might suggest we are obligated to distinguish all past determinations each time we conduct a new investigation given underselling is something we must consider in every investigation.

[10] Confidential Staff Report ("CR") at Table C-1.

[11] CR at Table C-1.

[12] Confidential Original Views ("Original Views") at 26.

### 2.    Supply Considerations

The evidence in the record indicates that the domestic industry's capacity to produce PET resin declined over the POI and its actual production was largely unchanged, even as demand grew.  The domestic industry's capacity to produce PET resin was flat from 2015 to 2016 at 6.9 billion pounds, then declined to 6.8 billion in 2017, a decrease of 1.5 percent; total capacity was 1.7 billion in interim 2017 and 1.6 billion in interim 2018.[13]  The industry's actual production of PET resin increased from 5.6 billion pounds in 2015 to 5.9 billion pounds in 2016 (an increase of 4.7 percent), then declined to 5.6 billion pounds in 2017 (a decrease of 4.7 percent); it was 1.2 billion pounds in interim 2017 and 1.4 billion pounds in interim 2018.[14]  Its capacity utilization rate increased from 81.0 percent in 2015 to 84.8 percent in 2016 (an increase of 3.8 percentage points), then decreased to 82.1 percent in 2017 (a decrease of 2.7 percentage points); it was 69.3 percent in interim 2017 and 89.0 percent in interim 2018.[15]

The purchasers' questionnaire responses indicated that throughout the POI the domestic industry had problems supplying demand in the U.S. market.  Of 25 responding U.S. purchasers, 19 reported supply constraints since the beginning of 2015.[16]  Most (13 of 19) reported that domestic suppliers since the beginning of 2015 generally were unable to provide the requested PET resin, refused to bid on business, or provided short shipments.[17]

Other purchasers reported that, since the beginning of 2015, a number of different issues caused supply constraints, including domestic producers placing many customers on

---

[13] CR at Table C-1.
[14] CR at Table C-1.
[15] CR at Table C-1.
[16] CR at II-13.
[17] CR at II-13 to II-14.

allocation, delayed deliveries, and unavailability due to weather.[18]  These purchaser responses did not specify that these supply constraints were limited to any fixed interval during the POI, and the absence of any such time circumscription does not suggest that the constraints were confined to latter portions of the POI.  Rather, any evidence on the record that purchasers responded to this question on the basis of a limited time period is detailed in those purchasers' responses.[19]  For instance, certain purchasers reported hurricanes occurring in October 2016, or the existence of antidumping and countervailing duty orders in 2017, as specific factors creating or adding to the supply constraints, but this does not demonstrate that other responses indicating supply constraints during the POI are necessarily constrained to these events.[20]  As detailed below, other evidence in the record—specifically, purchaser testimony and the domestic industry's own importing decisions—provides affirmative evidence indicating that constraints began in 2015 as a function of other factors prevalent throughout the POI.

Specifically, at the Commission's hearing in the final phase of these investigations, U.S. purchasers testified that supply constraints began early in 2015.[21]  These constraints were largely tied to domestic producers' decisions not to increase their own capacity in anticipation of a new domestic production facility operated by M&G Polymer USA ("M&G"), which was expected to have a nominal annual production capacity of 2.4 billion pounds.[22]  Construction on

---

[18] CR at II-14.

[19] In one time-period–specific comment, some purchasers reported that prior and current antidumping petitions and rulings restricted options for U.S. consumers, making imports more costly in 2017.  CR at II-14.

[20] *See* CR at II-12 to II-13.

[21] Hearing Tr. at 118, 147, 241–245.

[22] CR at III-10.  This capacity would have increased the domestic industry's overall capacity by approximately 35 percent in 2017.  Derived from *id.* at Table III-5.

that facility began in December 2014, and although it was scheduled to be completed at the end of 2016, it was never finished before M&G ultimately declared bankruptcy in October 2017.[23]

Purchaser Graham Packaging testified that although the M&G facility start-up was continuously and routinely delayed for "almost two years" prior to M&G's ultimate decision to file for bankruptcy, the domestic industry "always factored that {soon-to-be available additional} capacity in their U.S. supply, and that it would be available to us to meet our projected and growing demand."[24]  Thus, domestic producers kept their capacity generally static throughout the POI under the assumption that M&G would bring on additional capacity that could meet the growing demand.  Although M&G ultimately declared bankruptcy in October 2017, that event could not turn back the remaining domestic producers' decisions starting in 2015 not to increase their capacity.  This testimony, and the additional testimony noted below, corroborates the responses of purchasers indicating that supply constraints began in 2015.

Graham Packaging also testified that M&G's serial assertions that its new production capacity was just "three more months" away from entering the market kept prices constrained even though U.S. purchasers were having trouble sourcing PET resin in 2016.[25]  Similarly, importer Niagara Bottling testified, and purchaser PepsiCo corroborated, that these "dynamics" of domestic producer competition for business in anticipation of M&G's new production

---

[23] CR at III-10 to III-11.
[24] Hearing Tr. at 147.
[25] Hearing Tr. at 241–242.

commencement were known and relevant "for years" prior to October 2017, and at least as early as October 2015.[26]

Furthermore, although Petitioners dispute when the supply constraints actually began, they acknowledged that there were constraints affecting their ability to supply U.S. purchasers at the end of 2017 and the beginning of 2018 related to M&G's bankruptcy in October 2017.[27] Likewise, 10 of 19 responding purchasers reported that the M&G bankruptcy caused supply disruptions.[28]  However, as detailed above and below, the record shows that domestic producer supply constraints were not limited to this time period.

The data reflecting the domestic industry's own imports of both subject and nonsubject PET resin, which were substantial and increasing over the POI, further indicate that the domestic industry was unable to supply demand from its own production, and increasingly relied on imports of PET resin to fulfill orders throughout the POI.  Domestic producers' imports of PET resin increased substantially from *** pounds in 2015 to *** pounds in 2017, an increase of *** pounds, or *** percent, over the full-year POI.[29]  The domestic producers indicated that they imported PET resin to supplement their domestic production or to supply a type of PET resin not made domestically, and not in order to better compete with subject imports.[30]

---

[26] Hearing Tr. at 243–245.
[27] Hearing Tr. at 118.
[28] CR at II-13.
[29] CR at Table IV-3.
[30] CR at Table III-9.  *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan,* USITC Pub. 4835 at 32.  Thus, these circumstances are different from those in which U.S. producers import low-priced subject product as a way to limit the amount of sales lost to subject producers.

The increase was particularly notable with respect to its imports of subject PET resin, as the domestic industry's imports of subject PET resin rose faster and by larger amounts, and increased its share of the U.S. market at a greater rate, than its imports of nonsubject PET resin. Specifically, the domestic industry imported *** pounds of subject PET resin in 2015, *** pounds in 2016, and *** pounds in 2017, for a total increase of *** pounds, or ***, over the full-year POI.[31]  As a share of apparent consumption, these imports increased from *** percent in 2015 to *** percent in 2016 and *** percent in 2017.[32]

The domestic industry's imports of nonsubject PET resin also rose in absolute terms from 2015 to 2017, although their relative share was steadier because the industry already imported sizable amounts of nonsubject PET resin from Mexico, ***, at the beginning and throughout the POI.[33]  Domestic producers imported *** pounds of nonsubject PET resin in 2015, *** pounds in 2016, and *** pounds in 2017, for a total increase of *** pounds, or *** percent, over the full-year POI.[34]

In total, the domestic industry imported PET resin representing *** percent of apparent U.S. consumption in 2015, *** percent in 2016, and *** percent in 2017.[35]  As the domestic producers became more reliant on imports, the market share of their domestic production declined, with the domestic industry's shipments of domestically produced PET resin accounting for 84.9 percent of apparent U.S. consumption in 2015, 79.5 percent in 2016, and

---

[31] CR at Table IV-3.
[32] CR at Table IV-3.
[33] CR at Tables III-9, IV-3, IV-13, VII-29.
[34] CR at Table IV-3.  As a share of apparent consumption, these domestic industry imports of nonsubject PET resin represented *** percent in 2015, *** percent in 2016, and *** percent in 2017. *Id.*
[35] CR at Table IV-3.

80.9 percent in 2017.[36]  To the extent the domestic industry's shipments of domestically

produced PET resin lost market share during the POI, an overall decline of 4.0 percentage

points from 2015 to 2017, the industry's *own* PET resin imports were responsible for \*\*\*

percentage points from 2015 to 2017 and accounted for \*\*\* percent of the decline in market

share of shipments of domestically produced PET resin.[37]

### 3.    Other Conditions of Competition

We continue to find, as in the Original Views, that price was "an important factor" in

purchasing decisions.[38]  Further, as discussed below, we again also find that although price is an

important factor, other factors such as availability and quality are often more important to

purchasers.  While U.S. producers uniformly reported that they perceived price to be the most

significant factor in purchasing decisions,[39] there was no similar consensus among U.S.

importers as to the significance of price in purchasing decisions.[40]  When comparing domestic

PET resin to imported PET resin, some importers indicated that price was not an important

purchasing consideration.  In particular, the data show that 3 of 8 responding importers of

product from Brazil, 1 of 6 responding importers of product from Indonesia, 3 of 8 responding

importers of product from Korea, 3 of 9 responding importers of product from Pakistan, and 7

of 10 responding importers of product from Taiwan reported that differences other than price

were sometimes, frequently, or always significant when comparing the imports with the

---

[36] Its market share was 76.3 percent in interim 2017 and 81.1 percent in interim 2018.  CR at Table C-1.

