## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**DAK AMERICAS LLC, INDORAMA VENTURES USA, INC., and NAN YA PLASTICS CORPORATION, AMERICA,**

    **Plaintiffs,**

 **v.**

**UNITED STATES,**

    **Defendant,**

  **and**

**NOVATEX LIMITED, G-PAC CORPORATION, NIAGARA BOTTLING, LLC, and iRESIN, LLC,**

    **Defendant-Intervenors.**

</td><td>

**Before: Gary S. Katzmann, Judge Court No. 18-00238**

*PUBLIC VERSION*

</td></tr>
</table>

## OPINION

[The court sustains the International Trade Commission's Remand Views.]

Dated: <u>May 3, 2021</u>

<u>Paul C. Rosenthal</u>, <u>Kathleen W. Cannon</u>, and <u>Brooke M. Ringel</u>, Kelly Drye & Warren, LLP, of Washington, DC, for plaintiffs.

<u>Brian R. Allen</u>, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for defendant. With him on the brief were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation.

<u>Brenda A. Jacobs</u>, Jacobs Global Trade & Compliance LLC, of McLean, VA, for defendant-intervenors, *Novatex Limited* and *G-PAC Corporation*. With her on the joint brief was <u>Neil R. Ellis</u>, Law Offices of Neill Ellis PLLC, of Washington, DC.

<u>John M. Peterson</u>, Neville Peterson LLP, of New York, NY, argued for defendant-intervenor, *Niagara Bottling, LLC*. With him on the brief were <u>Richard F. O'Neill</u> and <u>Patrick B. Klein</u>.

Susan G. Esserman, Joel D. Kaufman, Luke M. Tillman, and Judy (Zhu) Wang, Steptoe & Johnson LLP, of Washington, DC, for defendant-intervenor, *iResin, LLC.*

Katzmann, Judge:  In its prior opinion in this case, the court, noting the Aristotelian maxim that "like cases should be treated alike," observed that consistency is a core value of administrative law.  DAK Americas LLC v. United States, 44 CIT __, __, 456 F. Supp. 3d 1340, 1346 (2020) ("DAK Americas I") (citations omitted).  "[T]hough past agency decision-making may not be precedential in the same way as case law through stare decisis, it remains of great importance." Id. at 1355 (footnote omitted).  The court's concern that "reasoned decision-making come to bear" on agency determinations impels that the agency explain its departure from prior determinations, insofar as there has been such a departure.  Id. at 1356.

The court now returns to the material injury investigation by the International Trade Commission ("Commission") on the effects of imports of PET resin -- a polyester polymer (i.e. plastic) material used to make many common products, including bottles -- on the U.S. domestic industry.  Before the court is the Commission's Remand Views, Views of the Commission, Sept. 23, 2020, ECF No. 117 ("Remand Views"), which the court ordered in DAK Americas I, so that the Commission could further explain certain aspects of its negative injury determination in accordance with the court's instructions.  On remand, the Commission again determined that the U.S. PET resin industry is not injured or threatened with material injury by PET resin imports sold at less than fair value.  Remand Views at 1.  Plaintiffs DAK Americas LLC ("DAK"), Indorama Ventures USA, Inc. ("Indorama"), and Nan Ya Plastics Corporation ("Nan Ya") (collectively, "Plaintiffs") again challenge the Commission's decision.  Pls.' Cmts. on the Int'l Trade Commission's First Remand Determination, Oct. 23, 2020, ECF No. 121 ("Pls.' Br.").  Defendant the United States ("Government") and Defendant-Intervenors Novatex Limited, G-Pac Corporation, iResin, LLC, and Niagara Bottling, LLC (collectively, "Defendant-Intervenors")

request that the court affirm the Commission's Remand Views.  Def. United States' Resp. to Pls.'

Cmts. on Remand, Nov. 23, 2020, ECF No. 130 ("Def.'s Br."); Corr. Version of Reply of Def.-

Inters., Novatex Ltd. and G-Pac Corp., to Pls.' Cmts. on the Remand Determinations of the U.S.

Int'l Trade Commission, Nov. 24, 2020, ECF No. 133 ("Novatex's Br."); Rebuttal Cmts. of Def.-

Inter., Niagara Bottling, LLC, Nov. 23, 2020, ECF No. 132 ("Niagara's Br."); Reply Br. of Def.-

Inter. iResin in Resp. to Pls.' Cmts. on the Remand Determination of the Int'l Trade Commission,

Nov. 24, 2020, ECF No. 135 ("iResin's Br.").  The court affirms.

## BACKGROUND

The court set out the relevant legal and factual background of the proceedings in further

detail in its previous opinion, <u>DAK Americas I</u>, 456 F. Supp. 3d at 1347–52.  Information relevant

to the instant opinion is set forth below.

Plaintiffs, U.S. producers of PET resin, filed antidumping petitions with the Commission

after subject imports surged following the 2015 imposition of remedial duties on PET resin imports

from Canada, China, India, and Oman.  <u>See</u> Petition for the Imposition of Antidumping Duties:

Imports of Certain Polyethylene Terephthalate Resin from Brazil, Indonesia, the Republic of

Korea, Pakistan, and Taiwan, Sept. 26, 2017, P.R. 1.  The Commission defined the period of

investigation ("POI") as the first quarter of 2015 through the first quarter of 2018.  <u>See</u> Confidential

Views of the Commission in Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea,

Pakistan, and Taiwan: Investigation. Nos. 731-TA-1387–91 (Final) at 4, USITC Pub. 4835 (Nov.

2018), P.R. 209, C.R. 342 ("Original Views").  The Commission found that the U.S. PET resin

market was price-sensitive and characterized by product fungibility, that the subject imports'

market share gains came at the same time as the domestic industry lost market share, and that the

domestic industry suffered a decline in financial condition during the POI.  <u>Id.</u> at 29–30, 45–46.

The Commission nevertheless concluded: (1) the underselling that occurred was not significant, based upon both indirect pricing reports that showed overselling was more prevalent and purchasers' reports that showed supply shortages as the cause of domestic market share losses; and (2) the subject imports did not have a significant adverse impact on the domestic industry.  Id. at 50–55.

Plaintiffs challenged that determination before the court.  See Compl., Dec. 26, 2018, ECF No. 9.  Plaintiffs moved for judgment on agency record, arguing that: (1) the Commission failed to explain why the underselling on the record was not significant in light of prior Commission and court decisions finding mixed underselling significant; (2) the Commission's determination that subject imports predominantly oversold domestic product was not supported by substantial evidence because the Commission excluded several points of conflicting evidence; (3) the Commission's finding that domestic supply constraints explain the subject import surge is not supported by substantial evidence because the record indicates supply constraints solely manifested from October 2016 onwards; and (4) the aforementioned errors make the Commission's ultimate no adverse impact determination unsupported by substantial evidence. DAK Americas I, 456 F. Supp. 3d at 1353.  The court granted Plaintiffs' motion and remanded the Commission's determination for further explanation and a decision based on substantial evidence. Id.

On remand, the three Commissioners who participated in the original determination and two Commissioners who were not on the Commission at the time of the original determinations re-examined the case and unanimously came to the same conclusions as in the Original Views. Remand Views at 3 n.7.  The Commission provided further explanation and analysis of the record evidence underlying its determination but did not change its ultimate conclusions that there was

no significant underselling and no adverse impact on the domestic industry.  See Remand Views

at 1.  The Commission filed its Remand Views with the court on September 23, 2020.  See Remand

Views.[1]  Plaintiffs filed their comments on the Remand Views on October 23, 2020.  Pls.' Br.  The

Government and Defendant-Intervenors filed replies to these comments on November 23, 2020.

Def.'s Br.; Novatex's Br.; Niagara's Br.; iResin's Br.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction to review negative material injury determinations by the

Commission under 19 U.S.C. § 1561a(a)(1)(C).  The court will hold unlawful those agency

determinations which are unsupported by substantial evidence on the record or otherwise not in

accordance with law under 19 U.S.C. § 1516a(b)(1)(B)(i).  A decision based on substantial

evidence and in accordance with law includes an examination of the record and an adequate

explanation for an agency's findings such that the record demonstrates a rational connection

between the facts accepted and the determination made.  Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).  Substantial evidence includes "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  Nippon Steel Corp. v.

United States, 458 F.3d 1345, 1358 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB,

340 U.S. 474, 477–78 (1951)).  The court must defer to the Commission's role as trier of fact and

not disturb its "considerable discretion in evaluating information obtained from questionnaires."