[37] CR at Table C-1.

[38] Original Views at 30.

[39] All four domestic producers reported that differences other than price were "never" significant when comparing the domestic like product and subject imports from each source.  CR at Table II-15.

[40] CR at Table II-15.

domestic like product.[41]  Purchasers' questionnaire responses also belied any general view that

price was the most significant factor in purchasing decisions.  Few or no U.S. purchasers

reported that differences other than price were "never" significant when comparing the

domestic like product and subject imports from each source.[42]  All 13 responding purchasers

comparing the domestic like product and subject imports from Indonesia and all 15 purchasers

comparing the domestic like product and subject imports from Taiwan reported that

differences other than price were sometimes, frequently, or always significant.[43]  For subject

imports from Brazil, only two of 15 responding purchasers reported that differences other than

price were never significant when compared with the domestic like product.[44]  For subject

imports from Korea, only one of 12 responding purchasers reported that differences other than

price were never significant.[45]  For subject imports from Pakistan, only one of 14 responding

purchasers reported that differences other than price were never significant.[46]

    While price was an important factor considered by purchasers in their purchasing

decisions, quality and availability were more important to most purchasers.  When asked to

rate the importance of 16 listed factors in their purchasing decisions, only one factor was rated

very important by all 25 respondents: availability.[47]  Product consistency was rated very

important by 24 of 25 responding purchasers, and reliability of supply was rated very important

---

[41] CR at Table II-15.
[42] CR at Table II-15.
[43] CR at Table II-15.
[44] CR at Table II-15.
[45] CR at Table II-15.
[46] CR at Table II-15.
[47] CR at Table II-9.

by 23 of 25 responding purchasers.[48]  Price was the fourth-ranked purchasing factor, with 22 of 25 responding purchasers rating it very important.[49]

Although purchasers generally cited price among the two most important factors in purchasing decisions, they more frequently cited availability or quality as more important. Twelve purchasers cited quality of PET resin as the first-most important purchasing factor, 10 cited PET resin availability/lead times as the second-most important factor, and nine cited price as the third-most important factor.[50]  The most often cited top two factors that firms considered in their purchasing decisions for PET resin were price (22 firms) and quality (20 firms).[51]  But only one of 25 responding purchasers reported that it always purchases the lowest priced PET resin product.[52]

Thus, notwithstanding the perception of domestic producers, the importer responses and the responses of actual purchasers indicate that while price is an important factor, other factors, specifically quality and availability, weigh importantly in such decisions as well.

**B.   Price Effects of Subject Imports**

As explained in the Original Views, the statute directs the Commission to undertake a two-pronged approach in considering price effects.[53]  First, we must determine "whether there has been significant price underselling by the imported merchandise as compared with the price of the domestic products of the United States;" and second, we must separately

---

[48] CR at Table II-9.
[49] CR at Table II-9.
[50] CR at Table II-8.
[51] CR at Table II-8.
[52] CR at II-23.
[53] Original Views at 32–33.

determine whether the imports are having price depressing or price suppressing effects on the domestic like product.[54]  In the Original Views, the Commission's analyses led it to the conclusion that there was neither significant underselling nor price depression or suppression. Only the first finding—of no significant underselling—is at issue in these remand proceedings.[55]

    **1. Data Collection**

  Applying our standard investigative methodology, the Commission collected average quarterly prices of the subject imports reported by U.S. importers for shipments to unrelated customers and average quarterly prices of the domestic like product reported by domestic producers for shipments to unrelated U.S. customers—which we refer to as "price data."[56] Specifically, the Commission collected price data from U.S. importers and domestic producers on four PET resin products meeting particular specifications, which we refer to as "pricing products" or simply "products";[57] the Commission chose these products with the input of Petitioners and respondents.[58]  All U.S. producers and eight importers provided some usable price data for sales of the requested products.[59]

  For each product, the Commission collected data from domestic producers and U.S. importers reflecting the quantity and f.o.b. value of their commercial shipments in each quarter

---

[54] 19 U.S.C. § 1677(7)(C)(ii).
[55] On appeal to the Court, Plaintiffs did not raise arguments concerning price depression or suppression.
[56] The terms "price data" and "pricing data" were used interchangeably in the Original Views.
[57] *See* Original Views at 33–34.
[58] Petitioners' Comments on Draft Questionnaires, EDIS Doc. 644147 (May 3, 2018); Graham Packaging Co. and Pactiv LLC Comments on Draft Questionnaires, EDIS Doc. 644192 (May 3, 2018); SK Chemicals America Comments on Draft Questionnaires, EDIS Doc. 644209 (May 3, 2018).
[59] *See* Original Views at 33–34; CR at V-9.

of the POI.[60]  These data present head-to-head price comparisons of PET resin with similar

specifications, sold during the same time period, at the same level of trade, and upon arm's

length commercial terms to unrelated customers.[61]  In these investigations, these data covered

a broad swath of U.S. PET resin shipments, and accounted in 2017 for approximately \*\*\*

percent of U.S. producers' shipments of PET resin, 100 percent of shipments of imports from

Brazil, \*\*\* percent of shipments of imports from Indonesia, 80.9 percent of shipments of

imports from Korea, 55.4 percent of shipments of imports from Pakistan, and 87.7 percent of

shipments of imports from Taiwan.[62]  Consequently, we find that these detailed and

comprehensive data of actual sales during the POI constitute the most probative information

allowing us to compare relative prices of subject imports and the domestic like product in order

to assess whether the subject imports undersold the domestic like product to a significant

degree.[63]

Because information provided by Petitioners during the preliminary phase of these

investigations suggested that some firms import PET resin either for internal consumption to be

used in the production of downstream products or for retail sales directly to end consumers,

the Commission collected information about these types of imports in the final phase of its

---

[60] CR at V-8.  As defined in the questionnaire, the values requested were f.o.b., U.S. point of shipment, should not have included U.S. inland transportation costs, and should have been net of all deductions for discounts or rebates.  *See* Blank Importer Questionnaire, EDIS Doc. 647038 (June 7, 2018) at 40.

[61] Price comparisons are the comparison of weighted average U.S. unit prices to the weighted average imported unit prices for the same pricing product.

[62] CR at V-9.

[63] Reviewing courts have recognized the value of the Commission's quarterly price comparisons in addressing whether there has been significant underselling.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1357; *Nippon Steel*, 458 F.3d at 1350; *Int'l Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade 2018); *Mexichem*, 179 F. Supp. 3d at 1246–47; *Arlanxeo USA LLC v. United States*, 2019 WL 2156362, at \*5 (Ct. Int'l Trade May 17, 2019), *aff'd* 2020 WL 5223723 (Fed. Cir. 2020).

investigations.[64]  The Commission identified these data as "purchase cost data for imports for internal consumption or retail sale" and requested that this data be reported as the "landed duty-paid" value of the imports.[65]  Purchase cost data for imports for internal consumption or retail sale are different from, and cannot be combined with, price data collected from U.S. importers for shipments to unrelated customers, as the latter reflect actual sales into the U.S. market and the former reflect U.S. importers' purchase costs.  U.S. importers' purchase costs do not capture other costs beyond the landed duty-paid value that U.S. importers may incur as a result of importing the product, such as logistical or supply chain costs and warehousing and inventory carrying costs.[66]  As a result, U.S. importers' purchase costs are not directly comparable to the U.S. importers' sales prices, which include all costs associated with importing.  For example, pursuant to the instructions in the Commission's importer questionnaire, *** provided in its questionnaire response purchase cost data for imports for internal consumption or retail sale along with estimates of its costs above the landed duty-paid

---

[64] Petition for the Imposition of Antidumping Duties: Imports of Certain Polyethylene Terephthalate Resin from Brazil, Indonesia, the Republic of Korea, Pakistan, and Taiwan, EDIS Doc. 623796 (Sept. 26, 2017), at 22.

[65] *See* Blank Importer Questionnaire at Q. III-2h to III-2o.  A "landed duty-paid" value is the value of the goods at the U.S. port of entry, including ocean freight and insurance costs, brokerage charges, and import duties.  *Id.* at Q. II-4.

In the Commission's staff report and its Original Views, the purchase cost data for imports for internal consumption or retail sale were referenced by the shorthand term "direct imports," reflecting that these data represented values for PET resin that firms imported for "direct" use in their own (or related firms') downstream production or for retail sales.  Use of this term, however, appears to have created some confusion, as illustrated by Petitioners' inaccurate reference to the quarterly price data as "indirect imports."  *See* Petitioners' Comments on Remand, pp. 3–11; Plaintiffs' Brief at 2, 6, 11, 15–17, 20, 22, 23, 25, 29, 30, 48.  Imports represented by the quarterly price comparison data are not "indirect imports"; they are products that are imported by importers and then sold through commercial transactions to unrelated purchasers.