Int'l Indus. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1325, 1333 (2018) (quoting NSK

Corp. v. United States, 32 CIT 966, 978, 577 F. Supp. 2d 1322, 1336–37 (2008)); see also Coal.

of Gulf Shrimp Indus. v. United States, 39 CIT __, __, 71 F. Supp. 3d 1356, 1365 (2015) (stating

---

[1] Many citations are to confidential filings for clarity in explaining the timeline of events.  Public versions, often filed at later dates, are available on the public docket with corresponding pagination.

that as part of its selection of methodology, the Commission "has discretion to select a data set that it will use in its investigation"); <u>Goss Graphics Sys. v. United States</u>, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), <u>aff'd</u>, 216 F.3d 1357 (Fed. Cir. 2000). "[W]hen the totality of the evidence does not illuminate a black-and-white answer to a dispute[]," the court defers to the Commission as "the expert factfinder . . . to decide which side's evidence to believe." <u>Nippon Steel Corp.</u>, 458 F.3d at 1359. The court also reviews remand results for compliance with its remand order. <u>See</u> <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014).

## DISCUSSION

On remand, the court ordered the Commission to provide further explanation of its conclusions regarding the following issues: "(1) the Commission's determination that overselling predominated and underselling was not significant in light of aspects of the record showing underselling and to address prior determinations that even underselling that occurred in less than 50 percent of price comparisons could be significant; (2) the Commission's finding that supply constraints were the cause of market share shifts rather than underselling in light of conflicting evidence that supply constraints solely occurred from October 2016 onwards; and (3) the Commission's no adverse impact determination in light of the insufficiencies in its overselling and supply constraint findings." <u>DAK Americas I</u>, 456 F. Supp. 3d at 1367–68.

Plaintiffs now challenge the Commission's remand determination, arguing that it "fail[ed] to comply with the [remand] instructions," and "repeated its original findings and rationale, which were rejected by this [c]ourt." Pls.' Br. at 2–3. The Government states that "[b]ecause the Commission's remand determinations are supported by substantial evidence and otherwise entirely in accordance with law, and fully respond to the [c]ourt's remand instructions, we respectfully ask

this [c]ourt to affirm." Def.'s Br. at 1.[2]  Further, the Government responds to Plaintiffs by stating that "the [c]ourt did not instruct the Commission to reverse its findings and reach an affirmative determination on remand," and "[n]owhere do the [c]ourt's instructions direct the Commission to discard its previous analyses and findings, nor do they suggest that the Commission's determinations could not be supported by any evidence in the record."  Def.'s Br. at 2–3.

Upon review of its Remand Views, the court now sustains the Commission's determination.  After previously pointing to the Commission's failure to explain and address certain evidence, counter-arguments, and past decisions that separately and collectively undermined its conclusions, the court now determines that with further explanation the Commission's conclusions are support by substantial evidence and in accordance with law.  Many of Plaintiffs' remaining issues with the Commission's conclusions stem from their own view of the record rather than a failure by the Commission to comply with the court's remand instructions.  Where reasonable minds may disagree, the court defers to the agency and does not disturb the agency's evaluation of the weight of evidence where its decision is adequately explained.  See Nippon Steel Corp., 458 F.3d at 1359.

## I.      *The Court Sustains the Commission's No Significant Underselling Conclusion.*

The Commission's Original Views concluded that there was no significant underselling of imports compared to the U.S. domestic price for PET resin despite the presence of an import surge during the POI, the price sensitivity of the PET resin market, and the fungibility or substitutability of subject goods.  Original Views at 29–30, 45–46, 50–55.  In making this determination, the Commission examined questionnaire responses from interested parties, quarterly pricing data from

---

[2] By and large, Defendant-Intervenors' positions are consistent with the Government's.  See Novatex's Br.; Niagara's Br.; iResin's Br.  Therefore, the court discusses the Government's position as representative of arguments in support of the Commission's Remand Views.

U.S. importers for commercial transactions ("quarterly pricing data"), data on direct imports for internal consumption for production of downstream products or for direct retail sale to end consumers ("direct imports"), and hearing testimony.  See id. at 33–34, 50 n.191, 51–52; see also Remand Views at 30 n.121.  The court identified three issues that undermined this conclusion: (1) apparent inconsistencies with the Commission's general conclusions that the U.S. PET resin market was characterized by price sensitivity and product fungibility and the significance of underselling compared to its prior determinations containing the same general conclusions about price and fungibility, DAK Americas I, 456 F. Supp. 3d at 1356–57; (2) unaccounted for differences in the selection of quarterly price data and unexplained contradictory evidence related to this data, id. at 1357–58; and (3) unexplained or unaccounted for evidence that pointed to the importance of price on the shift in market share away from domestic producers, id. at 1361–62.

On remand, the Commission provided additional analysis and explanation of the U.S. PET resin market that shaped the Commission's views as to each of the three issues identified by the court.  See Remand Views at 10–12.  The Commission continued to conclude that there was no significant underselling by imports in the U.S. PET resin market.  Id. at 16.  However, based on the same price data, the Commission explained that other factors, including availability and quality, impacted the PET resin market in addition to price sensitivity and substitutability.  Id. at 11 ("[O]nly one factor was rated very important by all 25 respondents: availability").  Thus, the commission concluded that "price by itself would in many instances not be determinative in purchasing decisions."  Id. at 27–28; see also id. at 12 ("Price was the fourth-ranked purchasing factor.").  Further, despite increased imports during the POI, the Commission again identified "overselling of the domestic product" because "th[e] imports predominantly sold at higher prices than the domestic product -- indicating that factors other than price were influencing purchasing

decisions." Id. at 28.  The Commission explained that "[c]onsistent with [its] well-established

practice, [it] focused [its] underselling analysis on a comparison of the number of instances of

underselling to the number of instances of overselling as reflected in the quarterly price

comparison data." Id. at 28.  Accordingly, the Commission concluded that, by volume, the

quarterly price data showed predominant overselling (69 percent of sales by volume).  Id. at 29.[3]

Because the Commission provided further explanation on the points identified by Plaintiffs and

highlighted by the court that seemed to undermine its conclusion that there was no significant

underselling by imports in the domestic PET resin market, the court affirms the Commission's no

significant underselling conclusion.[4]

### A.    *Inconsistencies with the Commission's Past Decisions*

In its prior opinion, the court instructed the Commission to "address why the underselling

that it found was not significant," "where the Commission made the same two determinations (i.e.

---

[3] While there was some underselling in each year of the POI, only in 2015 did the underselling predominate, constituting 58 percent of sales by volume.  Remand Views at 29.  Because the last two years of the POI were predominated by overselling (64 percent and 85 percent in 2016 and 2017, respectively), the Commission concluded that the "quarterly sales price data reflect predominant overselling of the domestic product by subject imports" and the "data weigh heavily against a finding of significant underselling of the domestic product by subject imports." Id. at 29.

[4] Plaintiffs contest the Commission's re-examination of the market characteristics on remand, and allege that "[t]he Commission does not . . . point to evidence that the quality of subject imports or availability issues (other than its continued, faulty reliance on domestic supply constraints) drove subject import sales instead of pricing in a market where, the Commission acknowledges, price is a very important factor." Pls.' Br. at 26.  The court is not persuaded by this argument.  It was appropriate that the Commission review and further explain its market assessment on remand given the court's instruction for the Commission to further explain its "findings of a general nature." DAK Americas I, 456 F. Supp. 3d at 1353.  The Commission supported this further analysis of the market with ample evidence and adequate explanation.  See Remand Views at 10–12 (analyzing record evidence of market conditions other than price that affected the U.S. PET resin market); see also id. at 32 nn.130–31 (citing Original Views at V-11–V-14 Tables V-3–V-6; id. at V-31 Table V-12).  The court defers to the Commission's expert analysis of market conditions during the POI. See Nippon Steel Corp., 458 F.3d at 1359.

price-sensitivity and substitutability)" in other results in which the Commission concluded the

opposite. <u>DAK Americas I</u>, 456 F. Supp. 3d at 1357 (citations omitted); <u>id.</u> ("[T]he court orders

the Commission in considering its underselling finding on remand to reasonably distinguish its

conclusions from findings of a general nature in prior determinations in the event of any conflict.").