[66] *See* Blank Importer Questionnaire at Q. II-4.

value (purchase cost) associated with this import activity.  These costs ranged from *** percent of the landed duty-paid value.[67]

Of the 19 importers that responded to the Commission's questionnaire during the final phase of these investigations, only two importers (***) reported purchase cost data for imports for internal consumption or retail sale, and only for one of the four pricing products (Pricing Product 1).[68]  These purchase cost data indicate that these imports of Pricing Product 1 were valued lower than the price data for domestic product in 21 quarterly comparisons (217 million pounds) by an average difference of 6.8 percent, while they were valued higher than the domestic product in six quarterly comparisons (59 million pounds) by an average difference of 8.6 percent.[69]  Over the POI, however, we find that the volume of such lower-valued subject imports internally consumed or for retail sale (217 million pounds) was small relative to the total volume of subject imports (nearly 2 billion pounds) and much smaller than the volume of subject imports reported in the importers' sales price data that oversold the domestic product (895 million pounds).[70]

We considered these collected purchase cost data and other data regarding price in our examination of underselling, although for the reasons stated above as elaborated below, we find the comprehensive quarterly price data to be paramount and the most probative price information collected in these investigations.

---

[67] CR at V-20.

[68] Original Views at 36.  As noted below, the Commission found unusable the data reported by ***.  *See* section II.B.2.c, *infra*.

[69] CR at Table V-7.  *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, USITC Pub. 4835 at 25 n.142.

[70] CR at Tables IV-2, V-7, V-10.  *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, USITC Pub. 4835 at 25 n.142.

### 2.    Inclusion of Certain Questionnaire Responses

The Court identified four questionnaire responses for which it requested more explanation from the Commission on its decisions of whether or not to include certain or all information contained in each one for the final phase of these investigations.  We provide that further explanation below.

### a.    ***

Importer *** completed a questionnaire response in the preliminary phase of these investigations, in which it provided responses to the price data requests.[71]  However, it did not respond to the final phase questionnaire despite efforts by Commission staff to elicit its response.  Reflecting the different periods of investigation, the price data requested in the preliminary phase of the investigations covered an overlapping but different period from that covered in the final phase.  The annual periods covered by the former were 2014–2016, whereas the annual periods for the final phase were 2015–2017.[72]  The Court has sought further explanation from the Commission as to why it did not include *** preliminary phase price data in the compilation of price comparison data in the final phase of the investigations.[73]

While the Court labeled *** as a "significant importer" and stated that *** price data represented *** percent of shipment volume in ***,[74] these statements were based on an imprecise description of the relative share of *** price data in 2016 in the Commission staff

---

[71] *** Importer Questionnaire Response, ***, at Part III.
[72] *See* Blank Importer Questionnaire, EDIS Doc. 624257 (Sept. 28, 2017) (preliminary phase); Blank Importer Questionnaire, EDIS Doc. 647038 (June 7, 2018) (final phase).
[73] Slip Op. at 26.
[74] Slip Op. at 25–26.

report.[75]  *** price data represents ***.[76]  *** imported subject merchandise from ***.[77]  When calculated as a share of commercial U.S. shipments of subject imports, *** price data actually accounted for *** percent in ***.[78]  Furthermore, its imports represented *** percent of cumulated subject imports in *** and *** percent of apparent U.S. consumption in ***.[79]  These data clarify that *** data accounted for nowhere near *** percent of total shipment volume.

The Commission used the import volume and value data provided by *** in its importers' questionnaire response from the preliminary phase during the final phase of these investigations.  These data raised no concerns regarding their accuracy and were appropriately incorporated during the final phase.  However, an examination of the same questionnaire response revealed that ***.[80]  Consequently, ***.

---

[75] CR at V-9 n.18.

[76] Staff Calculations, EDIS Doc. 718201 (Aug. 26, 2020).

[77] CR at Table IV-1.

[78] This figure is correct whether based on the data collected during the preliminary phase or the final phase of these investigations.

[79] Data Worksheets, EDIS Doc. 658541 (October 11, 2018).

[80] *See* Blank Importer Questionnaire at 10.  The relevant question and table for its ***.  *** Importer Questionnaire Response, *** at Q. II-7a, Q. III-2c; *** Importer Questionnaire Response Revision, ***; *** Importer Questionnaire Response Revision, ***; *** Importer Questionnaire Response Revision, ***.

Furthermore, even for the data that *** categorized as price data in its preliminary

phase questionnaire response, its reported prices were aberrant by any standards.  These

reported data showed ***.[81]  ***.[82]

###### b.   ***

The Court remanded for further explanation the Commission's decision to include ***

importer questionnaire responses in their entirety despite Plaintiffs' allegations of an

inconsistency between the responses that the Commission did not reconcile.[83]  In its purchaser

questionnaire response, the company stated "***" to a yes-no question regarding whether

subject imports it purchased instead of the domestic like product were lower priced.[84]  In its

importer questionnaire response, *** submitted its company's numerical price data for its sales

---

[81] CR at V-9 n.18.  ***.  *** Importer Questionnaire Response, *** at Q. II-7a, Q. III-2c; *** Importer Questionnaire Response Revision, ***; *** Importer Questionnaire Response Revision, ***; *** Importer Questionnaire Response Revision, ***.

[82] Although not specifically at issue in this remand, the Court found in its opinion that "the Commission did not contact *** regarding any potential errors until over eleven months after it submitted its data at the preliminary stage and only twenty-four days before the record closed."  Slip Op. at 26.  The Commission respectfully submits that further contact with *** as to these potential errors was not warranted.  As a general matter, once the preliminary phase of an investigation has ended, the Commission does not expend further resources perfecting questionnaire responses from this preliminary phase, but instead subsequently issues new questionnaires pertaining to the final phase of the investigation, which covers an overlapping, but later period of time.  The Commission collects new data for this later time period and, with respect to questions that may have arisen during the preliminary phase of an investigation, seeks information on such questions following party comments during questionnaire drafting.  Additionally, in this particular instance, *** individually responded several times to Commission questions during the preliminary phase, which provided a reasonable indication that *** would respond to the Commission's questionnaire during the final phase.  *See* *** Importer Questionnaire Response Revision, ***; *** Importer Questionnaire Response Revision, ***; *** Importer Questionnaire Response Revision, ***.

[83] Slip Op. at 27–28.

[84] ***, EDIS Doc. 650041 (July 11, 2018) at Q. III-28.  In its submissions, Plaintiffs repeatedly cite to an incorrect question in the purchaser questionnaire.  *See* Plaintiffs' Brief at 25 (citing Q. IV-3); Plaintiffs' Reply Brief at 12 (citing Q. IV-3); Plaintiffs' Comments on Remand, p. 10 (citing Q. IV-3).  Question IV-3 in the purchaser questionnaire is not a yes-no question.  *See* Blank Purchaser Questionnaire, EDIS Doc. 647038 (June 7, 2018) at Q. III-28 and IV-3.

of subject imports, showing that ***.[85]  Petitioners requested that the detailed price data of

*** sales of subject imports, demonstrating general ***, be excluded in the final phase of these

investigations in favor of the yes-no question, in which *** stated that subject imports were

*** priced than domestic product.[86]

     *** are extensive in coverage and reflect actual and precise prices and quantities, while

the answer at issue in *** is not.  The price data in *** importer questionnaire response reflect

*** sales of subject imports from ***.[87]  As the Court recognized, these data reflect that *** "is

a major importer."[88]

     In contrast, Petitioners point to *** answer to one part of one question in its ***.[89]  The

question as a whole, however, begins by asking *** if it has made these purchases "{s}ince

January 2015," or to restate, at any point during the POI, to which *** responded "***."[90]  ***

indicating when these purchases were made, the type or volume of PET resin purchased,

frequency, or, as opposed to ***, how much *** the purchases of subject imports were than

the domestic like product.  Moreover, in the same question, *** explained that ***.[91]

     Other answers in *** response regarding price and its purchasing decisions, taken

together, provide even more context than any single answer.  Purchasers were asked to

---

[85] *** Importer Questionnaire Response, ***.
[86] Plaintiffs' Comments on Remand, p. 10.
[87] *** Importer Questionnaire Response at Q. III-2.
[88] Slip Op. at 12.
[89] Plaintiffs' Reply Brief at 17. *See* *** at Q. III-28.
[90] *** at Q. III-28.
[91] *** at Q. III-28.

compare the domestic product and the imports from each of the subject countries for which they had knowledge for a number of different purchasing factors, including price.  ***.[92]

In our analysis of *** importer questionnaire data and *** questionnaire response, we find the specific price data more probative for our price analysis than general comments about perceived price in the market and do not question the accuracy of either of its questionnaire responses.  We again emphasize that the questions examined in *** importer *** questionnaire responses explore different subject matter and, in this case, ***.  Therefore, they cannot be directly compared.  However, even considered collectively, the questionnaires indicate that ***.[93]  We find no contradiction between these questionnaire responses.  For all these reasons, we again decline to exclude any of the data or other responses from either *** final phase questionnaires.