In addition to the added analysis of the U.S. PET resin market discussed above, the

Commission noted that its "findings in these investigations are not that there was 'mixed'

underselling," but rather, "that the data in these investigations evidenced predominant overselling

by the subject imports." Remand Views at 38.[5] This was because "[t]his is not a case where the

number of instances of underselling and overselling are close or 'mixed,' but rather one in which

instances of overselling far prevail." <u>Id.</u> at 38. The Commission went on to distinguish its

conclusion from that in eight other investigations in which there was a high degree of

substitutability, price was an important consideration, and there was some degree of underselling

identified. <u>See id.</u> at 39–46 (Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan,

Korea, the Netherlands, Turkey, and the United Kingdom, Inv. Nos. 701-TA-545–47, 731-TA-

---

[5] Plaintiffs challenge the Commission's price analysis by alleging that the Commission should have examined underselling by considering both quarterly price data and direct imports in toto. Pls.' Br. at 16. The Commission explained that direct imports "cannot be combined with[] [quarterly pricing data] as the latter reflect actual sales to the U.S. market and the former reflect U.S. importers' purchase costs[, which] do not capture other costs beyond the landed duty-paid value that U.S. importers may incur as a result of importing the product, such as logistical or supply chain costs and warehousing and inventory carrying costs." Remand Views at 15 (citing Blank Importer Questionnaire at Q. II-4). The Commission also explained that it considered the direct import data in its underselling analysis, but ultimately concluded that the quarterly price data was "paramount and the most probative price information." <u>Id.</u> at 16. As the Government notes, "Plaintiffs cite no prior Commission determinations in which the Commission has combined these two data sets because the Commission has never done so." Def.'s Br. at 20 n.18. The court therefore concludes that the Commission adequately considered direct import data and explained its use and consideration of that data in reaching its no significant underselling conclusion. Its decision not to numerically combine the two data sets was also explained and the court is unpersuaded by Plaintiffs' challenge to this methodology.

1291–97 (Final) USITC Pub. 4638 (Sept. 2016) ("Certain Hot-Rolled Steel Flat Products");

Certain Corrosion-Resistant Steel Products from China, India, Italy, Korea, and Taiwan, Inv. Nos.

701-TA-534–37, 731-TA1274–78 (Final), USITC Pub. 4620 (July 2016) ("Certain CRS

Products"); Cold-Rolled Steel Flat Products from China and Japan, Inv. Nos. 701-TA-541, 731-

TA-1284, 1286 (Final), USITC Pub. 4619 (July 2016) ("Cold-Rolled Steel Flat Products"); Certain

Steel Nails from China, Inv. No. 731-TA-1114 (Final), USITC Pub. 4022 (July 2008) ("Certain

Steel Nails"); DRAMs and DRAM Modules from Korea, Inv. No. 701-TA-431 (Final), USITC

Pub. 3616 (Aug. 2003) ("DRAMS from Korea"); Certain Stainless Steel Plate from Belgium,

Canada, Italy, Korea, South Africa, and Taiwan, Inv. Nos. 701-TA-376, 377, 379, 731-TA-788–

93 (Final), USITC Pub. 3188 (May 1999) ("Certain Stainless Steel Plate"); Cold-Rolled Carbon

Steel Plates and Sheets from Argentina, Inv. No. 731-TA-175 (Final), USITC Pub. 1637 (Jan.

1985) ("Cold-Rolled Carbon Steel Plates"); Certain Carbon Steel Products from Spain, Inv. Nos.

701-TA-155, 157–60, 162 (Final), USITC Pub. 1331 (Dec. 1982) ("Certain Carbon Steel

Products")).  The Commission distinguished the percentages of underselling and overselling by

volume, see id. at 39–45 (discussing all determinations), the timing of overselling compared to the

market share of imports, see id. at 39, 40, 41 (discussing Certain Hot-Rolled Steel Flat Products,

Certain CRS Products, and Cold-Rolled Steel Flat Products), and the differences in purchaser

responses as to the primary reason for purchasing imports rather than domestic product, see id. at

39–42, 44–45 (discussing all determinations except DRAMS from Korea).  Some determinations

were distinguished on other bases, such as the type or availability of data analyzed.  See Remand

Views at 43–45 (discussing DRAMS from Korea, Certain Stainless Steel Plate, Cold-Rolled

Carbon Steel Plates, and Certain Carbon Steel Products).

Plaintiffs again challenge the Commission's Remand Views as inconsistent with those past determinations by alleging that "[t]he Commission changed nothing in its pricing analysis in response to these broad findings of error." Pls.' Br. at 16. Plaintiffs argue that "[h]ad the Commission also considered" underselling by direct imports, "it would have further reported that there was underselling in [[    ]] percent of quarterly direct price comparisons and [[    ]] percent of direct import pricing comparisons on a volume basis." Id. at 27. Based on this alleged error, Plaintiffs argue that "the Commission provided a simplistic comparison of the underselling percentage here, based on the unrevised, indirect quarterly price comparisons, to the underselling percentages found in other cases." Id. Plaintiffs also contend that the Commission should have considered "the record as a whole on the low import prices" and the "specifics of the PET resin market [and] U.S. producers['] attempt[] to combat unfair import competition" compared to each prior determination. Id. at 28–29.

The Government responds that "the Commission found that 'the unique facts, and the analysis and conclusions drawn from them' were not applicable to the present investigations and determinations." Def.'s Br. at 22 (citing Altx, Inc. v. United States, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365 (2001)). Similarly, the Government explains that the Commission "cited various factors examined in the other cases that distinguished the other cases from the facts of the instant investigations, such as the timing of importation and the importance of price in purchasing decisions." Id.[6] Further, the Government notes that "[d]iscussion of these various factors by the

---

[6] For similar reasons, iResin contends that the Remand Views are consistent with the Commission's two previous determinations regarding PET resin, Polyethylene Terephthalate (PET) Resin from India, Indonesia, and Thailand, Inv. Nos. 701-TA-439 and 731-TA-1077, 1078 and 1080 (Final) USITC Pub. No. 3769 (May 2005) and Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman, Inv. Nos. 701-TA-531-532 and 731-TA-1270–73 (Final), USITC Pub. No. 4604 (April 2016). iResin's Br. at 4–5.

Commission, as well as several other sections of the Commission's Remand Views, contradicts Plaintiffs' argument that the Commission 'ignores all of the other record evidence.'" Id. at 22 n.20.

The court concludes that the Commission's further explanation of the U.S. PET resin market on remand and discussion of relevant factors from the other cases complies with this aspect of the remand instructions. Thus, the Commission's explanation that the prior determinations materially differed on the basis of volume, timing of imports, and the importance of price to the markets adequately explains why its conclusions of a general nature regarding the market conditions for U.S. PET resin were distinct from market conditions for products subject to past investigations. The court affirms this aspect of the Commission's Remand Views because the Commission complied with the court's instruction for the Commission to explain "whether: (1) good reasons prompt that departure; or (2) the prior determinations are inapposite such that it is not in fact a departure at all." DAK Americas I, 456 F. Supp. 3d at 1356 (citing Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973); British Steel PLC v. United States, 127 F.3d 1471, 1475 (Fed. Cir. 1997); Chisholm v. Def. Logistics Agency, 656 F.2d 42, 47 (3d Cir. 1981)); see also id. at 1354–56 (discussing Cleo Inc. v. United States, 501 F.3d 1291, 1298–99 (Fed. Cir. 2007); Usinor v. United States, 26 CIT 767, 792, 24 ITRD 1711 (2002)).

### B.    *Quarterly Pricing Data*

In its original opinion, the court concluded that certain inconsistencies undermined the Commission's selection of quarterly pricing data, related to both data that was included and excluded in the data set. Specifically, the court identified three issues within the Commission's selected quarterly pricing data: (1) the exclusion of [[                    ]] data and the inclusion of [[                    ]] data; (2) the exclusion of [[                    ]] data; and (3) the inclusion

of [[                ]] data.  Id. at 1357–61.  In response to the court's remand instructions, the

Commission addressed each set of indirect pricing data identified by the court as not adequately

explained or not supported by substantial evidence, reached the same conclusions, and relied on

the same set of data for the remand decision.