### c.   ***

The Court instructed the Commission to explain its exclusion of the data of ***, finding that the Commission "failed to address conflicting evidence" in excluding *** data.[94]

*** of its importer questionnaire on ***.  It reported ***.[95]

The questionnaire had asked *** for quantities and values of its U.S. commercial shipments of the four defined pricing products or, if *** imported for its own internal

---

[92] *** at Q. IV-3.
[93] Derived from *** Importer Questionnaire Response at Q. III-2 and CR at Tables V-3 to V-6. *See* Staff Calculations, EDIS Doc. 720083 (Sept. 21, 2020).
[94] Slip Op. at 23–24, 31.
[95] *** Importer Questionnaire Response, ***, at Q. III-2r ("First *** Importer Questionnaire Response").

consumption or retail sale, the quantities and purchase costs of the four defined pricing products, plus estimates of additional importing costs.  ***.[96]

In describing its business model, ***.[97]  ***.[98]  ***.[99]  ***.[100]

*** of its importer questionnaire on ***.  It reported ***.[101]  ***.[102]  Most importantly, ***.[103]

The data pertaining to price that *** submitted in its revised importer questionnaire response were not included in the Commission staff report as ***.  Despite numerous shortcomings with these data and the fact that *** did not internally consume or sell its imports of PET resin at the retail level, the data pertaining to price reported by *** in the pricing product tables were included in the staff report as ***.[104]  These shortcomings include the fact that *** placed its data in the ***.  Furthermore, because *** reported the value of its U.S. commercial shipments as being ***.[105]

We again find that the data pertaining to price provided by *** are not properly considered by the Commission.  *** stated that it ***, and we have no factual basis to assign these data among the pricing products.  In addition, given ***.

---

[96] First *** Importer Questionnaire Response at Q. III-2r.

[97] First *** Importer Questionnaire Response at Q. III-2r.

[98] First *** Importer Questionnaire Response at Q. III-2r.

[99] First *** Importer Questionnaire Response at Q. III-2r.

[100] First *** Importer Questionnaire Response at Q. III-2r.  ***.  This same business scenario was detailed in ***, which ***.  *See id.* (referencing ***); *** Importer Questionnaire Response, *** at Q. III-2r ("Second *** Importer Questionnaire Response") (same); ***; CR at I-15 to I-16, V-1.

[101] Second *** Importer Questionnaire Response at Q. III-2a to III-2c, III-2e.  ***.  *See* First *** Importer Questionnaire Response at Q. III-2.

[102] Second *** Importer Questionnaire Response at Q. III-2i to III-2m.

[103] Second *** Importer Questionnaire Response at Q. III-2r.

[104] CR at V-9 n.19.

[105] CR at V-9 nn.19 & 24.

The Court found that even if *** data should not have been included in the price data or the purchase cost data for imports for internal consumption or retail sale, as we have again found, its reported data "still constitute evidence that fairly undermines the Commission's conclusion" because it was the *** and the placement of its data in the staff report as ***.[106] The Commission must consider all information on the record, but the placement of these data in the staff report is not binding on the Commission as to its nature and the merit we accord it in our analysis.[107]  Moreover, although the *** questionnaire response would indicate that it ***, the attendant values of those reported volumes by themselves provide no basis for comparison with the prices for domestic products.

### d.   ***

The Court directed the Commission to explain its differing treatment of the questionnaire data of ***, which was excluded, and the questionnaire data of ***, which was included, when a "similar inconsistency" in the reported data was found in each questionnaire.[108]

We find that there is a meaningful difference between the questionnaire data submitted by *** and *** in that, as explained above, *** that can be compared, and therefore used, in any way to price data for the domestic like product in our underselling analysis.  By contrast, ***, an importer engaged in usual and open commercial market transactions, submitted

---

[106] Slip Op. at 31.
[107] *Altx, Inc. v. United States*, 26 Ct. Int'l Trade 1425, 1432–33, 25 I.T.R.D. (BNA) 1028, 1034 (Ct. Int'l Trade 2002), *aff'd*, 370 F.3d 1108, 1121–22 (Fed. Cir. 2004).
[108] Slip Op. at 24–25.

specific and usable price data for ***.[109]  ***.[110]  The precision of the data being reported was

at issue ***, and therefore we find that it was reasonable to include *** data, and that its

inclusion has no bearing on the exclusion of the reported data of ***.[111]

### 3.     Underselling Analysis

As in the Original Views, we again find that the record indicates a high degree of

substitutability between subject imports and the domestic like product and that price is "an

important consideration" in purchasing decisions.[112]  We emphasize, however, that in light of

the evidence showing that quality and availability were at least as important to many

purchasers during the POI, price by itself would in many instances not be determinative in

purchasing decisions.  In fact, the record in these investigations shows that, while subject

import volumes increased during the POI, those imports predominantly sold at higher prices

than the domestic product—indicating that factors other than price were influencing

purchasing decisions.

We continue to find that the record indicates predominant overselling of the domestic

product by subject imports and offer additional explanation of these findings in response to the

Court's instructions.[113]

---

[109] *** Importer Questionnaire Response, ***, at Q. III-2d; phone note by ***, ***.

[110] Phone note by ***.

[111] Even if we were to exclude *** data for that single quarter, which represented *** percent of the quantity of the price data and *** percent of the value of the price data for that product in that quarter, the price for all subject imports would have been $*** per pound rather than $*** per pound. As the calculated U.S. price would remain unchanged at $*** per pound, the data would continue to show overselling by the subject imports of the domestic like product.  Data Worksheets, EDIS Doc. 658541 (October 11, 2018).

[112] Original Views at 33; CR at Tables II-9, II-13, II-15.

[113] Original Views at 34–35.

Consistent with our well-established practice, we focused our underselling analysis on a comparison of the number of instances of underselling to the number of instances of overselling as reflected in the quarterly price comparison data.  We obtained quarterly POI-wide comparative data for each of the four pricing products, resulting in 156 instances in which we could compare subject import and domestic prices.  These data showed predominant overselling of the domestic product by subject imports, with subject imports selling at higher prices than the comparable domestic product in 106 of 156 quarterly price comparisons, *i.e.*, 68 percent of comparisons, and selling at lower prices than the domestic product in only 50 of 156 quarterly price comparisons, *i.e.*, 32 percent of comparisons.  Furthermore, the 8.1 percent average margin of overselling exceeded the 5.8 percent average margin of underselling.[114]

The quarterly price data also show predominant overselling of the domestic product by subject imports when examined on the basis of sales quantities.  During the POI, subject imports oversold the comparable domestic product in comparisons representing 895 million pounds (69 percent of sales volumes) and undersold the domestic product in comparisons representing 394 million pounds (31 percent of sales volumes).[115]  Overselling predominated for all pricing products except for Pricing Product 3, which accounted for the smallest volume of subject imports.[116]

The trends in the price comparison data further indicate that there was not significant underselling by the imports in the context of these investigations.  Underselling was most frequent early in the POI, with 21 of 36 occurrences (58 percent) in 2015 showing

---

[114] CR at Table V-10.
[115] CR at Table V-10.
[116] CR at Table V-10.

underselling.[117]  In each of the last two years of the POI, overselling predominated, with 32 of

50 occurrences (64 percent) in 2016 and 40 of 47 occurrences (85 percent) in 2017 showing

overselling.[118]

Because the comprehensive quarterly sales price data reflect predominant overselling of

the domestic product by subject imports, we find that these data weigh heavily against a

finding of significant underselling of the domestic product by subject imports.

As instructed by the Court, we have also again scrutinized the purchase cost data for

imports for internal consumption or retail sale collected in these investigations.  The

Commission received valid and usable purchase cost data for only one of the four defined

pricing products—Pricing Product 1—from importers ***.[119]  As explained above, the

Commission declines to include in our analysis the data reported by *** given its repeated

explanation that it was unable to distinguish its data according to the specific pricing product

descriptions.  We therefore again consider purchase cost data for imports for internal

consumption or retail sale only for the one product on which we received such data, Pricing

Product 1.

The purchase cost data indicate that the reported values of imports of Pricing Product 1

for internal consumption or retail sales are generally lower than reported prices for domestic

---

[117] *See* CR at Tables V-3 to V-6.
[118] *See* CR at Tables V-3 to V-6.
[119] CR at V-19.

Pricing Product 1.[120]  However, the volume of such imports is small relative to the total volume of subject imports and to the volume of importers' sales of subject imports that oversold the domestic product—as reflected in the price data.[121]  As detailed above in our discussion of the price data, subject imports oversold the comparable domestic product in comparisons representing 895 million pounds.[122]  By comparison, the purchase cost data for imports for internal consumption or retail sale reflecting values lower than the price data for domestic product represented only 217 million pounds.[123]  Accordingly, when considering both sets of data, the price data continue to show predominant overselling by the subject imports on a volume basis.

Furthermore, there are limitations to comparisons of purchase cost data for imports for internal consumption or retail sale and U.S. producer price data because the purchase cost data for imports for internal consumption or retail sale do not capture other costs beyond the landed duty-paid costs that importers may incur as a result of importing the product, as discussed above.  As a result, purchase cost data for imports for internal consumption or retail

---

[120] The purchase cost data for imports for internal consumption or retail sale for Pricing Product 1 reflected values lower than the price data for domestic Pricing Product 1 in 21 quarterly comparisons (representing 217 million pounds) by an average difference of 6.8 percent, while these data reflected values higher than the price data for domestic Pricing Product 1 in six quarterly comparisons (representing 59 million pounds) by an average difference of 8.6 percent.  Derived from CR at Table V-7. *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, USITC Pub. 4835 at 25 n.142.

[121] As explained above, we use the term "price data" to refer to U.S. importers' and domestic producers' sales price for shipments to unrelated customers, whereas we use the term "purchase cost data for imports for internal consumption or retail sale" to refer to the landed duty-paid value of imports made by U.S. importers for their internal consumption or for retail sale.

[122] CR at Table V-10.