        *1.*      ***Exclusion of [[***        ***]] Data and Inclusion of [[***
                        ***]] Data***

        First, the court remanded the Commission's decision to exclude [[                ]] data

given similar inconsistencies in the included data of [[                ]] for further explanation

and a decision based on substantial evidence.  Id. at 1358–59.  Relatedly, the court instructed the

Commission to address the weight of this conflicting evidence in the context of its conclusion that

there was no significant underselling.  Id. at 1362.  On remand, the Commission again decided to

exclude the data of [[                ]].  Remand Views at 23. The Commission explained that certain

discrepancies and inconsistencies in the [[                ]] data made it improper for the

Commission's consideration.  Id. at 25.  Specifically, [[


]] and reported differing data on [[


]].  Id. at 24–25.  Further, as to the court's conclusion that this

data constituted evidence that undermined the Commission's underselling conclusion despite it

not being included in its data set, the Commission explained that the values of [[                ]]

reported volumes did not provide a comparison with the prices for domestic products so that it not

carry as much weight in its ultimate decision.  Id. at 26.  Finally, the Commission explained that

there was a "meaningful difference" between the data submitted by [[                ]] and [[

]] because [[                ]] provided "specific and usable price data" with only

one identified discrepancy.  Id. at 27.  Unlike [[                    ]], [[                        ]] fully

addressed the Commission's concerns regarding the discrepancy identified.  Id.

Plaintiffs contend that this decision "does not comply with the court's instruction" because

the Commission relied upon the same rationale -- "[[

]]" -- and does not "take into account in any way this [[

]]."  Pls.' Br. at 24.  Plaintiffs argue that "[a] claimed

inability to determine the pricing category of these imports is without merit, given that there was

[[                                                                                              ]]."

Id. at 24 n.20.  Finally, Plaintiffs state that the Commission's decision to continue to include [[

]] data "reflects a selective approach to excluding certain data wholesale while

including other questionable data."  Id. at 24.  The Government responds that the "Commission

provided a fulsome and detailed explanation of its decision not to consider the data pertaining to

price provided by [[              ]] in its underselling analysis."  Def.'s Br. at 8.  "The Commission

explained the 'meaningful difference' it found in the data submitted" and "reasonably included [[

]] data."  Id. at 9–10.  Finally, the Government argued that "[[                ]]

data pertaining to price is not appropriately considered as price data or purchase cost data for

imports for internal consumption or retail sale."  Id. at 18 n.16 (citing Remand Views at 23–26).

The court concludes that the Commission complied with its remand instructions to

adequately explain its decision to exclude this data and this data's impact on its underselling

analysis.  The court agrees with the Government that, contrary to Plaintiffs' contention, "the

Commission did not completely disregard [[                  ]] questionnaire data, as it again relied

on the aggregated import volumes and values data that included [[            ]] data."  Id. at 7

(citing Original Views at IV-4 n.5 Table IV-1).  The Commission's reasons for excluding this data

from the quarterly pricing data reflect a reasoned analysis of its decision to exclude this data, rather

than Plaintiff's alleged "selective approach."  <u>Coal. of Gulf Shrimp Indus.</u>, 71 F. Supp. 3d at 1365

("[The Commission] has discretion to select a data set that it will use in its investigation . . . ").

### *2.      Exclusion of the Pricing Data of Importer [[                                        ]]*

Second, the court found that the Commission's "failure to address, in any way, . . . the

exclusion of data from a significant importer[, [[                                  ]],  was] insufficient to

constitute substantial evidence on the record" and demonstrated that "the Commission failed to

adequately address an important aspect of the issue."  <u>DAK Americas I</u>, 456 F. Supp. 3d at 1359

(citing <u>Siemens Energy, Inc. v. United States</u>, 38 CIT __, __, 992 F. Supp. 2d 1315, 1324 (2014),

<u>aff'd</u>, 806 F.3d 1367 (Fed. Cir. 2015); <u>SKF USA, Inc. v. United States</u>, 263 F.3d 1369, 1382–83

(Fed. Cir. 2001)).   On remand, the Commission clarified that the significance of this data was

limited because [[                        ]] represented a significant volume of imports from [[          ]]

rather than [[                                                                              ]].

Remand Views at 18.  Further, the Commission explained that it excluded this data because of

certain inaccuracies and aberrancies in the information it provided to the Commission.  <u>Id.</u> at 18–

19.  Specifically, based on examination of the importer's questionnaire response, the Commission

concluded that "[[

                                        ]]" and that the data contained [[

                                        ]].  <u>Id.</u> at 18–19.  Further, because [[


                                        ]].  <u>Id.</u> at 19.  Thus,

the Commission again excluded this data.

Plaintiffs challenge the renewed exclusion of this data, arguing that, "[e]ven if [it] pertains only to one subject country in 2016, it represents almost [[      ]] of the import volume of that country in 2016, the year of the import surge that is the focus of this case" and therefore that "the Commission has failed to justify its continued decision to exclude entirely the [[         ]] pricing data." Pls.' Br. at 23–24. The Government responds that "[t]he Commission reasonably declined to include this 'aberrant' price data." Def.'s Br. at 11. Further, the Government explains that the Commission did not wholly disregard the impact of this importer because the Commission "used, 'the import volume and value data provided by [[          ]] in its importers' questionnaire," but simply excluded its price data for the reasons explained. Id. at 10–11.

The court concludes that the Commission complied with the remand instructions and affirms the Commission's decision to exclude [[            ]] indirect pricing data. The explanation regarding the relative weight of the data and the aberrancies requiring the data to be excluded remedies the deficiency in the Original Views of not addressing a significant aspect of the issue. The Commission did not entirely exclude data from this importer and sufficiently explained why it excluded the data it did. The court is unpersuaded by Plaintiffs' attempt to have the court reweigh this evidence. See Int'l Indus., 311 F. Supp. 3d at 1333 (directing the court to defer to the Commission's role as trier of fact); Coal. of Gulf Shrimp Indus., 71 F. Supp. 3d at 1365 ("The [Commission] has discretion to select a data set that it will use in its investigation . . . ."). Based on its explanation, there was a rational connection between the exclusion and the aberrancy of the data. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50.

### 3.    *Inclusion of [[            ]] Data*

The third issue identified by the court as to the Commission's selection of quarterly pricing data related to the Commission's inclusion of U.S. purchaser [[          ]] questionnaire response

and pricing data despite showing lower priced imports and overselling of subject imports, respectively. <u>DAK Americas I</u>, 456 F. Supp. 3d at 1360–61; <u>see also</u> Pls.' Mem. of L. in Supp. of Mot. for J. on Agency R. at 25, May 16, 2019, ECF No. 43. The court concluded that, while "there may be a reasonable explanation for the Commission's determination," the Commission erred by failing to provide any explanation of this decision. <u>DAK Americas I</u>, 456 F. Supp. 3d at 1361. On remand, the Commission explained that it continued to include this data because it found no contradiction in [[            ]] data or responses. Remand Views at 20. The importer [[

]] was asked as both a [[                ]] and importer whether PET resin imports were lower priced than domestically produced PET resin, which to the first it answered [[      ]] to a yes-no question and to the second it answered with numerical price data. <u>Id.</u> The Commission concluded that the general answer in response to the first questionnaire was context-specific and therefore had a limited value in the Commission's analysis of underselling. <u>Id.</u> at 20–21. Thus, it determined that the specific price data from the importer questionnaire to be "more probative for our price analysis than general comments about perceived price in the market and do not question the accuracy of either of its questionnaire responses." <u>Id.</u> at 22. Therefore, the Commission concluded that there was no inconsistency in including both the questionnaire response and quarterly price data in its analysis. <u>Id.</u> at 22.

Plaintiffs challenge the Commission's explanation by contending that it improperly weighed [[            ]] pricing data because its questionnaire indicated "[t]hat subject imports were [[                                    ]]." Pls.' Br. at 25. The Government characterizes Plaintiffs' position as proposing that the Commission exclude specific price data in favor of "a single answer to a yes-no question." Def.'s Br. at 12. The Government instead argues that the

Commission correctly "found [[            ]] specific price data more probative for its price analysis than general comments." Id. at 12.

The court affirms the Commission's inclusion of [[          ]] pricing data in light of its further explanation of this issue on remand. See Nippon Steel Corp., 458 F.3d at 1359 (noting that the court defers to the Commission as "the expert factfinder . . . to decide which side's evidence to believe"). The Commission adequately explained its decision; it is not the province of the court to reweigh this evidence. Int'l Indus., 311 F. Supp. 3d at 1333 (stating that the court affords the Commission "considerable discretion in evaluating information obtained from questionnaires.").