[123] Derived from CR at Table V-7.

sale may not fully reflect the actual cost to the importer.[124]  ***, which accounted for most of the quantity of the purchase cost data for imports for internal consumption or retail sale, provided estimates of the costs above landed duty-paid value associated with its importing activities.  *** estimated that inventory carrying costs were *** percent of landed duty-paid value, while other costs ranged from *** percent of the landed, duty-paid value.[125]  We find again that the additional costs associated with purchase cost data for imports for internal consumption or retail sale narrow the difference between the values of such imports and domestic prices.[126]

Based on the foregoing, we maintain our finding that the price data as a whole do not show significant underselling.

We have also considered the lost sales that the domestic industry claimed were due to price competition from subject imports.  Purchasers were asked in their questionnaires whether they had purchased subject imports instead of the domestic like product during the POI.  The Commission received responses from 25 purchasers providing comprehensive

---

[124] *See Tool Chests and Cabinets from China*, Inv. No. 701-TA-575 (Final), USITC Pub. 4753 (January 2018) at 28 n.149; *Silicon Metal from Australia, Brazil, Kazakhstan, and Norway*, Inv. Nos. 701-TA-567–569 and 731-TA-1343–1345 (Final), USITC Pub. 4773 (April 2018) at 25 n.144.

[125] CR at V-20.  Commissioner Schmidtlein notes that subsequent to the issuance of the questionnaires in the final phase of these investigations, the Commission refined its questions regarding purchase costs for imports for internal consumption or retail sale.  The questionnaires now specifically request additional costs that the importer would not have incurred if it purchased the product from another importer or a domestic producer.  It is unclear in this instance whether *** would have incurred inventory carrying costs or the other reported additional costs if it had purchased PET resin from an importer or domestic producer, but Commissioner Schmidtlein has erred on the side of including those additional costs in her analysis.

[126] *See* CR at V-20, Table V-7.  As noted above, for the quarterly comparisons in which the import purchase cost was lower than the domestic sales price, the average difference was 6.8 percent.  *Id.* at Table V-7.  *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, USITC Pub. 4835 at 25 n.142.

coverage of the entire U.S. market for that period.[127]  Nineteen of the 25 purchasers reported

that they purchased subject imports instead of the domestic product during the POI.[128]  Eleven

of those 19 purchasers reported that the subject imports were priced lower than the domestic

product, while the remaining eight said they were not priced lower.[129]  These responses do not

specify quantities, prices, and time periods of purchasing, unlike the price data.[130]  In addition,

only four of those 11 purchasers who reported that subject imports were priced lower than the

domestic product also reported that the lower price of subject imports was a primary factor in

purchasing decisions.[131]  Nor did any of those four purchasers report reducing their share of

purchases from domestic sources over the POI.[132]  In fact, one of them, ***, which accounted

for the large majority of the volume of subject imports that were reportedly purchased due to

their lower price, also reported increasing its share of total purchases from domestic sources

over the POI.[133]

Further, the total volume of subject imports purchased by those four importers was

relatively small, accounting for a total of *** pounds of subject imports.[134]  This volume of

---

[127] *Compare* CR at Table V-11 *with* Table IV-12.

[128] CR at Table V-12.

[129] CR at Table V-12.

[130] *See* CR at Tables V-3 to V-6.

[131] CR at Table V-12.  As discussed above, the record in this case provides ample support for the importance of factors other than price—such as availability and reliability of supply—to U.S. purchasers of PET resin.  *See* section II.A.3, *supra*.

[132] CR at Tables V-11, V-12.

[133] CR at Tables V-11, V-12.

[134] CR at Table V-12.  One of the four purchasers, ***, did not provide a quantity purchased. However, *** also reported "no" in response to the question of whether subject imports were priced lower than the domestic product.  *Id*.

subject imports reportedly purchased due to price was equivalent to only \*\*\* percent of subject imports and \*\*\* percent of apparent U.S. consumption over the POI.[135]

Purchasers were also asked to compare and rate the domestic product and imports from each subject country with regard to 16 factors that influence purchasing decisions.[136]  For the factor of price, half of the purchasers familiar with subject imports from Brazil (four of eight purchasers) and half of the purchasers familiar with subject imports from Indonesia (two of four purchasers) rated those products as comparably or higher priced than the domestic product, while the other halves rated those imports as lower priced than the domestic product. Purchasers familiar with subject imports from Taiwan were similarly closely split, with five rating the subject imports as comparably or higher priced than the domestic product, and six rating the subject imports as lower priced.[137]  Purchasers familiar with subject imports from Korea leaned towards rating the subject imports lower priced, with three rating imports as comparably or higher priced and five ranking them as lower priced, while purchasers familiar with subject imports from Pakistan leaned the other way, with six rating the subject imports as comparably or higher priced and only three ranking the subject imports as lower priced.[138]  In sum, subject imports from three of the five subject countries were more often rated as comparably priced or higher priced than the domestic product.[139]  Thus, these rankings do not provide evidence compelling a finding that the cumulated subject imports were generally priced lower than the domestic product, let alone significantly undersold the domestic product.

---

[135] CR at Tables V-12, C-1.
[136] CR at Table II-11 & n.1.  *See id.* at II-29 n.47.
[137] CR at Table II-11.
[138] CR at Table II-11.
[139] CR at Table II-11.

Particularly when considered alongside the detailed and comprehensive quarterly price data, these rankings do not detract from the actual sales data showing that the subject imports predominantly oversold the domestic product.

The Court has asked us to consider and better explain why the aggregation of the responses on this factor, as urged by Petitioners, does not undermine our finding that overselling predominated.[140]  As an initial matter, we do not find that simply adding purchaser responses to a rating question is particularly meaningful in isolation, given that such an approach does not account for factors such as product mix and volumes represented by the responses.  Also, in addressing this point, the Court relied on Petitioners' incomplete calculation of the ratings to note that "there were twenty purchaser responses of underselling and only nine of overselling."[141]  Petitioners, however, ignore all of the ratings of "comparable," notwithstanding that those ratings are as pertinent as the ratings for higher prices or lower prices.  Particularly, a rating of "comparable" indicates that the subject imports were not lower priced than the domestic product, and therefore would not support a finding of significant underselling.  When the "comparable" responses are included, 20 purchaser responses rating subject import prices lower and 20 purchaser responses rating subject import prices comparable or higher priced than the domestic product.[142]  To the extent this numeric comparison adds to our evaluation, we do not find that the even split in these ratings outweighs the comprehensive and data-specific quarterly price comparisons which show predominant overselling by the subject imports.

---

[140] Slip Op. at 29–30.
[141] Slip Op. at 29; Petitioners' Comments on Court Remand at 4–5.
[142] CR at Table II-11.

The Court also took note of Petitioners' argument that 16 purchasers responded in some fashion to the overall factor rating question, even though not all 16 responded to the specific price factor question at issue here or provided data for every country comparison.[143] Plaintiffs argued that because there were more purchasers (16) who responded to this specific price factor rating question than there were importers (eight) and domestic producers (four) that provided the data for the 156 quarterly price comparisons, the responses to the rating question cannot be given less weight.[144] This argument overlooks the sheer volumes of shipments, of both subject imports and domestic product, that were accounted for in the quarterly price comparisons. These data were reported by all four domestic producers of PET resin, *i.e.*, all three Petitioners themselves and M&G, accounting for \*\*\* of U.S. producers' 2017 shipments of PET resin,[145] and by importers whose price data accounted in 2017 for 100 percent of shipments from Brazil, \*\*\* percent of shipments from Indonesia, 80.9 percent of shipments from Korea, 55.4 percent of shipments from Pakistan, and 87.7 percent of shipments from Taiwan.[146] We determined to rely heavily on the quarterly price comparisons in these investigations not based on the number of firms from which these data were collected, but rather on the detailed and accurate nature of such types of data and the comprehensive coverage of these data in these investigations. We find the coverage levels to be substantial and the data to provide more probative information on the issues of quantity, value, and

---

[143] *See* Slip Op. at 29–30.
[144] *See* Slip Op. at 29–30; Plaintiffs' Brief at 17–18.
[145] *See* CR at III-1, V-9.
[146] CR at V-9. The lower coverage for imports from Indonesia was attributable in part to the \*\*\*. *Id.* at V-8 n.17, V-9 n.22.

instances of underselling than a simple tally of how many firms responded to a comparison of factors.[147]

To summarize our consideration of the purchaser price ratings, we first note that most responses for three of the five subject countries indicated that the subject imports were not lower priced than the domestic product, and thus did not support of finding of significant underselling.  Second, while we disagree that we are required to accept Petitioners' proposed methodology for assessing the meaning of the responses to the price ratings over our well-established methodology, even using Petitioners' approach, at best the numbers show that responding purchasers were evenly split as to whether or not subject imports were lower priced than the domestic product.  Even viewed this way, these data do not undermine the quarterly price comparisons and do not compel a finding of significant underselling.  Finally, we reject Petitioners' proposal that the number of responding firms is more important to our price analysis than the comprehensiveness and detail of the data.  As explained above, we find that the quarterly price comparisons were comprehensive in that they both spanned the entire POI and accounted for large quantities of U.S. shipments on PET resin.  These data showed

---

[147] Petitioners also misapprehended why the Commission placed less weight on the answer to the price rating question than on the multiple data responses used in the quarterly price data comparisons.  By arguing that the Commission's weighing of the ratings was "inconsistent" with its weighing of the price comparisons, Plaintiffs have assumed the Commission's reason for giving less weight to the rating response was because not all 16 responding purchasers provided data for every country.  This is not, however, the basis for our finding that these responses are less probative than the detailed quarterly price data; rather, as discussed above, we do not find that counting the number of firms that responded to any particular question outweighs our examination of the specific data covering the vast majority of U.S. shipments of PET resin.  The Court noted that the Commission relied on the quarterly price comparisons notwithstanding that not all firms reported price data for all quarters.  *See* Slip Op. at 17–18.  We would not expect all firms to report detailed price data on the defined products for all 13 quarters, as it would not be unusual for some firms to have no sales during certain quarters over a three-year-plus period.

predominant overselling by the subject imports, and the purchasers' price ratings do not undermine this robust evidence of overselling.