### C.    *Other Data and Questionnaire Responses Undermine the Commission's Conclusion*

In its original opinion, the court also identified several pieces of unaddressed or inadequately addressed evidence on the record that undermined the Commission's conclusion that there was no significant underselling in the U.S. PET resin market during the POI. Specifically, the court instructed the Commission to address on remand the following: (1) purchaser price rankings from questionnaires; (2) reported prices from purchasers who purchased subject imports instead of domestic; (3) pricing data for direct imports showing underselling; and (4) significant market share gains in a price-sensitive market characterized by product fungibility. DAK Americas I, 456 F. Supp. 3d at 1361–62. The Commission addressed each point on remand to explain why these issues did not undermine its no significant underselling determination.

### 1.    *Purchaser Price Rankings from Questionnaires*

The court previously noted that the record showed "twenty purchaser responses of underselling and only nine of overselling." Id. at 1361. However, the Commission simply noted that "we have considered this information, we do not believe it outweighs the actual price data we have collected that show that subject imports are typically higher priced" without further

explanation of how this determination reconciled with the rest of its determination. Id. (citing Original Views at 38 n.150). On remand, the Commission explained that it "do[es] not find that simply adding purchaser responses to a rating question is particularly meaningful in isolation, given that such an approach does not account for factors such as product mix and volumes represented by the responses." Remand Views at 34. As to the rankings, it found that "subject imports from three of the five subject countries were more often rated as comparably priced or higher priced than the domestic product, [and thus do not] compel[] a finding that the cumulated subject imports were generally priced lower than the domestic product, let alone significantly undersold the domestic product," especially "when considered alongside the detailed and comprehensive quarterly price data." Id. The Commission noted that, even considering an addition of responses in isolation, twenty purchasers indicated that imports and domestic product were comparably priced or higher priced to the twenty purchasers that indicated that imports were lower priced than the domestic product. Id. at 35. Thus, the Commission concluded that "the even split" in responses cannot outweigh "the comprehensive and data-specific quarterly price comparisons which show predominant overselling by the subject imports." Id.

Plaintiffs challenge this explanation as insufficient. Pls.' Br. at 17. Plaintiffs contend that the Commission cannot include answers indicating that imports were priced comparable to domestic product with those that indicated imports were priced higher than the domestic product because "[t]he proper analysis -- and the approach the Commission typically follows -- is to simply take off the neutral responses regarding comparability and not add them to either the higher- or lower-priced group." Id. at 19 n.17 (citing, e.g., Certain Crystalline Silicon Photovoltaic Products from China and Taiwan, Inv. Nos. 701-TA-511 and 731-TA-1246–47 (Final), USITC Pub. 4519 (Feb. 2015)). Additionally, Plaintiffs argue that the Commission did not request volume data

alongside the questionnaire responses, the Commission regularly relies upon these questionnaire

responses in its determinations, and that this determination is a piecemeal dismissal of purchaser

data without an assessment of the record as a whole.  Id. at 20.  The Government responds that

"the Commission employed a methodology in its price analysis that accounted for factors such as

product mix and volume."  Def.'s Br. at 14–15.  Further, the Government contends that the

Commission explained that Plaintiffs' proposed methodology "overlook[ed] the sheer volumes of

shipments . . . that were accounted for in the quarterly price comparisons" and that it "found the

coverage levels for the price data to be 'substantial.'"  Id. at 16 (quoting Remand Views at 34).

The Government also argues that "the results of Plaintiffs' approach [do not] outweigh the

Commission's comprehensive data-driven price comparisons showing predominant overselling by

the subject imports."  Id. at 15–16.

　　　　The court concludes that the Commission complied with the remand instructions in

providing this further explanation.  The court agrees with the Government that the methodology

employed by the Commission reasonably accounts for product mix and volume in accordance with

previous cases.  See Coal. of Gulf Shrimp Indus., 71 F. Supp. 3d at 1365 (deferring to the

Commission's methodology in selecting data and weighing product selection and volume

considerations); Whirlpool Corp. v. United States, 37 CIT 1775, 1786–87, 35 ITRD 2513 (2013)

(affirming the Commission's selection of import data based on product and volume

considerations); Def.'s Br. at 14–15.  While Plaintiffs note that the court's previous opinion

doubted the Commission's conclusion that there was no significant underselling based on the

quarterly pricing data of eight importers rather than the questionnaire responses of sixteen

importers, Pls.' Br. at 19; DAK Americas I, 456 F. Supp. 3d at 1361–62, the court now accepts the

Commission's decision in light of its explanation that it more heavily weighed the volume of

imports over the quantity of importers and more detailed quarterly pricing data over more general

narrative responses.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  As the Government notes,

19 USC § 1677(7)(C)(ii) does not require the Commission "to determine whether there has been

significant price overselling, or a lack of significant underselling and overselling" which a rating

of "comparable" may show, but rather "whether there has been significant price underselling."

Def.'s Br. at 16 n.15.  The court defers to the Commission's weighing of the evidence, including

its further explanation of how the Commission understands the questionnaire responses in relation

to the quarterly pricing data.  See Int'l Indus., 311 F. Supp. 3d at 1336.

### 2.  *Reported Prices from Purchasers Who Purchased Subject Imports Instead of Domestic*

The court also noted that the Commission failed to address or explain the weight of

evidence showing that "[e]leven of nineteen purchasers shifting from buying the U.S. product

reported the imports were lower-priced" and that "most purchasers' reported import prices were

lower."  DAK Americas I, 456 F. Supp. 3d at 1362.  Thus, the court concluded that this constituted

evidence that undermined the Commission's finding that underselling was not significant, and

overselling predominated.  Id.  On remand, the Commission addressed the data indicating that

eleven purchasers shifted to buying lower-priced imports by explaining that

> [t]hese responses do not specify quantities, prices, and time periods of purchasing,
> unlike the price data.  . . .  [O]nly four of those 11 purchasers who reported that
> subject imports were priced lower than the domestic product also reported that the
> lower price of the subject imports was a primary factor in purchasing decisions.
> Nor did any of those four purchasers report reducing their share of purchases from
> domestic sources over the POI.

Remand Views at 32–33 (footnotes omitted).  Furthermore, the Commission noted that the volume

of subject imports represented by these four purchasers was quite small, particularly when

compared to the volume of price data showing overselling.  Id. at 33.

Plaintiffs argue that "the Commission repeats the same error it committed [before], focusing on the reason the purchasers gave for the purchase rather than their report that imports were lower priced." Pls.' Br. at 17. Plaintiffs contend that "[t]his is the very approach the [c]ourt rejected because it goes to a different question than whether the imports were, in fact, lower priced." Id. at 17 (citing DAK Americas I, 456 F. Supp. 3d at 1362). Plaintiffs also claim that "[t]he Commission's volume-based" analysis "improperly ignores the significant volumes bought by all the purchasers that said imports were lower priced -- the key fact to be examined on remand." Id. at 17. The Government responds that "the Commission reasonably gave more weight in its analysis of underselling to the voluminous, specific price data" than the "yes-no responses" of these particular importers. Def.'s Br. at 17.

The court concludes that the Commission adequately addressed this evidence on remand. By providing further explanation and context for the responses, the Commission explained that it did consider this evidence and explained the weight it gave this evidence relative to other data on the record. Plaintiffs contend that the court previously rejected such an approach. That is not so. Rather, the court's previous opinion noted that the Commission failed to adequately address this evidence. Having explained its consideration of this evidence, the court defers to the Commission's determination as the expert trier of fact. See Nippon Steel Corp., 458 F.3d at 1359; Int'l Indus., 311 F. Supp. 3d at 1336.

### 3. *Direct Import Pricing Data Showing Underselling*

The court previously concluded that direct import pricing data "showed underselling in [[ ]] percent of comparisons," which "constitute[d] evidence that fairly undermine[d] the Commission's overselling finding . . . that the Commission failed to address." DAK Americas I,

456 F. Supp. 3d 1362.[7]  On remand, the Commission explained that of the four subject products, it received useable data for direct import pricing for just one product.  Remand Views at 29–30. The data did show that the value of those direct imports was lower than those for the domestic product; however the volume was "small relative to the total volume of subject imports and to the volume of importers' sales of subject imports that oversold the domestic product."  Id. at 30 (explaining that the direct imports showing underselling composed just a quarter of the volume of the imports showing overselling).  Further, the Commission explained that comparison of direct imports to all subject imports was limited by the fact that direct imports "do not capture other costs beyond the landed duty-paid costs that importers may incur."  Id. at 31.