The Court instructed the Commission on remand "to address prior determinations that even underselling that occurred in less than 50 percent of price comparisons could be significant."[148] The Court based this instruction on its holding that the Commission has made prior determinations of a general nature that "mixed underselling is more significant in price-sensitive markets for substitutable goods," and that where the Commission makes the same two determinations, *i.e.*, price sensitivity and substitutability, on which "this finding of a general nature is predicated," the Commission must address why the underselling that it found was not significant.[149]

As a factual matter, we clarify that our findings in these investigations are not that there was "mixed" underselling. To the contrary, we explicitly find that the data in these investigations evidenced predominant overselling by the subject imports. As discussed above, the data showed that the subject imports oversold the domestic product in 68 percent of price comparisons during the POI, and in 76 percent of comparisons during the last two years of the POI.[150] This is not a case where the number of instances of underselling and overselling are close or "mixed," but rather one in which instances of overselling far prevail. For this reason alone, a comparison to prior investigations in which the Commission found "mixed" underselling may not be informative.

---

[148] Slip Op. at 41.
[149] Slip Op. at 20–21.
[150] *See* CR at Tables V-3 to V-6.

Additionally, as we have noted in the introductory section to these Views, we respectfully disagree that Commission findings on price sensitivity, substitutability, and underselling are general in nature.  As the Court of International Trade has previously noted, the Commission "is not compelled to find a certain percentage of underselling to be significant in one investigation merely because it has done so in previous cases.  The significance of underselling in an investigation will necessarily depend on the particulars of the product and industry at issue, not necessarily on the import of certain percentages understood in the abstract."[151]

Nonetheless, we explain below how the facts of these investigations distinguish them from those of other investigations cited by Plaintiffs in their submissions to the Court.

> a.   **Certain Hot-Rolled Steel Flat Products from Australia Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom**

In the *Hot-Rolled Steel* determinations, the Commission found that there was a high degree of substitutability between subject imports and the domestic like product and that price was an important consideration in purchasing decisions, as in the present investigations.[152] Cumulated subject imports undersold the domestic like product in 49.5 percent of 396 quarterly comparisons and by 67.3 percent in terms of volume.[153]  In the present investigations,

---

[151] *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1365 (Ct. Int'l Trade 2001), *aff'd following remand*, 370 F.3d 1108 (Fed. Cir. 2004).  *See also Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 718 (Fed. Cir. 2020) (quoting *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007) (That the Commission reached different outcomes in cases with different circumstances 'do{es} not indicate that the Commission either committed legal error in the methodology it used in this case or departed from the mode of analysis it regularly employs.'")

[152] *See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545–547 and 731-TA-1291–1297 (Final), USITC Pub. 4638 (Sept. 2016) at 35.

[153] *See Certain Hot-Rolled Steel,* USITC Pub. 4638 at 35–36.

those comparable underselling percentages were 32 percent and 31 percent, respectively.[154]

Moreover, underselling was predominant during 2014 and continued into 2015 in the earlier

determinations, when the volume and market share of subject imports were at their peak,

suggesting that the underselling was contributing to these increases.[155]  In the present

investigations, overselling was predominant in 2016 and 2017, when the volume and market

share of subject imports were at their peak.[156]  Whereas in *Hot-Rolled Steel*, more than one-

third of responding purchasers (18 of 48) stated that price was the primary reason for

purchasing subject imports instead of the domestic product, in the present investigations, less

than one in six responding purchasers (four of 25) reported that price was a primary factor in

their decision to purchase subject imports.[157]  The Commission found "predominant

underselling" by subject imports in *Hot-Rolled Steel*, whereas in the present investigations, we

found and continue to find "predominant overselling."[158]  We do not find the unique facts, and

the analysis and conclusions drawn from them, in the *Hot-Rolled Steel* determinations to be

applicable to the present investigations and determinations.

>    b.  **Certain Corrosion-Resistant Steel Products ("CRS") from China,
>        India, Italy, Korea, and Taiwan**

In the *CRS* determinations, the Commission found that there was a moderate to high

degree of substitutability between subject imports and the domestic like product and that price

was an important consideration in purchasing decisions, which is somewhat similar to the

---

[154] Original Views at 34.

[155] *See Certain Hot-Rolled Steel*, USITC Pub. 4638 at 36.

[156] Original Views at 34–35; CR at Table C-1.

[157] *See Certain Hot-Rolled Steel*, USITC Pub. 4638 at 36 n.187; CR at Table V-12.

[158] *See Certain Hot-Rolled Steel*, USITC Pub. 4638 at 36–37; Original Views at 34–35.

present investigations.[159]  Cumulated subject imports undersold the domestic like product in 59 percent of 239 quarterly comparisons and by 72 percent in terms of volume.[160]  In the present investigations, the comparable underselling percentages were 32 percent and 31 percent, respectively.[161]  Moreover, underselling was predominant during 2014 in the earlier determinations, when the volume and market share of subject imports were at their peak.[162]  In the present investigations, overselling was predominant in 2016 and 2017, when the volume and market share of subject imports were at their peak.[163]  In *CRS*, almost all responding purchasers (12 of 13) stated that price was the primary reason for purchasing subject imports instead of the domestic product, whereas in the present investigations, only four of 25 indicated as much.[164]  In *CRS*, the Commission found underselling by subject imports to be "significant," whereas in the present investigations, we found and continue to find "predominant overselling."[165]  We do not find the unique facts, and the analysis and conclusions drawn from them, in the *CRS* determinations to be applicable to the present investigations and determinations.

### c.  Cold-Rolled Steel Flat Products from China and Japan

In *Cold-Rolled Steel*, the Commission found that there was a high degree of substitutability between subject imports and the domestic like product and that price was an

---

[159] *See Certain Corrosion-Resistant Steel Products from China, India, Italy, Korea, and Taiwan,* Inv. Nos. 701-TA-534–537 and 731-TA-1274–1278 (Final), USITC Pub. 4620 (July 2016) at 25.

[160] *See Certain Corrosion-Resistant Steel Products from China et al.,* USITC Pub. 4620 at 26.

[161] Original Views at 34.

[162] *See Certain Corrosion-Resistant Steel Products from China et al.,* USITC Pub. 4620 at 26.

[163] Original Views at 34–35; CR at Table C-1.

[164] *See Certain Corrosion-Resistant Steel Products from China et al.,* USITC Pub. 4620 at 27 n.136; CR at Table V-12.

[165] *See Certain Corrosion-Resistant Steel Products from China et al.,* USITC Pub. 4620 at 27; Original Views at 34–35.

important consideration in purchasing decisions, as in the present investigations.[166]  But in *Cold-Rolled Steel*, unlike in the current investigations, cumulated subject imports undersold the domestic like product in 67 percent of quarterly comparisons and representing 77 percent of volume.[167]  In the present investigations, the near converse is true, with underselling in 32 percent of the comparisons representing 31 percent of volume.[168]  Moreover, underselling occurred most frequently during 2014 in *Cold-Rolled Steel*, when subject imports gained market share.[169]  In the present investigations, overselling was most frequent in 2016 and 2017, when the volume and market share of subject imports were at their peak.[170]  In *Cold-Rolled Steel*, price was the most frequently cited first-most factor for purchasers when making a purchase, and in the present investigations it was not.[171]  More than one-third of responding *Cold-Rolled Steel* purchasers (15 of 42) stated that price was the primary reason for purchasing subject imports instead of the domestic product in the earlier determinations, whereas in the present investigations, it was four of 25.[172]  The Commission considered all these data and found underselling by subject imports to be "significant" in *Cold-Rolled Steel*, whereas in the present investigations, we have considered all available data and found, and continue to find, "predominant overselling."[173]  We do not find the unique facts, and the analysis and

---

[166] *See Cold-Rolled Steel Flat Products from China and Japan*, Inv. Nos. 701-TA-541 and 731-TA-1284 and 1286 (Final), USITC Pub. 4619 (July 2016) at 26, 28.

[167] *See Cold-Rolled Steel Flat Products from China and Japan*, USITC Pub. 4619 at 29.

[168] Original Views at 34.

[169] *See Cold-Rolled Steel Flat Products from China and Japan*, USITC Pub. 4619 at 29.

[170] Original Views at 34–35; CR at Table C-1.

[171] *See Cold-Rolled Steel Flat Products from China and Japan*, USITC Pub. 4619 at 26; CR at Table II-8.

[172] *See Cold-Rolled Steel Flat Products from China and Japan*, USITC Pub. 4619 at 30 n.155; CR at Table V-12.