Plaintiffs contend that the "Commission repeats exactly what it said in the original determination," i.e. "that the volume of direct imports was less than the volume of indirect imports."  Pls.' Br. at 21.  Further, Plaintiffs argue that the Commission did not "consider this evidence of underselling on direct import sales in conjunction with the other record data," but rather "again simply compares the volumes . . . and finds the direct sales volumes to be outweighed by the [quarterly price] sales volumes."  Id.  The Government responds that "the Commission did not find that the purchase cost data for [direct imports] reflected price 'underselling' but instead reflected 'generally lower' values."  Def. Br. at 18–19 (citing Remand Views at 30).  Therefore, the Government argues that "the Commission reasonably found that the purchase cost data for [direct imports] . . . was not as probative to the Commission's price analysis as the actual

---

[7] Relatedly, the court remanded for further explanation by the Commission its exclusion of [[
          ]] direct quarterly pricing data showing underselling.  DAK Americas I, 456 F. Supp. 3d at 1362.  The court addresses this specific issue in combination with the Commission's further explanation of its exclusion of [[                              ]] data above.  See Sec. I.B.1. supra.

[quarterly] price data showing predominant overselling." Id. at 20 (citing Remand Views at 30–31).

The court concludes that the Commission's further explanation that the purchase cost data for direct imports showing lower costs does not undermine its no significant underselling conclusion and complies with the remand instructions.[8]  Because the Commission provided adequate explanation of the limited comparability and smaller relative volumes of direct import data with quarterly price data, the court defers to the Commission in the weight it assigns this evidence.  See Int'l Indus., 311 F. Supp. 3d at 1336.  As to Plaintiffs' contention that the Commission did not consider this evidence in conjunction with other record evidence tending to show underselling, the court notes that the Commission showed that it did consider the direct import data in its underselling analysis, but ultimately concluded that the quarterly price data was "paramount and the most probative price information."  Remand Views at 16.  The Commission addressed the fact that the direct import data was underinclusive of costs as compared to quarterly price data and that the [[                                                                          ]] were related to the supply constraints discussed in detail below.  Id. at 8–10, 15.  This provides sufficient explanation to support the Commission's conclusions and for the court to conclude that this determination was based on substantial evidence.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

### 4.    *Significant Market Share Gains in a Price-Sensitive Market Characterized by Product Fungibility*

Finally, the court previously noted that the Commission's conclusion that the U.S. PET resin market was highly price-sensitive and characterized by product fungibility warranted further explanation because of Plaintiffs' argument that "subject imports' market share gains came at the

---

[8] As discussed, the court also rejects Plaintiffs' contention that the Commission erred by not combining direct import pricing data with quarterly pricing data.  See supra n.5.

same time as domestic industry's lost market share, and that the domestic industry suffered a steep

decline in financial condition during the POI." <u>DAK Americas I</u>, 456 F. Supp. 3d at 1362.  On

remand, the Commission explained that

> increased imports by the domestic producers themselves account for an equivalent
> percentage of the loss of market share by domestically produced product.  The
> domestic industry's own imports of PET resin in 2016 thus explain most . . . of the
> 5.4 percentage-point decline in the domestic industry's market share that year, and
> by their own representations the imports were due to the domestic industry's supply
> limitations, not a need to access low-priced imports to compete in the market.

Remand Views at 50.  This added further explanation to the Commission's statement in the

Original Views that, despite increasing demand and increased shipments by the domestic industry

during the POI, the imports "did not significantly undersell the domestic like product" but that the

domestic industry "ceded some market share . . . for non-price reasons" as evidenced by the

domestic industry's improved financial condition in 2016 and higher-priced imports throughout

the POI.  Original Views at 45.

Plaintiffs contest this explanation for the subject import market share gains.  In their view,

domestic producers increased imports because the price-sensitive U.S. PET resin market was

flooded with low-priced imports.  Pls.' Br. at 14.  Plaintiffs note that "Congress and the

Commission have recognized that imports by a domestic producer based on a need to meet

customer price demands reflect defensive efforts to survive, not a self-inflicted injury."  <u>Id.</u>

Further, Plaintiffs contend that "[t]he Commission does not address why, if there was a shortage

in the market, non-subject imports did not gain market share along with subject imports."  <u>Id.</u>  The

Government responds that the Commission's year-by-year focus and examination of the domestic

industry's own importation behavior supports its conclusion that the domestic industry contributed

to domestic production market share loss rather than being caused by competition from lower-cost

imports.  Def.'s Br. at 28–29.

The court notes that Plaintiffs' continued dispute with the Commission on the question of market share depends upon the court's acceptance or rejection of the Commission's re-examined findings regarding the U.S. PET resin market. Because the Commission on remand re-examined the record to explain that in addition to price-sensitivity, the U.S. PET resin market was also subject to availability and quality, which the court accepts, Plaintiffs' arguments carry less weight. Furthermore, the court accepts the Commission's explanation of the existence of supply constraints throughout the POI, discussed in detail below, that provides further reconciliation and support for the Commission's finding of no significant underselling despite increased imports and loss of market share by the domestic industry. See Remand Views at 6–12. This discussion includes consideration of the domestic industry's non-subject imports in comparison to subject imports, directly contrary to Plaintiffs' claims. See, e.g., Remand Views at 9 ("[T]he domestic industry's imports of subject PET resin rose faster and by larger amounts[] and increased its share of the U.S. market at a greater rate, than its imports of nonsubject PET resin."). Because of the Commission's added explanation of market conditions and supply constraints, the court concludes that the Commission's re-examination of the domestic industry's market share losses was based on substantial evidence and in accordance with the remand instructions.

In short, the court concludes that the Commission complied with the court's instructions to further explain its "no significant underselling" conclusion, including its added analysis of market conditions, consistency with prior determinations, selection of price data, and the relative weight it assigned varying pieces of evidence. The court now affirms the Commission's determination that there was no significant underselling by imports in the U.S. PET resin market during the POI as based on substantial evidence and in accordance with law.

**II.      The Commission's Conclusion that Supply Constraints Caused Domestic Industry Market Share Loss Is Based on Substantial Evidence.**

In <u>DAK Americas I</u>, the court held that "the Commission's conclusion -- that supply constraints rather than underselling were the cause of market share shifts -- is unsupported by substantial evidence." 456 F. Supp. 3d at 1363.  In reaching this conclusion, the court identified four aspects of the record and the Commission's determination that undermined its conclusion: (1) the Commission identified no specific supply constraints prior to October 2016; (2) the majority of narrative responses solely cited post-October 2016 supply constraints; (3) the Commission's determination was inconsistent with its prior determinations that later-in-time supply constraints cannot explain earlier-in-time subject import increases; and (4) the Commission failed to adequately respond to conflicting evidence.  <u>Id.</u> at 1363–66.  On remand, the Commission again found supply constraints in the domestic industry's ability to supply U.S. demand throughout the POI.  Remand Views at 5.  The Commission provided additional explanation of this finding, including evidence supporting that there were supply constraints throughout the POI, addressed the evidence the court previously identified as conflicting, and distinguished seemingly inconsistent determinations cited by the court.  <u>Id.</u> at 5–12, 48–51.

**A.      Evidence of Supply Constraints Throughout the POI**

The court previously noted that the Commission's Original Views focused on evidence occurring late in the POI to explain the supply constraints throughout the POI.  This evidence included Hurricane Matthew in October 2016, Hurricane Harvey in August 2017, and the bankruptcy of domestic supplier M&G in September 2017.  <u>DAK Americas I</u>, 456 F. Supp. 3d at 1363–64.  The court concluded that, when examined together and separately, these events could not account for the Commission's conclusion that supply constraints throughout the POI caused the market shifts away from the domestic industry to imports.  <u>Id.</u>

On remand, the Commission addressed this conclusion and provided further explanation of the evidence supporting domestic industry supply constraints. First, the Commission noted that purchaser responses indicating domestic supply constraints "were [not] limited to any fixed interval during the POI, and the absence of any such time circumscription does not suggest that the constraints were confined to latter portions of the POI." Remand Views at 6 ("U.S. purchasers testified that supply constraints began early in 2015."). Rather, the Commission explained that "domestic producers kept their capacity generally static throughout the POI under the assumption that [the construction of M&G's planned production facility in Corpus Christi] would bring on additional capacity that could meet the growing demand," beginning in 2015 and "were known and relevant for years prior to October 2017, and at least as early as October 2015." Id. at 7–8. Further, as discussed above, the Commission pointed to the domestic industry's own increase in imports as indication of supply constraints. Id. at 8–10. As discussed, the Commission noted that quality and availability were important factors to purchasers' decisions, including for "[t]en of 14 purchasers that switched to subject imports" who detailed supply constraints since 2015. Id. at 11–12, 51.