[173] *See Cold-Rolled Steel Flat Products from China and Japan*, USITC Pub. 4619 at 30; Original Views at 34–35.

conclusions drawn from them, in *Cold-Rolled Steel* to be applicable to the present investigations and determinations.

### d. Certain Steel Nails from China

In the *Steel Nails* determination, the Commission found that there was a moderate to high degree of substitutability between subject imports and the domestic like product and that price was "generally … the largest single factor affecting purchasing decisions."[174]  This differs from the present investigations, where price is "an important factor" and is not the most frequently cited first-most factor or even among the top three of important purchasing factors.[175]  In *Steel Nails*, subject imports undersold the domestic like product in 49 percent of quarterly comparisons.[176]  In the present investigations, the comparable underselling percentage was 32 percent.[177]  In light of the truly "mixed" underselling in *Steel Nails* and the fact that 27 of 33 purchasers reported that subject imports were priced lower than the domestic product, the Commission found "significant price underselling" by subject imports. We do not find the unique facts, and the analysis and conclusions drawn from them, in the earlier determinations to be applicable to the present investigations and determinations.

### e. DRAMs and DRAM Modules from Korea

In *DRAMs*, the Commission found that there was a high degree of substitutability between subject imports and the domestic like product and that price was an important

---

[174] *See Certain Steel Nails from China*, Inv. No. 731-TA-1114 (Final), USITC Pub. 4022 (July 2008) at 17–18; CR at Tables II-8, II-9.
[175] Original Views at 33; CR at Tables II-8, II-9.
[176] *See Certain Steel Nails from China*, USITC Pub. 4022 at 18.
[177] Original Views at 34.

consideration in purchasing decisions, as in the present investigations.[178]  However, subject

imports undersold the domestic like product in "the majority" of possible comparisons and with

increasing frequency over the POI of the *DRAMs* investigation.[179]  In the present investigations,

the comparable underselling percentage was 32 percent, and underselling occurred with

decreasing frequency over the POI.[180]  The Commission found "significant price underselling" by

subject imports in DRAMs, whereas in the present investigations, we found and continue to find

"predominant overselling."[181]  We do not find the unique facts, and the analysis and

conclusions drawn from them, in the *DRAMs* determination to be applicable to the present

investigations and determinations.

> **f.   Certain Stainless Steel Plate from Belgium, Canada, Italy, Korea, South Africa, and Taiwan**

In *Stainless Steel Plate*, the Commission found that the domestic like product was a

"commodity product that sells largely on the basis of price."[182]  Cumulated subject imports

undersold the domestic like product in 41.5 percent of 277 quarterly comparisons, which the

Commission characterized as "mixed" underselling.[183]  In the present investigations, the

comparable underselling percentage was 32 percent.[184]  Moreover, the Commission in *Stainless

Steel Plate* conducted a separate analysis for imports from one subject country (Taiwan)

because of a lack of quarterly comparison price data and found that the value of those subject

---

[178] *See DRAMs and DRAM Modules from Korea*, Inv. No. 701-TA-431 (Final), USITC Pub. 3616 (Aug. 2003) at 22–23.

[179] *See DRAMs and DRAM Modules from Korea*, USITC Pub. 3616 at 23.

[180] Original Views at 34.

[181] *See DRAMs and DRAM Modules from Korea*, USITC Pub. 3616 at 25; Original Views at 34–35.

[182] *See Certain Stainless Steel Plate from Belgium, Canada, Italy, Korea, South Africa, and Taiwan*, Inv. Nos. 701-TA-376, 377, and 379 and 731-TA-788–793 (Final), USITC Pub. 3188 (May 1999) at 17.

[183] *See Certain Stainless Steel Plate from Belgium et al.,* USITC Pub. 3188 at 18.

[184] Original Views at 34.

imports "was consistently lower than that for domestic producers' shipments of the same products," which contributed to its mixed underselling finding.[185]  The Commission also relied on confirmed lost sales and lost revenue allegations.[186]  In the present investigations, we have not found a similar level of confirmed lost sales and lost revenue.[187]  In *Stainless Steel Plate*, price was the most frequently cited first-most factor for purchasers when making a purchase, and in the present investigations it is not.[188]  As stated above, the Commission found "mixed" underselling by subject imports in *Stainless Steel Plate*, whereas in the present investigations, we found and continue to find "predominant overselling."[189]  We do not find the unique facts, and the analysis and conclusions drawn from them, in *Stainless Steel Plate* to be applicable to the present investigations and determinations.

g.   **Cold-Rolled Carbon Steel Plates and Sheets from Argentina**

In *Cold-Rolled Carbon Steel*, despite finding underselling by subject imports in each (100 percent) of 13 "instances of comparison,"[190] other evidence in the record led the Commission to  reach a negative determination.[191]  We do not find the unique facts, and the analysis and conclusions drawn from them, in *Cold-Rolled Carbon Steel* to be applicable to the present investigations and determinations.

---

[185] *See Certain Stainless Steel Plate from Belgium et al.,* USITC Pub. 3188 at 18–19.

[186] *See Certain Stainless Steel Plate from Belgium et al.,* USITC Pub. 3188 at 19 and n.113.

[187] Original Views at 37–38.  *See* CR at Table IV-12.

[188] *See Certain Stainless Steel Plate from Belgium et al.,* USITC Pub. 3188 at 17; CR at Tables II-8, II-9.

[189] *See Certain Stainless Steel Plate from Belgium et al.,* USITC Pub. 3188 at 19; Original Views at 34–35.

[190] *See Cold-Rolled Carbon Steel Plates and Sheets from Argentina*, Inv. No. 731-TA-175 (Final), USITC Pub. 1637 (Jan. 1985) at 6.

[191] *See Cold-Rolled Carbon Steel Plates and Sheets from Argentina*, USITC Pub. 1637 at 3, 6.

### h.  Certain Carbon Steel Products from Spain

In this decades-old investigation, the Commission was unable to use the available price data to make comparisons between subject imports and domestic product.  Instead, the Commission relied on lost sales and lost revenue information—the overwhelming majority of which indicated that the lower price of subject imports was the principal reason for their purchase instead of the domestic product—to find underselling by the subject imports.[192]  In the present investigations, we were able to use the available price data to make comparisons and found that only 32 percent reflected underselling.[193]  Furthermore, only four of 25 purchasers reported that the lower price of subject imports was a primary reason for their purchase instead of the domestic product.[194]  We do not find the unique facts, and the analysis and conclusions drawn from them, in *Carbon Steel Products* to be applicable to the present investigations and determinations.

### 4.  Conclusion on Price Effects

In view of the foregoing, we again find that subject imports predominantly oversold the domestic product during the POI, and conclude that there was not significant underselling.[195]  Accordingly, and in view of our findings in the Original Views, unchallenged, that subject imports did not have the effect of depressing prices or preventing price increases for the

---

[192] *See Certain Carbon Steel Products from Spain*, Inv. Nos. 701-TA-155, 157–160, and 1162 (Final), USITC Pub. 1331 (Dec. 1982) at 19–25.

[193] Original Views at 34.

[194] CR at Table V-12.

[195] Our finding of no significant underselling based on the facts of these investigations should not be taken to imply that underselling cannot be considered significant based on the facts of another investigation where the instances or quantities associated with underselling are less than a majority.  As explained in these views, the Commission reaches its conclusions on price effects in light of the facts on a given record.

domestic like product that would otherwise have occurred to a significant degree, we again do not find that the subject imports caused significant price effects.

### C.     Impact of the Subject Imports

We begin our supplemental and further explanation of the impact of the subject imports by stating, as the Commission did in its Original Views, that no single factor is dispositive and all relevant economic factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[196]

The Court directed the Commission on remand to reconsider "its finding that supply constraints were the cause of market share shifts rather than underselling in light of conflicting evidence that supply constraints solely occurred beginning in October 2016."[197]  The Court also directed the Commission on remand to reconsider "its impact finding in light of the insufficiencies in its overselling and supply constraint findings."[198]

The Commission held its hearing in these investigations on September 13, 2018.[199]  At the hearing, the Commission heard testimony regarding supply constraints in the market spanning the POI, including the time period prior to October 2016.  As we discussed in addressing the conditions of competition, these constraints stemmed from the expectation in the U.S. market that the construction of the new M&G Texas facility, which began in December 2014, would be completed by the end of 2016.[200]  Anticipating the expanded production

---

[196] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act of 2015, Pub. L. 114-27.  *See also* Original Views at 42.
[197] Slip Op. at 41.
[198] Slip Op. at 41.
[199] CR at I-1.
[200] CR at III-10 to III-11.  *See* section II.A.2, *supra*.

capacity that would be brought on board by that facility and the consequent decommissioning of existing domestic PET resin production capacity, domestic producers chose not to expand capacity in their existing facilities, even as demand grew.[201] Not only did this construction start prior to the POI, but progress toward its scheduled completion, or anticipation of progress toward its scheduled completion, occurred during 2015 and 2016, the first two years of the POI, and into 2017, prior to M&G's bankruptcy filing in October 2017.[202]

U.S. purchaser Graham Packaging testified at the Commission's hearing that although the scheduled startup of production at the M&G facility was delayed for almost one year by the time of M&G's bankruptcy in October 2017—and actually never began—the domestic industry "always factored that {anticipated additional} capacity in their U.S. supply, and that it would be available to us to meet our projected and growing demand."[203]

Similarly, U.S. importer Niagara Bottling testified, and U.S. purchaser PepsiCo corroborated, that these "dynamics" of "domestic competition" keeping prices constrained during a period of rising demand "were in play *for years* leading up to late 2017" because of "repeated delays" in the commencement of M&G's new production capacity.[204]

We find that this sworn witness testimony about market conditions over a span of years beginning in late 2014 evinces that the constraints spanned the POI. Further, this testimony

---

[201] CR at Tables III-5 (showing no production capacity increase from 2015 to 2017 ***) and IV-12 (showing apparent U.S. consumption increasing each year from 2015 to 2017).