Plaintiffs again contest the Commission's finding of supply constraints throughout the POI. Plaintiffs argue that the Commission's contention "that unspecific supply constraint claims must have occurred before October 2016 is not substantial evidence" because "[o]nly three out of 10 purchasers identified specific domestic supply constraints all of which occurred after October 2016." Pls.' Br. at 5 (citing Original Views at V-31–V-33). Plaintiffs also challenge the Commission's continued reliance on purchaser narratives and its added reliance on hearing testimony as further evidence of its conclusion. Id. at 4–6. Therefore, Plaintiffs argue that, "contrary to the Commission's unsupported conclusion that the domestic industry intentionally

constrained supply to make way for M&G, the record shows that the domestic industry was trying to make up ground in the wake of the 2016 trade relief, but such efforts were stunted by the next subject import wave."  Id. at 11; id. at 11 n.10 ("It is absurd to suggest . . . that the domestic industry 'chose not to expand capacity' . . . as opposed to the rational, record-based explanation that it simply could not do so after being hammered by one group of unfairly-untraded imports and immediately facing another.").   The Government responds that, "[i]n combination with the questionnaire responses . . . indicating supply constraints beginning in 2015 and through 2016 and the domestic industry's own importation behavior, the Commission reasonably found 'that this sworn witness testimony about market conditions over a span of years beginning in late 2014 evinces that the [supply] constraints spanned the POI."  Def.'s Br. at 25 (quoting Remand Views at 48).

        Given the additional explanation by the Commission, the court affirms the Commission's conclusion that supply constraints were the cause of domestic industry ceding market share rather than low-priced imports.  The Commission added explanation and pointed to specific supporting evidence in accordance with the court's instructions.  Plaintiffs' arguments to the contrary are unavailing.   Contrary to Plaintiffs' claim, the court did not "reject" purchaser narratives as supportive of supply constraints.  See Pls.' Br. at 4–6.  Rather, the court noted aspects of the purchaser narratives that were unaddressed or unexplained in light of the Commission's conclusions regarding supply constraints.  DAK Americas I, 456 F. Supp. 3d at 1364.  The Commission has now reconciled that evidence with its conclusion about domestic supply constraints and the court accepts that conclusion as based on substantial evidence.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  That the domestic industry could not meet increased demand during the POI, does not, as Plaintiffs contend, indicate that the domestic industry was necessarily

harmed by imports.  See Pls.' Br. at 14.  Rather, as the Commission explained, the domestic

industry's inability to supply domestic demand caused increased purchases of imports, even in

instances where the imports were higher priced.   Remand Views at 51.   The Commission

sufficiently explained that this choice made by the domestic industry was made in light of a market

that anticipated further domestic production at the M&G facility, which was unexpectedly delayed

and then cancelled as the POI proceeded that left the domestic industry unable to effectively supply

the domestic market as planned.  Id. at 7–8.  Similarly, the Commission's reliance on hearing

testimony that may have been contradicted elsewhere in the record was also explained and based

on substantial evidence.[9]    Thus, the court disagrees with Plaintiffs' contention that the

Commission's explanation of supply constraints was absurd.  Rather, the court, faced with two

plausible explanations of record evidence, defers to the Commission as the expert factfinder.  See

Nippon Steel Corp., 458 F.3d at 1359.  The court accepts the Commission's explanation of its

conclusion that supply constraints caused the domestic industry to cede market share in light of its

analysis of hearing testimony, purchaser narratives, direct import data, and quarterly price data.

See id. at 1358; Int'l Indus., 311 F. Supp. 3d at 1333.

---

[9] Plaintiffs contend that the testimony cited by the Commission was based on impermissible speculation "that domestic producers did not raise their prices in 2016 in the face of Corpus Christi coming online -- a different point than the Commission's interpretation of early supply constraints." Pls.' Br. at 9.  By contrast, the Government claims that "Graham Packaging stated that during the preliminary phase of these investigations, it testified about product shortages. During the preliminary phase, it testified about the effect of M&G's anticipated production facility on the market 'every year since 2015.'" Def.'s Br. at 25 n.24 (citation omitted).  The Government also responds that "Plaintiffs seem to divorce the economic effects of supply and demand on price by arguing that witnesses could not speak about price and supply at the same time when testifying that the start up delay of M&G's anticipated production facility, during 2015 and 2016, did not increase prices despite increased demand because of domestic competition." Id.  The court agrees with the Government and rejects Plaintiffs' attempt to have the court re-weigh conflicting hearing testimony.

### B.    *Consistency with Prior Determinations*

In previously determining that the Commission's conclusion regarding domestic industry supply constraints was unsupported by substantial evidence, the court pointed to previous decisions by the Commission in which it noted that "supply constraint events that follow subject import increases cannot be the cause of them." DAK Americas I, 456 F. Supp. 3d at 1364. The court therefore ordered the Commission to address Certain CRS Products and Cold-Rolled Steel Flat Products on remand and to explain or reconcile any inconsistencies between those decisions and its remand determination. Id. at 1364–65. As instructed, the Commission addressed those prior determinations. Remand Views at 48–49. The Commission noted that in those determinations it found that the "supply constraints could not explain 'the magnitude and duration' of the increase in subject imports." Id. at 48. However, here the Commission found that the "market conditions keyed to M&G's construction that began in 2014 and affected market participant's behavior throughout the POI" including the domestic industry's own increased imports of PET resin could explain the imports throughout the POI. Id. at 49. Further, the events occurring later in the POI "exacerbated these already existing supply constraints." Id. Thus, unlike the two prior determinations, the supply constraints identified by the Commission in this investigation were not similarly limited in duration or magnitude. Id. at 51.

Plaintiffs argue that these distinctions "ignore[] that the acute supply shortage on record here was also limited -- in fact limited to the latter part of the period and after the subject import surge, making [Certain CRS Products and Cold-Rolled Steel Flat Products] highly relevant." Pls.' Br. at 13–14 n.13. Similarly, Plaintiffs argue that "[t]he Commission's mischaracterization of this underlying record as showing supply shortages 'throughout the POI' also improperly conflates the long-term condition of the domestic industry's capacity to supply the entire U.S. market with the

acute supply factor of M&G's bankruptcy in October 2017." Id.  In support of the Commission's

position on these past determinations, the Government explains that the Commission "cited various

factors examined in the other cases that distinguished the other cases from the facts of the instant

investigations."  Def.'s Br. at 22.

The court concludes that the Commission complied with the remand instructions by further

explaining its conclusion regarding the existence of supply constraints throughout the POI and by

distinguishing these cases based on the more limited timing of supply constraints in those

decisions.  The Commission properly distinguished those decisions based on its determination that

"the prior determinations are inapposite such that it is not in fact a departure at all." DAK Americas

I, 456 F. Supp. 3d at 1356 (citing Atchison, Topeka & Santa Fe Ry., 412 U.S. at 808; British Steel

PLC, 127 F.3d at 1475; Chisholm, 656 F.2d at 47); see also id. at 1354–55 (discussing Cleo, 501

F.3d at 1298–99; Usinor, 26 CIT at 792).  Plaintiffs' arguments to the contrary rely upon their

view that the Commission's supply constraints conclusion was erroneous.  Thus, for the reasons

stated above, the court also rejects this challenge.

### C.    *Conflicting Arguments and Evidence*

Finally, the court ordered the Commission to address conflicting arguments and evidence

weighing against its conclusion regarding the domestic industry's supply constraints.  Id. at 1365–

66.  Specifically, the court asked the Commission to further address (1) its conclusion that domestic

producers' own increase in imports supported its supply constraints conclusion when those imports

represented a small portion of the subject imports during the POI; (2) purchaser narratives citing

post-October 2016 supply constraint events; and (3) the increase in subject imports despite being

higher-priced.  Id.  On remand, the Commission addressed these points.  First, as to domestic

producers' own imports, the Commission noted that "by their own representations the imports

were due to the domestic industry's supply limitations, not a need to access low-priced imports to compete in the market."  Remand Views at 50.  The Commission also explained that the purchaser questionnaire responses indicated supply constraints by the domestic industry throughout the POI because of increased demand and static production.  Id. at 5.  Finally, the Commission explained, "[o]f 25 responding U.S. purchasers, 19 reported supply constraints since the beginning of 2015. . . .  Other purchasers reported that, since the beginning of 2015, a number of different issues caused supply constraints, including domestic producers placing many customers on allocation, delayed deliveries, and unavailability due to weather."  Id. at 5–6.