[202] CR at III-10 to III-11.

[203] Hearing Tr. at 145, 147.

[204] Hearing Tr. at 243–245 (emphasis added).

was corroborated by the importer and questionnaire responses of these firms in which they similarly indicated that there were supply constraints beginning in 2015 and through 2016.[205]

The Court instructed us to address previous determinations in which the Commission found that "supply constraint events that follow subject import increases cannot be the cause of them."[206]  In the *CRS* investigations, the Commission found that the cited supply constraints could not explain the "magnitude and duration" of the increase in subject imports—not that they did not contribute to the increase—as the disruptions occurred in early 2014 "and were of limited duration" while subject imports had been increasing since 2013.[207]  Likewise, in *Cold-Rolled Steel*, the Commission focused on the limited reach and duration of shortages resulting from 2014 weather events.  There, the Commission found that shortages alleged to have continued throughout 2015 were not corroborated by reports from U.S. market participants, and were not to be "so widespread and persistent" as to explain *subsequent* subject import volumes in 2014 and 2015.[208]  By contrast, in these investigations, we find that the witness testimony and questionnaire responses evince market conditions keyed to M&G's construction that began in 2014 and affected market participant's behavior throughout the POI.  The confluence of Hurricanes Matthew and Harvey later in the POI then exacerbated these already existing supply constraints.

---

[205] *See* CR at Table II-4 ("firms reporting supply constraints since January 1, 2015").
[206] Slip Op. at 35–36.
[207] *See Certain Corrosion-Resistant Steel Products from China et al.,* USITC Pub. 4620 at 24.
[208] *See Cold-Rolled Steel Flat Products from China and Japan*, USITC Pub. 4619 at 27–28.

In addition to the importers' testimony and questionnaire responses of importers and purchasers, the existence of supply constraints throughout the POI was reflected in domestic producers' actions in supplying purchasers with imports to fulfill orders.

The record shows that, in 2016, the domestic industry began increasing its own imports of PET resin.  ***.[209]  ***, already a substantial importer of PET resin in 2015 at *** pounds, appreciably increased its imports in 2016, to *** pounds.[210]  ***.[211]  Domestic producers stated that they imported PET resin to supplement their domestic production or supply a type not produced domestically.[212]  As a whole, the domestic industry's shipments of subject imports increased from *** pounds in 2015 to *** pounds in 2016, for an increase of *** percent.[213]

In 2016, the share of the market held by domestically produced PET resin declined *** percentage points.[214]  At the same time, the domestic industry's imports of subject PET resin in 2016 represented *** percentage points of market share.[215]  The domestic industry's imports of nonsubject PET resin in 2016 represented *** percentage points of market share.[216]  The domestic industry's imports in total in 2016 thus represented *** percentage points of market share.[217]  We find that these increased imports by the domestic producers themselves account

---

[209] CR at Table III-9.  According to ***.  *Id.*  Although *** later stated that an additional reason for importing was ***, we note that *** subject imports were generally *** than domestic PET resin. Petitioners' Posthearing Brief, Exh. 5 at 2; CR at Table V-10.

[210] CR at Table III-9.

[211] CR at Table III-9.  ***.  *Id.*

[212] CR at Table III-9.  *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, USITC Pub. 4835 at 32.  *** certified that it did not import PET resin.  *** U.S. Producers' Questionnaire at II-7.

[213] CR at Table IV-12.

[214] CR at Table IV-13.

[215] CR at IV-40.

[216] CR at IV-40.

[217] CR at IV-40.  U.S. producers' U.S. shipments of all imports increased from *** percent of the market in 2015 to *** percent of the market in 2016.  *Id.*

for an equivalent percentage of the loss of market share by domestically produced product. The domestic industry's own imports of PET resin in 2016 thus explain most (*** percentage points) of the 5.4 percentage-point decline in the domestic industry's market share that year, and by their own representations the imports were due to the domestic industry's supply limitations, not to a need to access low-priced imports to compete in the market.

The record shows that purchasers were aware of the domestic industry's need to import PET resin to fulfill purchaser orders. Several purchasers reported that U.S. producers supplied them with imported PET resin rather than U.S.-produced PET resin since 2015.[218] The record also contains coinciding reports of domestic supply constraints since 2015, including customers being placed on allocation and restrictions on the specifications of the PET resin offered.[219]

The responses regarding lost sales and lost revenue likewise reflect near unanimous reporting by purchasers that domestic producers had supply issues. Ten of 14 purchasers that switched to subject imports indicated that the lower price of these imports was not a primary reason for the shift, and provided details of supply constraints since 2015.[220] The record evidence thus contradicts Petitioners' claim that supply constraints were limited to a brief period at the end of the POI.[221] U.S. producers' increasing volume of imports from 2015 to 2016, the responses by purchasers regarding their decisions to purchase subject imports since

---

[218] CR at Table II-4 (statements by *** regarding U.S. producers' use of imports to supply customers since 2015); *id.* at II-26 (purchasers reporting reasons for decreased domestic purchases included limited availability of domestic product and that suppliers chose to supply the purchases with imports rather than their U.S.-produced PET resin since 2015); *id.* at II-28 (since 2015, eight of 23 purchasers reported that they had ordered domestic product but were instead supplied imported product, while seven of 24 purchasers reported that they had searched for domestic PET resin but had been offered imported product); *id.* at Table V-12 (*** response to lost sales allegation concerning ***).
[219] CR at Table II-4.
[220] CR at Table V-12.
[221] Petitioners' Prehearing Brief at 54–55; Hearing Tr. at 23.

2015, and the increase in subject imports despite being higher priced in 2016, all indicate that supply constraints, rather than low-priced subject imports, were the trigger for the market share changes that occurred as nonsubject imports from Canada, China, India, and Oman largely exited the market in 2016 following Commerce's imposition of antidumping and countervailing duty orders on imports from those countries.

Furthermore, the domestic industry's condition improved in 2016, the year with the most significant increase in subject imports, including increased importation by the domestic industry itself.  Subject imports increased in 2016 by their greatest amount during the POI, due in part to the importation actions of the domestic industry, both in terms of market share and on an absolute basis.[222]  Yet, as demonstrated above, subject imports predominantly oversold the domestic like product in 2016.  We decline to find that subject imports priced predominantly higher than the domestic product in 2016 caused material injury to the domestic industry.

Moreover, the domestic industry increased its domestic shipments each year of the POI, including 2016, and its full-year capacity utilization rate was the highest on the record in 2016.[223]  Its employment-related indicators and financial indicators were mixed over the POI, and a number of financial indicators improved in 2016 and declined in 2017, but as explained above, we do not find that subject imports had any significant price effects on the domestic industry.  Consequently, we do not find that the increased presence of subject imports explains the decline in the industry's financial indicators during the POI.

---

[222] CR at Table C-1.
[223] CR at Table C-1.

As noted by the Court, the domestic industry's capacity utilization rate was 69.3 percent in interim 2017 and 89.0 percent in interim 2018.[224]  We find that the lower volume of subject imports in interim 2018 compared to interim 2017, and the financial indicators of the domestic industry that were higher in interim 2018 than in interim 2017, were likely due at least in part to the pendency of these investigations and their initial effects on the U.S. market.[225]

Having reexamined and supplemented our impact findings based on the Court's instructions, we again find that subject imports did not have a significant impact on the domestic industry.

## Conclusion

For the foregoing reasons, and the reasons provided in the Original Views as supplemented here, we again determine that an industry in the United States is not materially injured or threatened with material injury by reason of subject imports of PET resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan found by Commerce to be sold in the United States at less than fair value.

---

[224] Slip Op. at 39.  *See* CR at Table C-1.
[225] CR at Tables IV-12, IV-13, VI-1, C-1.  *See* 19 U.S.C. § 1677(7)(I) (consideration of post-petition information); *LG Electronics, Inc. v. U.S. Int'l Trade Comm'n*, 26 F. Supp. 3d 1338, 1353 (Ct. Int'l Trade 2014); Uruguay Round Agreements Act Statement of Administrative Action, H.R. Rep. 103-316, vol. I at 854 (1994).  In addition, the comparative interim capacity utilization rates may reflect increased production and sales by the three remaining producers following M&G's bankruptcy and closure of its West Virginia facility in October 2017.  CR at III-10 to III-13, Table C-1.

## **CERTIFICATE OF SERVICE**

I, Brian R. Allen, hereby certify that, on this 23rd day of September 2020, I filed

electronically a true and correct copy of the attached **REMAND DETERMINATIONS**.

Pursuant to the Court's Administrative Order 02-01, this filing constitutes electronic service on

all of the parties participating in this appeal.

*/s/ Brian R. Allen*
Brian R. Allen
Attorney for the Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3034
Facsimile: (202) 205-3111
brian.allen@usitc.gov