Plaintiffs contest each of these points.  First, Plaintiffs argue that "[t]he [c]ourt decisively held that" there was no substantial evidence for "U.S. producers' decision to increase imports was indicative of supply constraints throughout the period."  Pls.' Br. at 6.  Second, Plaintiffs' argue that the Commission mistakenly emphasizes domestic producers' non-subject imports rather than examining the impact its subject imports had on market share loss and the impact by imports of non-producers, together.  Id. at 7.  Finally, Plaintiffs argue that without this evidence, the Commission failed to address "the record [or] other evidence that would support its conclusion." Id. at 8.  The Government responds that Plaintiffs mischaracterize the court's previous opinion that ordered the Commission to address conflicting evidence and did not reject that evidence.  Def.'s Br. at 29 n.26.  Rather, it argues that the Commission's finding regarding the domestic producers own imports "is important to demonstrate the choice that domestic producers made to import instead of produce PET resin themselves, regardless of the amount of excess production capacity they reported to possess."  Id. at 28.

The court concludes that the Commission adequately addressed the enumerated pieces of conflicting evidence in its remand decisions in accordance with the court's instructions.  First, the

Commission's explanation that the domestic industry's imports, despite being small relative to the subject import increase, contributed to its market share loss provides adequate explanation of the Commission's understanding of this evidence. See Remand Views at 9–10. That plus the domestic industry's own representations that its imports were not caused by a need to compete with low-cost imports also explains why there were increased imports that were higher priced. The court is not persuaded by Plaintiffs' additional challenges on these points, as the court did not reject any reliance on this evidence, DAK Americas I, 456 F. Supp. 3d at 1365–66, and the Commission itself did not rely exclusively on the disputed evidence, but rather incorporated it as part of its larger explanation of domestic industry supply constraints. Remand Views at 9. Thus, as the expert decisionmaker, the Commission is entitled to deference even when reasonable minds may disagree about the evidence. Nippon Steel Corp., 458 F.3d at 1359.

Finally, Plaintiffs identify additional pieces of evidence that they claim also conflict with the Commission's supply constraint conclusion but which the Commission did not address. Specifically, Plaintiffs cite (1) testimony from purchasers and respondents' counsel that there were no supply shortages until later in the POI, Pls.' Br. at 11; (2) "evidence of U.S. producers' low capacity utilization, lost market share, and declining profitability," id. at 12; (3) evidence that the domestic industry was able to increase its capacity utilization that undermines the Commission's "conclusion that the domestic industry was unable or unwilling to supply the U.S. market," id.; (4) previous cases in which the Commission stated that material injury is not precluded by reason of subject imports where the domestic industry could not satisfy the demand because of supply constraints, id. at 13 & n.12 (citing Citric Acid and Certain Citrate Salts from Belgium, et al., Inv. Nos. 731-TA-1374–76 (Final), USITC Pub. 4799 (July 2018) ("Citric Acid"); Frozen Warmwater Shrimp from China, et al., Inv. Nos. 701-TA-491-493, 495, and 497 (Final), USITC Pub. 4429

(Oct. 2013); Utility Scale Wind Towers From China and Vietnam, Inv. Nos. 701-TA-486 and 731-TA-1195–96 (Final), USITC Pub. 4372 (Feb. 2013); Small Diameter Graphite Electrodes From China, Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 (Feb. 2009)); (5) their contention that increased domestic producer imports were caused by a price-sensitive market flooded with low-priced imports, id. at 14; and (6) the fact that non-subject imports did not gain market share along with subject imports given the shortage in the market, id.

The court does not agree that the Commission has not addressed these pieces of evidence and arguments. The Commission addressed each of these pieces of evidence in its Remand Views, drew reasonable inferences, and explained how it weighed the evidence on the record. Remand Views at 6–7, 46–49 (addressing hearing testimony); id. at 51–53 (addressing domestic industry capacity utilization, lost market share, declining profitability); id. at 6–7 (addressing domestic industry's capacity utilization); id. at 8–9 (addressing domestic industry's increased imports); id. (comparing the volume and impact of non-subject imports). Plaintiffs' citations to allegedly unaddressed evidence boil down to an attempt to re-weigh the evidence or draw their own inferences from the evidence. However, the court defers to the Commission as the expert fact finder and declines to disturb the Commission's findings. Nippon Steel Corp., 458 F.3d at 1359. As to the previous decisions in which material injury is not precluded by reason of supply constraints, Plaintiffs' citations only support that the presence of supply constraints does not always preclude a material injury finding, not that there are never occasions in which the presence of supply constraints explains domestic industry rather than harmful imports. See, e.g., Citric Acid at 31–32 (noting "that the fact that a domestic industry may not be able to supply all of demand does not mean that it cannot be materially injured" . . . but ultimately concluding that supply constraints were not "so significant as to explain the significant and increasing volume of subject

imports"). The Commission adequately explained that the domestic supply constraints in the U.S.

PET resin market during the POI precluded such a finding in this instance, and thus the prior cases

are inapposite. See Remand Views at 5–8.

In short, the court upholds the Commission's further explanation of its conclusion that supply

constraints, rather than low-priced imports, caused any harm to the domestic industry as based on

substantial evidence and in accordance with law.

### III.    The Court Sustains the Commission's No Adverse Impact Determination.

Based on the Commission's conclusions that there was no significant underselling of

subject imports and that domestic supply constraints caused the surge in imports during the POI,

the Commission concluded that there was no adverse impact or material injury to the domestic

industry caused by subject imports.  In examining the Commission's Original Views, the court

concluded that the previously enumerated deficiencies with the Commission's underselling and

supply constraint conclusions undermined its adverse impact determination. DAK Americas I,

456 F. Supp. 3d at 1366–67.  Further the court noted that the domestic industry's poor financial

indicators during the POI compared to the post-POI period after subject imports receded also

undermined the no adverse impact decision regardless of some evidence indicating domestic

industry improvement in 2016. Id.

On remand, the Commission stated that "[h]aving reexamined and supplemented our

impact findings based on the [c]ourt's instructions, we again find that subject imports did not have

a significant impact on the domestic industry."  Remand Views at 53.  For the reasons discussed

extensively above, the court concludes that the Commission's reliance on its no significant

underselling and domestic supply constraints conclusions to support its adverse impact

determination is supported by substantial evidence in light of the Remand Views.  Regarding the

domestic industry's financial indicators, the Commission on remand noted that "[t]he responses regarding lost sales and lost revenue likewise reflect near unanimous reporting by purchasers that domestic producers had supply issues." Id. at 51.  Further, the Commission stated that "the domestic industry's condition improved in 2016, the year with the most significant increase in subject imports" yet "subject imports predominantly oversold the domestic like product in 2016." Id. at 52.  Similarly, the Commission concluded that "the domestic industry increased its domestic shipments each year of the POI, including 2016, and its full-year capacity utilization rate was the highest on the record in 2016." Id.

Plaintiffs rely on their arguments regarding the Commission's underselling and supply constraint conclusions to contend that the Commission's no adverse impact determination is again unsupported by substantial evidence. Pls.' Br. at 29.  In support of the Commission's conclusion, the Government argues that "[h]aving provided a more detailed explanation of its findings that subject imports predominantly oversold the domestic like product and that supply constraints occurred throughout the POI, the Commission on remand likewise provided further detail in its impact analysis." Def.'s Br. at 30.  Thus, it contends that "[b]ased on the totality of evidence in the record, the Commission reasonably concluded again that the subject imports did not have a significant impact on the domestic industry." Id. at 31.

The court concludes that the Commission's "no adverse impact" determination as explained in the Remand Views is based on substantial evidence and consistent with the remand instructions.  Having remedied the previously identified deficiencies regarding its underselling and supply constraint conclusions, the Commission has also provided further explanation and support for its no adverse impact determination.  As to the domestic industry's financial conditions, the court concludes that the Commission's explanation as to why any declines were not related to

subject imports was reasonable and based on substantial evidence.  See <u>Motor Vehicle Mfrs. Ass'n</u>,

463 U.S. at 43.  Therefore, the court sustains the Commission's "no adverse impact" determination.

**CONCLUSION**

For the reasons stated above, the court sustains the Remand Views and enters judgment in

favor of the Government.

**SO ORDERED.**

<u>/s/  *Gary S. Katzmann*</u>
Judge

 Dated:  <u>May 3, 2021</u>
  New York, New York